Dmitri Iglitzin, WSBA No. 17673
Darin M. Dalmat, WSBA No. 51384
Gabe Frumkin, WSBA No. 56984
BARNARD IGLITZIN & LAVITT LLP
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6003
iglitzin@workerlaw.com
dalmat@workerlaw.com
frumkin@workerlaw.com

Aaron Streepy, WSBA 38149
Jim McGuinness, WSBA 23494
STREEPY LEMONIDIS CONSULTING & LAW GROUP, PLLC
2800 First Avenue, Suite 211
Seattle, WA 98121
Telephone: (253) 528-0278
Fax: (253) 528-0276
aaron@slglc.com
jim@mcguinnessstreepy.com

*Attorneys for Plaintiff Faye Guenther*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

| | |
|---|---|
| FAYE IRENE GUENTHER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH H. EMMONS, individually, and OSPREY FIELD CONSULTING LLC, a limited liability company,<br><br>Defendants. | No. 2:22-cv-00272-TOR<br><br>**DECLARATION OF COUNSEL DARIN M. DALMAT IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

DECLARATION OF DALMAT ISO MOTION FOR SUMMARY JUDGMENT – Page 1
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

I, Darin M. Dalmat, hereby declare and state as follows:

1.  I am one of the attorneys representing Plaintiff Faye Irene Guenther and the involved parties, James G. McGuiness and Aaron Streepy in this matter.

2.  Attached as **Exhibit 1** is a true and correct copy of email correspondence dated from July 27, 2021, to July 29, 2021, bates stamped UFCW-EMMONS_000987–990. UFCW produced this email correspondence in discovery.

3.  Attached as **Exhibit 2** is a true and correct copy of email correspondence dated September 10, 2021, bates stamped UFCW-EMMONS_000899–901. UFCW produced this email correspondence in discovery.

4.  Attached as **Exhibit 3** is a true and correct copy of email correspondence dated November 13, 2021, bates stamped UFCW-EMMONS_000923–924. UFCW produced this email correspondence in discovery.

5.  Attached as **Exhibit 4** is a true and correct copy of excerpts from the transcript of the deposition of Faye Guenther taken on May 13, 2024.

6.  Attached as **Exhibit 5** is a true and correct copy of excerpts from the transcript of the deposition of Adam Jackson taken on March 11, 2024.

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

7. Attached as **Exhibit 6** is a true and correct copy of email correspondence dated November 13, 2021, bates stamped UFCW-EMMONS_000162–167. UFCW produced this email correspondence in discovery.

8. Attached as **Exhibit 7** is a true and correct copy of excerpts from the transcript of the deposition of Michael Selvaggio taken on October 12, 2023.

9. Attached as **Exhibit 8** is a true and correct copy of deposition exhibit 4 which was introduced at the deposition of Michael Selvaggio taken on October 12, 2023.

10. Attached as **Exhibit 9** is a true and correct copy of a screenshot of a text message produced in discovery by UFCW Local 367 bates stamped Hines sub resp. 030.

11. Attached as **Exhibit 10** is a true and correct copy of a document produced in discovery by UFCW Local 3000, bates stamped RFP Resp. No. 2 - 002095.

12. Attached as **Exhibit 11** is a true and correct copy of screenshots of a Facebook post in the Facebook group Local 367 Members Forum, produced in discovery by UFCW Local 3000, bates stamped RFP Resp No. 2 - 002099–2100.

DECLARATION OF DALMAT ISO MOTION
FOR SUMMARY JUDGMENT – Page 3
Case No. 2:22-cv-00272-TOR

13. Attached as **Exhibit 12** is a true and correct copy of email correspondence dated December 21–22, 2021, bates stamped UFCW-EMMONS_000925. UFCW produced this email correspondence in discovery.

14. Attached as **Exhibit 13** is a true and correct copy of excerpts from the transcript of the deposition of Joseph H. Emmons taken on September 6, 2023.

15. Attached as **Exhibit 14** is a true and correct copy of an email and letter dated August 15, 2022, bates stamped UFCW-EMMONS_000029–32. UFCW produced this email and letter in discovery.

16. Attached as **Exhibit 15** is a true and correct copy of an email from Marc Perrone to Daniel Clay dated November 3, 2023, bates stamped UFCW-EMMONS_000936. UFCW produced this email in discovery.

17. Attached as **Exhibit 16** is a true and correct copy of an email from Marc Perrone dated November 3, 2023, bates stamped UFCW-EMMONS_000937. UFCW produced this email in discovery.

18. Attached as **Exhibit 17** is a true and correct copy of deposition exhibit 8 which was introduced at the deposition of Michael Selvaggio taken on October 12, 2023.

DECLARATION OF DALMAT ISO MOTION FOR SUMMARY JUDGMENT – Page 4
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

19. Attached as **Exhibit 18** is a true and correct copy of deposition exhibit 6 which was introduced at the deposition of Michael Selvaggio taken on October 12, 2023.

20. Attached as **Exhibit 19** is a true and correct copy of photos produced in discovery by UFCW Local 3000 bates stamped RFP Resp No. 2 - 002111–2116.

21. Attached as **Exhibit 20** is a true and correct copy of deposition exhibit 7 which was introduced at the deposition of Michael Selvaggio taken on October 12, 2023.

22. Attached as **Exhibit 21** is a true and correct copy of the Common Interest Privilege Agreement executed on June 29, 2022, bates stamped EMM_000001–9. Defendant Emmons produced this document in discovery.

23. Attached as **Exhibit 22** is a true and correct copy of the July 12, 2021, letter from Beverly G. Grant, excluding its exhibits. The name of the complaining member has been redacted to preserve her privacy.

24. Attached as **Exhibit 23** is a true and correct copy of a screenshot of a text message, bates stamped UFCW-EMMONS_000953. UFCW produced this screenshot in discovery.

DECLARATION OF DALMAT ISO MOTION
FOR SUMMARY JUDGMENT – Page 5
Case No. 2:22-cv-00272-TOR

25. Attached as **Exhibit 24** is a true and correct copy of a screenshot, with the member's name redacted, produced in discovery by UFCW Local 367 bates stamped Hines sub resp. 009.

26. Attached as **Exhibit 25** is a true and correct copy of a screenshot produced in discovery by UFCW Local 367, bates stamped Hines sub resp. 010.

27. Attached as **Exhibit 26** is a true and correct copy of the Confidential Settlement and Release Agreement executed on August 19, 2021. The claimant's name has been redacted to preserve her privacy.

28. Attached as **Exhibit 27** is a true and correct copy of UFCW Local 367's Minutes dated July 29, 2021. Local 367 produced these in discovery.

29. Attached as **Exhibit 28** is a true and correct copy of UFCW Local 367's Minutes dated June 16, 2021, and July 1, 2021. Local 367 produced these in discovery.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Executed on this 27th day of September, 2024.

*s/Darin M. Dalmat*
Darin M. Dalmat, WSBA No. 51384
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6028
dalmat@workerlaw.com

DECLARATION OF DALMAT ISO MOTION
FOR SUMMARY JUDGMENT – Page 6
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

## DECLARATION OF SERVICE

I hereby certify that on the date noted below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

| PARTY/COUNSEL | DELIVERY INSTRUCTIONS |
|---|---|
| Ambika Kumar<br>Sara A. Fairchild<br>Davis Wright Tremaine LLP<br>920 Fifth Ave., Ste. 3300<br>Seattle, WA 98104<br>ambikakumar@dwt.com<br>sarafairchild@dwt.com | ☐ Hand Delivery<br>☐ Certified Mail<br>☐ Facsimile<br>☐ E-mail<br>☐ U.S. Mail<br>☒ E-Service |
| John A. DiLorenzo<br>Davis Wright Tremaine LLP<br>560 SW 10th Ave., Ste. 700<br>Portland, OR 97205<br>johndilorenzo@dwt.com | ☐ Hand Delivery<br>☐ Certified Mail<br>☐ Facsimile<br>☐ E-mail<br>☐ U.S. Mail<br>☒ E-Service |

DATED this 27th day of September, 2024 at Seattle, Washington.

By: _____
Esmeralda Valenzuela, Paralegal

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

# EXHIBIT 1

| | |
|---|---|
| **From:** | "Michael Hines" <mhines@ufcw367.org> |
| **Sent:** | Thu, 29 Jul 2021 01:01:42 +0000 (UTC) |
| **To:** | "Daniel Clay" <dclay@ufcw555.org> |
| **Cc:** | "Marc Perrone" <mperrone@ufcw.org>; "Lisa Pedersen" <lpedersen@ufcw.org>; "John Bishop" <jbishop@ufcw555.org>; "Kate Meckler" <kmeckler@ufcw.org> |
| **Subject:** | Re: Request for International Research Support: Side by side between UFCW 555 and UFCW 21 |

Thank you Dan,

I can confirm this complaint is representative of 367's concerns. I would also like to reserve the right to bring forward additional concerns regarding actions by Local 21 that are detrimental to our membership and will provide details shortly.

Sincerely,

Michael Hines
Secretary Treasurer
UFCW 367
Sent from my iPhone

> On Jul 28, 2021, at 3:07 PM, Daniel Clay <dclay@ufcw555.org> wrote:

Dear President Perrone,

I am writing to file a formal complaint that UFCW Local 21 is actively interfering with Local 555 and 367's retail bargaining table. This interference is having a detrimental impact on Local 555 and our membership.

As you may know, on July 21st UFCW Local 555 informed other UFCW Region 7 Presidents of our pending merger with Local 368A as well as our agreement with Local 367 to collaborate on retail bargaining. As of Thursday of last week, we began bargaining with the retail employers and informed Fred Meyer, Allied Employers, and Safeway/Albertsons of our intent to bargain jointly with Local 367. A Representative of UFCW Local 367 has joined us at our bargaining table both last and this week.

Yesterday, UFCW Local 21 President Faye Guenther reached out to Region 7 Director Kate Meckler to inform the Region of her intent to intervene in both Local 555 and 367's negotiations as well as demand the International invoke Article 23 of the International Constitution should UFCW 367 continue to bargain with Local 555. The email below is proof of Local 21 following though on this threat. Local 555 finds it outrageous that a Union Leader within the UFCW family would attack another UFCW's bargaining table.

To be clear, we have only had two days of bargaining with each of the retail employers and have only requested the employers agree to a joint bargaining table for 555, 368A, and 367. Nothing else has been offered or agreed to at this time. However, Local 21 seems to make wild accusations in the email below regarding Local 555's retail contracts, labeling them as cheaper and less rich. Local 21 further mischaracterizes Local 555's concerns over the secrecy and lack of a coherent strategy around the white paper tactic as a statement that 555 doesn't see strike preparation as strategic. We will assume President Guenther was just mistaken as she wasn't available for the Region 7 and 8 bargaining discussion in LA.

The email below makes clear President Guenther will take action to prevent Local 367 members and their elected leadership from exercising autonomy and deciding for themselves what is best for them. She states her intention and outlines her plan to do so under the guise of members being "harmed" and moved to a "substandard contract." It is clear that Local 21 not only thinks they are the Leadership of UFCW 367 but intends to interfere further and substitute their judgement for that of the elected leadership and membership.

Also, Local 21's reference to Local 555's contract as substandard is offensive. Our members fought over a year to achieve the highest pay increases any UFCW has seen in a long time without giving up important benefits such as a traditional Taft-Hartley Pension thus transferring risk from the employers to the members.

To make matters worse, Local 21 as a healthcare local believes they can dictate retail bargaining to Local 555, the largest retail Local in the northwest region. These actions by UFCW Local 21 put our bargaining

Confidential

and members at risk all while hurting Local 555's image with our members, the public, and the employers we deal with.

Finally and most seriously, it has come to our attention that on Monday, July 26th, President Guenther and Secretary-Treasurer Mizrahi called Scott Powers about our negotiations in an attempt to dictate what terms of Local 555's settlement would be acceptable to Local 21. This is wildly out of bounds and anything but the swiftest and strongest response allows a precedent that undermines the autonomy of every Local in the country.

We request Local 21 be forced to cease and desist from its attempts to interfere with and negatively impact Local 555 and Local 367's potential settlement as well as be banned from making any public statements or any further attempts to contact the employer representatives about our negotiations. Finally, we request that steps be taken to hold President Guenther and any others responsible for their detrimental interference in Local 555 and 367's bargaining with the retail employers. If this complaint needs to come in another form to be deemed official and valid, please advise as such.

I have copied UFCW Local 367 Secretary-Treasurer Mike Hines so he may confirm with a reply that this is a complaint on behalf of both 555 and 367.

Dan Clay


---------- Forwarded message ---------
From: **Faye Guenther** <faye@ufcw21.org>
Date: Tue, Jul 27, 2021 at 9:53 PM
Subject: Fwd: Request for International Research Support: Side by side between UFCW 555 and UFCW 21
To: Daniel Clay <dclay@ufcw555.org>
Cc: Joe Mizrahi <jmizrahi@ufcw21.org>


Dan-

In full transparency, I am sharing the email below. I know how rumors can spread.


I hope you support my request to the International to do a side by side between UFCW 21 and UFCW 555. I will also be requesting this tomorrow at our chain meetings.

Faye

Get Outlook for Android

---

**From:** Faye Guenther <faye@ufcw21.org>
**Sent:** Tuesday, July 27, 2021, 6:21 PM
**To:** Milton Jones; 'kmeckler@ufcw.org'
**Subject:** Request for International Research Support: Side by side between UFCW 555 and UFCW 21


7/27/21


Dear Milton and Kate-

Confidential

We learned from an email from Dan where he announced the merger with the Idaho local, that UFCW 367 has decided to join the UFCW 555 bargaining table because of "shared interest and values". Having been involved in 4 mergers, I know the International must approve such transactions. Since Dan announced this merger with the Idaho local and that UFCW 367 is joining their table, was the International involved in this entire decision?  If so, I would like to discuss why such action was taken.

We have reports from the 555 bargaining table that Angel did not show up and that no UFCW 367 rank and file members attended the bargain, so I am unsure how seriously to take Dan's email and my hope is that the International had nothing to do with Angel deciding to join Dan's table. The implications of this decision could have a very negative impact on UFCW 21 and Teamster 37 members.

In regards to "shared interests and values" it is my hope that UFCW 555 and UFCW 367 do not wish to reduce the wages and benefits of UFCW 367 members.  I've attached the side by side comparison of the Sound Health plan (which includes 367 members) with the UFCW 555 plan. We know Kroger is intent on lowering healthcare standards across the country. Obviously, we are concerned that the employers will be all too eager to move 367 members to cheaper and less rich health plan, and potentially attempt to move 367 members to the lower wage rates in 555 contracts as well. If the employer refuses to bargain with UFCW 367 until legally required, Dan's timeline is not lined up unless he holds out.  If Dan settles, UFCW 367 will be left to settle their own contract.  One of the values shared by UFCW 555 at the meeting in California is that it was not strategic to prepare for a strike.  If not preparing for a strike is an additional shared value, then  UFCW 357 will be isolated, without having done the work to prepare.

Should Angel agree to a plan that increases eligibility requirements for healthcare, increase premiums, out of pockets, wait periods, copays, etc. that this erosion will inevitably leak into our bargain.  We have alerted Jeff Endick and Sharon Goodman about Angel's erratic and unpredictable behavior to prepare legally for impacts their actions may have on the Sound Trust.

I am hoping, along with your research department, that you can help me answer the following questions:

1. Is our information in this side by side accurate?
2. We need help creating a full side by side comparing all wages and benefits between UFCW 21 and 555 so that we know all the risks we face. If you have a copy of the UFCW 555 contract, we request a copy.
3. Can the bargaining department send us a current Health, Pension comparison, so that we understand the other possible ramifications?
4. What role, if any,  did the International play in having UFCW 367 and UFCW 555 join together to bargain?

We will always stand in solidarity with 367 and 555 members and leadership and will do whatever

UFCW-EMMONS_000989

it takes to stop the UFCW 367 members from being harmed and moved to a substandard contract.

We want to make sure that we flagged this potential problem for you all and also wanted to make sure we had accurate information.

Thank you,

Faye Guenther

Cell: 206-294-9337

<UFCW Local 555 health comparison example.docx>

UFCW-EMMONS_000990

# EXHIBIT 2

**From:** "Daniel Clay" <dclay@ufcw555.org>
**Sent:** Fri, 10 Sep 2021 20:29:07 +0000 (UTC)
**Cc:** "Kate Meckler" <kmeckler@ufcw.org>; "Michael Hines" <mhines@ufcw367.org>; "Kim Cordova" <kcordova@ufcw7.com>; "Eric Renner" <eric@ufcw1439.org>; "Frank Mutchie" <mutchie@ufcw1496.org>; "Sarah Thody" <ufcw8@yahoo.com>; "Nicolai B Cocergine" <ncocergine@local4ufcw.org>
**Subject:** Re: Region 4 Hazard Pay Letter from UFCW Presidents in MI, OH, IN and KY

---

All –

Out of respect for Faye's wishes, I decided to leave her off this email. I don't understand why she isn't comfortable talking with me as she was comfortable having secret discussions with the employer representatives we all have to deal with.

As Faye has decided this is no longer a private matter... I did file charges against Faye for secretly contacting employers at my bargaining table behind my back and attempting to limit our settlement. She does not sit at my bargaining table and she is not welcome. Local 555 is an autonomous Local just as are your Locals. Failure to stand up to bullies who think they are emperors undermines and puts at risk entire organizations like ours. Several of you on this email have expressed concerns to me about similar bad behavior which I have and will continue to keep private. But to you I say this, saying nothing is a tacit endorsement of bad behavior.

Minding my own business has always served me well. I want to be clear with all of you, I will never involve myself in your business unless you specifically and clearly request I do so. My respect for you as elected Presidents of your respective locals precludes such underhanded behavior.

That said, I'm happy to talk with and work with anyone about how we can put additional cash in our members pockets. We all agree they deserve it!

Dan

On Fri, Sep 10, 2021 at 12:03 PM Faye Guenther <faye@ufcw21.org> wrote:

Hi Kate and Union Presidents-

UFCW 21 is happy to discuss all approaches to winning hazard pay and the letter seems like a great approach.

That said, I would like to take this conversation off group email. You may or may not be aware that Dan has brought charges against me for "interfering with his bargain".  I do understand the charge; however it exists none the less.

As such, I am sure you will understand that I am not fully comfortable discussing bargaining strategy with Dan.

Thank you for your understanding and I look forward to working with all of you in solidarity.

Faye Guenther

UFCW 21 President

Cell: 206-294-9337

Confidential

**From:** Kate Meckler <kmeckler@ufcw.org>
**Sent:** Friday, September 10, 2021 10:27 AM
**To:** Michael Hines <mhines@ufcw367.org>; Kim Cordova <kcordova@ufcw7.com>; Dan Clay - Cell <dclay@ufcw555.org>; Eric Renner <eric@ufcw1439.org>; Frank Mutchie <mutchie@ufcw1496.org>; Sarah Thody <ufcw8@yahoo.com>; Faye Guenther <faye@ufcw21.org>; Nicolai B Cocergine <ncocergine@local4ufcw.org>
**Subject:** Re: Region 4 Hazard Pay Letter from UFCW Presidents in MI, OH, IN and KY

NOTE:  I inadvertently used Nicolai's old email address.  Adding him to this thread.  Please note his new email is ncocergine@local4ufcw.org

Thank you Kim and Mike…let's give the others a chance to catch up.  If there is a desire to do a joint letter from the region 7 locals I am happy to facilitate.

---

**From:** Michael Hines <mhines@ufcw367.org>
**Date:** Friday, September 10, 2021 at 8:47 AM
**To:** Kate Meckler <kmeckler@ufcw.org>, Kim Cordova <kcordova@ufcw7.com>, Dan Clay - Cell <dclay@ufcw555.org>, Eric Renner <eric@ufcw1439.org>, Frank Mutchie <mutchie@ufcw1496.org>, Nicolai Cocergine <ncocergine@ufcwlocal4.org>, Sarah Thody <ufcw8@yahoo.com>, Faye Guenther <faye@ufcw21.org>
**Subject:** RE: Region 4 Hazard Pay Letter from UFCW Presidents in MI, OH, IN and KY

367 would be willing to sign off on the letter. I don't think it will change Kroger's behavior but it's a good show of solidarity and our members will appreciate it.

Sincerely,

**Michael Hines**

**President**

6403 Lakewood Dr. W. | Tacoma, WA 98467

Main: 253-589-0367 | Toll Free: 800-562-3645

www.facebook.com/ufcw367



**From:** Kate Meckler <kmeckler@ufcw.org>
**Sent:** Friday, September 10, 2021 6:50 AM
**To:** Kim Cordova <kcordova@ufcw7.com>; Dan Clay - Cell <dclay@ufcw555.org>; Eric Renner <eric@ufcw1439.org>; Michael Hines <mhines@ufcw367.org>; Frank Mutchie <mutchie@ufcw1496.org>; Nicolai Coergine <ncoergine@ufcwlocal4.org>; Sarah Thody <ufcw8@yahoo.com>; Faye Guenther <faye@ufcw21.org>
**Subject:** Fwd: Region 4 Hazard Pay Letter from UFCW Presidents in MI, OH, IN and KY

Good morning - FYI wanted to share with you some info from the locals in the Midwest.

Attached is a letter to Kroger from the Region 4 Local Unions renewing the call for hazard pay.  Kroger has made masks mandatory for all employees vaccinated and unvaccinated in Region 4.  With the current surge and the Kroger mask mandate, the Locals decided to make another push for hazard pay.

Kate

**From:** Brad Edwards <bedwards@ufcw.org>
**Sent:** Friday, September 10, 2021 8:53 AM
**To:** Milton Jones <mjones@ufcw.org>
**Cc:** Brad Edwards <bedwards@ufcw.org>
**Subject:** Region 4 Hazard Pay Letter from UFCW Presidents in MI, OH, IN and KY

Please see the letter from Region 4 Locals to Kroger regarding hazard pay.

Thanks, Brad

Bradley L. Edwards

International Vice President

Director, UFCW Region 4 – Central

bedwards@ufcw.org

Cell: 817.437.0193

# EXHIBIT 3

**From:** "Daniel Clay" <dclay@ufcw555.org>
**Sent:** Sat, 13 Nov 2021 01:54:01 +0000 (UTC)
**To:** "Marc Perrone" <mperrone@ufcw.org>
**Subject:** Follow Up

---

Marc –

Thanks for taking the time to talk to me earlier in the week. After giving significant thought to our conversation, I have grave concern over the path Locals 21 and 1439 are currently taking. I would request you not allow this to proceed.

Local 21 leadership deliberately interfered with Local 555's negotiations, fundamentally altering the course of negotiations and damaging the potential settlement that Local 555 members could have achieved. As part of that deliberate campaign, Local 21 leadership lied about Local 555 to other locals in Region 7 damaging Local 555's relationships and reputation. Expanding the area and influence of bad actors under the UFCW International umbrella risks significant future disharmony and harm.

Local 21 failed in its last merger attempt with Local 367 and in doing so, essentially "burnt the turf" for future mergers. In fact, Local 367's eventual Leadership ran on a platform of never merging at least partially based on the multiple lies and threats made by Local 21 as part of that merger process. At a time when larger local unions make strategic sense for union workers, they deliberately ensured that Local 367 members wouldn't benefit from joining with a larger and better resourced local once they decided they had lost the merger vote.

Apart from my concerns about Local 21 consistently creating havoc and chaos in Region 7, I fear the reputational damage to UFCW as a whole is the most likely outcome of this merger. As a result of multiple sexual harassment complaints and the subsequent investigations, President Renner saw fit to resign his position at Local 1439 as an appropriate settlement to the accusations against him and others. His subsequent agreement to merge with Local 21 and continue on as an employee reeks of cover up and corruption. UFCW, under your leadership, has fought too hard to defend those who are harassed in the workplace to join the ranks of those who accept harassment by covering it up and protecting the harassers.

And do not think for a minute this matter won't see the light of day. I caught a whiff of the stench in Eastern Oregon which is tangentially attached to Local 1439. Since then, I've heard twice more about trouble at Local 1439. Stopping this cover up disguised as a merger puts the UFCW International on the right side of history and legitimizes our voice in speaking against those who abuse and harass the less powerful. That President Guenther speaks so loudly for the rights of victims while protecting and enabling an abuser is scandalous and will be treated as such when the truth inevitably comes out.

Every organization faces challenges similar to what Local 1439 (and by extension the International) now must face. Large organizations are bound to have problems that need to be addressed, however the shame isn't in having problems but in not taking steps to ensure the problems don't happen again. The problems must be dealt with and not covered up.

As for my specific concerns about this merger and how it will negatively impact Local 555 members, I see several issues.

First, currently Local 21 and 555 have very little contact with each other which is important to Local 555 based on Local 21's actions in the previous months. In retail, Local 367 and 1439 serve as buffers between the two larger locals. While Local 555's healthcare and cannabis jurisdiction in Southwest Washington abuts Local 21's jurisdiction in those same fields, our retail jurisdictions don't even meet, let alone overlap. Allowing this merger to go forward will create flashpoints in Northeastern Oregon as well as Idaho between the two locals. While Local 555 has only had Idaho for a few months, we have invested significantly by putting the right staff in place, establishing a permanent footprint, improving contracts through collective bargaining, and working with Ademola Oyefeso to develop a political program targeting right to work in Idaho. Candidly, if I'd known about this Local 21 and 1439 merger, I wouldn't have agreed to merge with Local 368A.

Second, a few years back Local 555 merged Local 1439's 401k into ours. As part of that, Local 1439 holds a seat named in the plan document which will likely be passed to the successor Local. Participants in this plan are significant and spread throughout Local 1439's jurisdiction. While it isn't impossible to unwind, it would be difficult to do so and Local 555 and 1439 members would likely be harmed by the unwinding. Local 555 cannot have representatives from Local 21 sitting on our plans.

Finally, I'm very concerned about a spreading cancer in Region 7 and the International. President Guenther lied to a room full of people about what she was willing to do as part of a coordinated bargaining campaign. She lied to you. She lied to Milton Jones. She lied to Jeff Fiedler. She was honest with me about her intentions and after I warned you, she doubled down by lying to you even more. Since that time, she has harassed and harangued those around her. She has interfered with other Local's bargaining. She has led a group of Locals to secretly and recklessly commission a blind white paper that could impact the entire country. She foolishly declared war against an employer without caring for the small locals in the midwest who will incur their wrath and suffer the consequences.

UFCW-EMMONS_000923

In your role as President of the International you are the physician responsible for the health of the UFCW body as a whole. Don't let the cancer spread.

Dan

Confidential

# EXHIBIT 4



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

FAYE IRENE GUENTHER, an individual,

     Plaintiff,

v.                         No: 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually,
AND OSPREY FIELD CONSULTING, LLC,
a limited liability company,

     Defendants.

_____

VIDEOTAPED DEPOSITION OF

FAYE GUENTHER

TAKEN ON
MONDAY, MAY 13, 2024
9:59 A.M.

DAVIS WRIGHT TREMAINE, LLP
920 FIFTH AVENUE, SUITE 3300
SEATTLE, WASHINGTON  98104

```
 1  flyer.
 2       Q.    Did you not want to know?
 3       A.    I didn't think he was subject to harassment
 4  charges.
 5       Q.    But you knew at that time that he was prohibited
 6  from supervising other employees, right?
 7       A.    That doesn't mean he was charged with sexual
 8  harassment.
 9       Q.    But is the answer correct, that when you saw this
10  flyer you knew at that time that he was not allowed to
11  supervise employees?
12       A.    Yeah, to resolve an internal dispute.
13       Q.    Okay.  All right.  So you didn't ask him.
14       A.    I did not.
15       Q.    Okay.  All right.  How many of these flyers did
16  you personally see posted?
17       A.    Can you define posted.  I'm not sure.
18       Q.    Well, how many did you see?  You just saw one?
19       A.    I saw -- I saw several.
20       Q.    Okay.  And where did they come from?
21       A.    I don't know.  I still don't know.
22       Q.    No, no, but who sent them to you?  You -- you said
23  you saw several.
24       A.    Oh.  Eric sent me a copy of this.  Jessica Roach
25  posted it inside of a forum with 800 UFCW members in it.  My
```

1   -- a few of my shop stewards e-mailed this to me.  Employers

2   texted me copies.

3        Q.    Okay.  Who is Jessica Roach?

4        A.    She is a member of 367.

5        Q.    Okay.  Why did she post it?

6        A.    I don't know.

7        Q.    Did you call her and ask her, "Why did you post

8   this?"

9        A.    I don't have her phone number.

10       Q.    Do you even know who she -- I mean, do you know

11  her?  If you saw her, would you know who she was?

12       A.    I don't think I would.

13       Q.    Okay.  So you know there is a Jessica Roach who

14  posted something, but you don't know this person.

15       A.    I do -- I know her.  She was on a bargaining team

16  that I was part of in 2000 --

17       Q.    Okay.

18       A.    -- '10 or '13.  I can't remember what year.

19       Q.    Okay.  Have you had any disagreements with her?

20       A.    She -- there was an attempt between 21 and 367 to

21  merge that did not succeed.

22       Q.    Okay.  But what does that have to do with

23  disagreements?

24       A.    She did not want the merger to proceed.

25       Q.    I see.  And you did?

1    Q.    I show elections being held anywhere from January

2    6th through the 20th.

3    A.    That sounds right.

4    Q.    Okay.

5    A.    And that would have just been -- that would have

6    just been the 1439 votes.

7    Q.    Is that because they're vote by mail ballots? How

8    did the -- how are the ballots counted for membership votes?

9    A.    The votes occurred -- I believe they occurred in

10    person at the meetings.  Constitutional votes -- I've had

11    multiple votes of all kinds since then.  I believe that

12    these votes occurred in person at the -- at their membership

13    meetings.

14    Q.    And there were various sites where these would

15    take place?

16    A.    Yes, dozens of sites.

17    Q.    Okay.  All right.  Then Mr. Renner comments, after

18    you ask if there are any more hit pieces, after he comments

19    on health issues, he says, "Jeff will be getting phone bills

20    either today or tomorrow."  Who is Jeff?

21    A.    Jeff Hofstader is the secretary-treasurer of 1439.

22    Q.    Why is he getting phone bills?

23    A.    There was an internal investigation occurring

24    within 1439.

25    Q.    On this issue?

1        A.    Yes.

2        Q.    **Okay.  And why were phone bills important?**

3        A.    We suspect -- well, I didn't.  1439 suspected that

4    internal people had created the flyer.

5        Q.    **Ah.  Who did -- by 1439 suspected, who within 1439**

6    **suspected?**

7        A.    Eric and Jeff suspected that people within -- on

8    the staff of 1439 had created the flyer.

9        Q.    **Okay.  And whose phone bills did they get?**

10       A.    I -- I believe it was Laurel Fish's phone bill and

11   perhaps Adam Jackson's, but I don't know for sure.

12       Q.    **And why did they suspect Laurel and Adam Jackson**

13   **were interfering?**

14       A.    Now that I understand what's going on, probably

15   because of what was happening prior to -- in August or

16   September.

17       Q.    **Did -- did you inquire as to, well, who on your**

18   **staff could possibly be doing this?**

19       A.    Yes.

20       Q.    **And what was his response?**

21       A.    He thought that it was Laurel Fish and Adam

22   Jackson.

23       Q.    **And did you ask the next question?  Which is,**

24   **well, why?**

25       A.    Perhaps.  This was -- I mean, I was not the



1  president of 1439.

2      Q.   Right.  But you wanted something to happen.  You

3  don't want anything to get in the way.

4      A.   I wanted to rule out internal people.  Adam and

5  Laurel had both said they supported the merger, so I was

6  surprised that they would have done that.

7      Q.   So he didn't say anything like, "Well, they filed

8  a complaint against me."

9      A.   No.

10     Q.   Okay.

11     A.   At this point, they had said they supported the

12  merger, and I was excited to have them come on staff.

13     Q.   Okay.  And let's look at the next page.  On

14  January 14th, you've got an emergency meeting about a Denver

15  strike.  Do you -- do you have membership all the way out in

16  Denver, Colorado?

17     A.   I was part of a coalition with local 7, local 21,

18  and other locals as we were building for the grocery

19  negotiation.  So this is a grocery -- this is a

20  Kroger/Albertsons strike.  Yeah.

21     Q.   Oh, okay.  I see.  Okay.  So then he comments

22  after that, he being Renner, says, "Hi Faye.  I have some

23  interesting info when you have time for a call.  I think we

24  found our culprits."  You see that?

25     A.   Yes.

```
1                         CERTIFICATE

2

3        I, the undersigned Valerie Barna, am a videographer

4   on behalf of NAEGELI Deposition & Trial. I do hereby

5   certify that I have accurately made the video recording

6   of the deposition of Faye Guenther, in the above

7   captioned matter on the 13th day of May, 2024 taken

8   at the location of Davis Wright Tremaine LLP, 920 5th

9   Avenue, Suite 3300, Seattle, Washington, 98107.

10

11       No alterations, additions, or deletions were made

12  thereto.

13

14       I further certify that I am not related to any of

15  these parties in the matter and I have no financial

16  interest in the outcome of this matter.

17

18

19  _____

20                  Valerie Barna

21

22

23

24

25
```

1                              CERTIFICATE

2

3          I, Kacey Hall, do hereby certify that I

4     reported all proceedings adduced in the foregoing matter

5     and that the foregoing transcript pages constitutes a

6     full, true and accurate record of said proceedings to the

7     best of my ability.

8

9          I further certify that I am neither related to

10    counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    17th day of May, 2024.

15

16

17

18    _____

19          Kacey Hall

20

21

22

23

24

25

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

FAY IRENE GUENTHER, an individual,

      Plaintiff,

vs.            Civil Action No. 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually, and OSPREY
FIELD CONSULTING LLC, a limited liability co.,

      Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

**VIDEOTAPED DEPOSITION OF**

**ADAM JACKSON**

**TAKEN ON**
**MONDAY, MARCH 11, 2024**
**9:12 A.M.**

**25 SOUTH ALTAMONT STREET**
**SPOKANE, WASHINGTON 99202**



*Powerful*
LITIGATION SUPPORT

```
 1        Q.    Okay.

 2        A.    So it was after.

 3        Q.    And when did you first see the flyer that was

 4   Exhibit --

 5              MR. MCGUINNESS:  19.

 6        Q.    -- 19?

 7              Thank you.

 8        A.    I don't know when I first saw it, but I'm guessing

 9   it was right around that time.  Might have been before.

10        Q.    What did -- well, was it did you see it --

11        A.    After.

12        Q.    -- after Thanksgiving or before Thanksgiving?

13        A.    I -- I don't remember.

14        Q.    You don't remember.

15        A.    I just did.  I -- I was working on the -- probably

16   around the same time.  So it could be after, it could be

17   right before.  I -- I really don't know.  I didn't --

18        Q.    Okay.

19        A.    -- think I would need to -- do you know what I

20   mean?  Remember something like that.  So I -- I don't know.

21        Q.    Okay.  The -- the merger plan is dated December

22   14, 2021.  Did the rank and file vote -- it says the

23   agreement has been approved by the executive board.  I'm

24   looking -- I'm talking at Paragraph 15 here, of both Locals

25   21 and 1439. Shall submitted to a vote of the respective
```

1   memberships.

2       A.   Yeah.

3       Q.   So --

4       A.   They voted afterwards.

5       Q.   -- so they would have voted after this?

6       A.   Yeah.

7       Q.   Do you recall Mr. Renner having any role in a

8   campaign about whether to vote for or against the merger?

9       A.   I -- I don't.  You mean him being involved in one?

10      Q.   Yeah.  Was he involved in the -- in the campaign?

11      A.   I don't -- I had -- I was not around Eric at that

12  time.  They gave me assignments that took me to Idaho to

13  work on right-to-work sign-ups and stuff that just kept me

14  away from the Local.

15      Q.   Did you follow --

16      A.   So I --

17      Q.   the campaign?

18      A.   Did I follow it?

19      Q.   Yeah.

20      A.   No, not particularly.

21      Q.   Okay.

22      A.   Yeah.

23      Q.   So did you have any awareness as to how the merger

24  was promoted?

25      A.   I knew that I did go out a couple of days with --

1  one of the assignments they had me do is go with an

2  organizer from Local 21 and take him to our, you know, some

3  of our stores out in Idaho and different -- Newport,

4  different locations other than Spokane, and introduce him to

5  members, and stuff like that, and talk about the -- talk

6  about the merger.

7        Q.    Okay.

8        A.    So that was the only involvement I really remember

9  having in it.

10       Q.    Okay.

11       A.    But as far as seeing Eric, or be part of it, or

12  what, I -- I just wasn't involved in it.

13       Q.    Okay.

14       A.    I was kind of on my way out as this was -- was

15  happening.

16       Q.    Okay.

17       A.    So --

18             MR. DILORENZO:  Thank you for spending all this

19  time with me.

20             THE WITNESS:  Yeah.

21             MR. DILORENZO:  Appreciate it.

22             Counsel, do you have any questions?

23  EXAMINATION

24  BY MR. MCGUINNESS:

25       Q.    Uh-huh.  Although maybe less questions.

```
 1                          CERTIFICATE

 2

 3        I, the undersigned Greg Salina, am a videographer on

 4   behalf of NAEGELI Deposition & Trial. I do hereby certify

 5   that I have accurately made the video recording of the

 6   deposition of Adam Jackson in the above captioned matter

 7   on the 11th day of March, 2024, taken at the location of

 8   25 S Altamont St, Spokane, WA 99202.

 9

10        No alterations, additions, or deletions were made

11   thereto.

12

13        I further certify that I am not related to any of

14   these parties in the matter and I have no financial

15   interest in the outcome of this matter.

16

17

18   _____

19                         Greg Salina

20

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3        I, Stephanie Moore, do hereby certify that I

 4   reported all proceedings adduced in the foregoing matter

 5   and that the foregoing transcript pages constitutes a

 6   full, true and accurate record of said proceedings to the

 7   best of my ability.

 8

 9        I further certify that I am neither related to

10   counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   26th day of March, 2024.

15

16

17

18   _____

19                 Stephanie Moore

20

21

22

23

24

25
```

# EXHIBIT 6

**From:** "Todd Crosby" <tcrosby@ufcw.org>
**Sent:** Sat, 26 Feb 2022 01:17:58 +0000 (UTC)
**To:** "Lisa Pedersen" <lpedersen@ufcw.org>
**Cc:** "Todd Crosby" <tcrosby@ufcw.org>
**Subject:** Local 3000 Merger Letters and Documentation
**Attachments:** Local 1439 Merger Documents.pdf;December 14, 2021 Minutes.pdf;Merger Vote Count - UFCW 21 - 2.092022-2.12.2022.pdf;FINAL Merger Agreement 1439-21.pdf;Merger Notification Letter to Regional Director - 21-1439.pdf

Lisa-

Please see the attached documents for final executive committee approval of the merger of Locals 1439 and 21 to create Local 3000.  I believe all of the documents are in order and I recommend approval.

Please advise,

Todd Crosby
Organizing Director
http://www.ufcw.org/



UNION MERGER AGREEMENT

In order to build a larger and stronger union better able to meet today's challenges; to more effectively represent members and negotiate contracts; to more aggressively organize essential workers; to achieve greater efficiency and stability; and to protect and enhance the well-being of the membership, United Food and Commercial Workers Union Local No. 21 (hereinafter referred to as **Local No. 21**) and United Food and Commercial Workers Local No. 1439 (hereinafter referred to as **Local No. 1439**) agree that their Local Unions shall merge into the Local Union on the terms and conditions set forth below.

1.  Local No. 21 and Local No. 1439 shall merge, effective March 1, 2022, and the newly merged Local Union shall be known as United Food and Commercial Workers Union, **Local No. 3000** (hereinafter referred to as **Local No. 3000**).

2.  Local No. 3000 shall be governed by the UFCW International Constitution, this merger agreement and Local 21's Bylaws until such time Local No. 3000 adopts new bylaws.  During the period ending September 30th, 2023, in the event of any conflict between any provision of the International Constitution or Local No. 21's Bylaws and any of the terms of this merger agreement, the terms of this merger agreement shall govern.

3.  From March 1, 2022 through September 30th, 2023 the officers of the newly merged Local Union shall be as follows:

|  |  |  |
|---|---|---|
| **President** | Faye Guenther | |
| **Secretary Treasurer** | Joseph Mizrahi | |
| **Recorder** | Maria Milliron | |

| | | | |
|---|---|---|---|
| **Former Local No. 1439 EBoard to be Local No. 3000 Vice Presidents** | Ana Alvarez | Judy Wick | |
| | Craig (CJ) Banning | Kinzie Michael | |
| | James Perez | Michelle Pecora | |
| | Jeff Hofstader | Robert Allen | |
| | Jeff Terpening | Shannon Corrick | |
| | Jeff White | Sharon Pearson | |
| | Jodee VanGog | Vanessa Roessner | |

| | | | |
|---|---|---|---|
| **Former Local No. 21 EBoard to be Local No. 3000 Vice Presidents** | Ames Reinhold | Greg Brooks | Mohamed Muhidin |
| | Amy Dayley | Gregg Barney | Naomi Oligario |
| | Ashley Price | Heidi Odom | Patricia Brown |
| | Atsuko Koseki | Jeff Smith | Richard Waits |
| | Carolyn Kennedy | J'nee Delancey | Rob Shauger |
| | Christina Gonzales Castaneda | Kyong Barry | Roger Yanez |
| | Cindy Franck | Maggie Breshears | Sam Dancy |
| | Cliff Powers | Maroot Nanakul | Scott Shiflett |
| | Cyndi Kirkpatrick-Cockett | Marsha Kaye Balk | Sia Tinoisamoa |
| | Derek Roybal | Matthew Skews | Tami Ottenbreit |
| | Emily Hunter | Mike Nord | Wil Peterson |
| | Fredel Albritton | | |

4.  Article VII of Local No. 21's Bylaws designates local union Vice Presidents by Division and geography.  The merged organization shall consist of a 51-member board including the President, Secretary-Treasurer, Recorder and 48 Vice Presidents consistent with the divisions and geographies currently designated in Local No. 21's

UFCW-EMMONS_0000163

**Faye Guenther** President

**Joe Mizrahi** Secretary-Treasurer



www.ufcw21.org

___

**_Via Fax and U.S. Mail_**

February 24, 2022

Todd Crosby, Director &
International Vice President
UFCW International Union, Region 7 NW
16400 Southcenter Parkway, Suite 300
Tukwila, WA 98188

Dear Mr. Crosby,

Please accept this letter as formal notification of the results of UFCW Local 21's merger vote with UFCW Local 1439.

Notice of the merger vote was provided to our membership on January 6, 2022.

Local 21 members voted on the merger agreement at meetings held February 9, 10, 11, and 12, 2022. The final vote count was 207 to approve the merger agreement and 11 to reject the merger agreement.

Thank you for your attention to this matter.

Sincerely,

Faye Guenther
President, UFCW Local 21

enclosure

___

*Our mission is to build a powerful Union that fights for economic, political and social justice in our workplaces and in our communities.*

Seattle: 5030 First Ave S, Suite 200, Seattle, WA 98134-2438, Phone 206-436-0210 or 800-732-1188, Fax 206-436-6700
Mt. Vernon: 1510 N 18th St, Mt Vernon, WA 98273-2604, Phone 360-424-5655, Fax 360-424-7909 | Silverdale: 3888 NW Randall Way #105, Silverdale, WA 98383, Phone 360-698-2341, Fax 360-662-1979 | Spokane: 2805 N. Market St. Spokane, WA 99207, Phone 509-340-7369, Fax 509-624-1188

UFCW-EMMONS_0000164

## UFCW 21 & UFCW 1439 Merger Vote Tallies

| Location | Date | Time | Yes | No | Provisional | Void | Total |
|----------|------|------|-----|----|-----|-----|-----|
| Bellingham | 2/9/2022 | 10:00 AM - 11:00 AM | 13 | 0 | 0 | 0 | 13 |
| Oak Harbor | 2/9/2022 | 2:00 PM - 3:00 PM | 10 | 0 | 1 | 0 | 11 |
| Mount Vernon | 2/9/2022 | 7:00 PM - 8:00 PM | 4 | 0 | 0 | 0 | 4 |
| Aberdeen | 2/9/2022 | 11:00 AM - 12:00 PM | 4 | 0 | 0 | 0 | 4 |
| Shelton | 2/9/2022 | 4:00 PM - 5:00 PM | 7 | 0 | 0 | 0 | 7 |
| Kennewick | 2/9/2022 | 12:00 PM - 1:00 PM | 2 | 0 | 0 | 0 | 2 |
| Walla Walla | 2/9/2022 | 5:00 PM - 6:00 PM | 2 | 0 | 0 | 0 | 2 |
| Silverdale | 2/9/2022 | 9:00 AM - 10:00 AM | 11 | 0 | 1 | 0 | 12 |
| Port Townsend | 2/9/2022 | 1:00 PM - 2:00 PM | 10 | 0 | 0 | 0 | 10 |
| Everett | 2/10/2022 | 9:00 AM - 10:00 AM | 11 | 1 | 0 | 0 | 12 |
| Lynnwood | 2/10/2022 | 2:00 PM - 3:00 PM | 15 | 1 | 0 | 0 | 16 |
| Bellevue | 2/10/2022 | 6:00 PM - 7:00 PM | 17 | 0 | 0 | 0 | 17 |
| Olympia | 2/10/2022 | 12:00 PM - 1:00 PM | 10 | 0 | 0 | 0 | 10 |
| Spokane | 2/10/2022 | 1:00 PM - 2:00 PM | 5 | 0 | 0 | 0 | 5 |
| Spokane | 2/10/2022 | 4:00 PM - 5:00 PM | 13 | 0 | 0 | 0 | 13 |
| Forks | 2/10/2022 | 1:00 PM - 2:00 PM | 1 | 0 | 0 | 0 | 1 |
| Port Angeles | 2/10/2022 | 5:00 PM - 6:00 PM | 2 | 2 | 0 | 0 | 4 |
| Des Moines | 2/11/2022 | 9:30 AM - 10:30 AM | 19 | 2 | 0 | 0 | 21 |
| Seattle-Phinney Ridge | 2/11/2022 | 12:00 PM - 1:00 PM | 18 | 4 | 0 | 0 | 22 |
| Des Moines | 2/11/2022 | 4:00 PM - 5:00 PM | 13 | 0 | 1 | 0 | 14 |
| Tacoma | 2/11/2022 | 7:00 PM - 8:00 PM | 7 | 1 | 0 | 0 | 8 |
| Tonasket | 2/11/2022 | 2:00 PM - 3:00 PM | 0 | 0 | 0 | 0 | 0 |
| Omak | 2/11/2022 | 5:00 PM - 6:00 PM | 8 | 0 | 0 | 0 | 8 |
| Wenatchee | 2/12/2022 | 12:00 PM - 1:00 PM | 5 | 0 | 0 | 0 | 5 |
| | | **Total** | **207** | **11** | **3** | **0** | **221** |

UFCW-EMMONS_0000165

## December 14, 2021 Executive Board Minutes

1. **Opening**
   The meeting was called to order by Joe Mizrahi, Secretary Treasurer at 6:30 p.m.

2. **Attendance**
   Present: Faye Guenther, Joe Mizrahi, Maria Milliron, Fredel Albritton, Gregg Barney,
   Kaye Balk, Kyong Barry, Maggie Breshears, Greg Brooks, Patricia Brown,
   Sam Dancy, Amy Dayley, J'nee Delancey, Cindy Franck,
   Christina Gonzalez Castaneda, Cynthia Hill, Emily Hunter,
   Cyndi Kirkpatrick-Cockett, Atsuko Koseki, Mohamed Muhidin, Mike Nord,
   Heidi Odom, Naomi Oligario, Tami Ottenbreit, Wil Peterson, Cliff Powers,
   Ashley Price, Jeannette Randall, Ames Reinhold, Derek Roybal, Rob Shauger,
   Scott Shiflett, Jeff Smith, Sia Tinoisamoa, and Richard Waits
   Excused: Carolyn Kennedy, Maroot Nanakul
   Absent:  Matthew Skews, Roger Yanez

3. **Reading of the Minutes from the prior meeting**

4. **Financial Report**

5. **Reports of Officers**

# UFCW 1439

Eric Renner, President • Jeff Hofstader, Secretary-Treasurer

**a VOICE for working America**

_**Via Fax and U.S. Mail**_

February 22, 2022

Todd Crosby, Director &
International Vice President
UFCW International Union, Region 7 NW
16400 Southcenter Parkway, Suite 300
Tukwila, WA 98188

Dear Mr. Crosby,

Please accept this letter as formal notification of the results of UFCW Local 1439's merger vote with UFCW Local 21.

Notice of the merger vote was provided to our membership on December 17, 2021.

Local 1439 members voted on the merger agreement at meetings held January 6, 10, 11, 12, 13, 14, 18, 19, 20, 2022. The final vote count was 191 to approve the merger agreement and 5 to reject the merger agreement.

Thank you for your attention to this matter.

Sincerely,

Eric Renner
President, UFCW Local 1439

enclosure

**United Food and Commercial Workers Local 1439**
1719 North Atlantic Street, Spokane, Washington 99205 ¦ (509) 328-6090 ¦ (800) 359-1439


PAPERMILL PRINTING

Confidential

# EXHIBIT 7



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE


FAYE IRENE GUENTHER, an individual,

        Plaintiff,

vs.                                Case No. 2:22-CV-00272-TOR

JOSEPH H. EMMONS, individually, AND
OSPREY FIELD CONSULTING LLC, a
limited liability company,

        Defendants.

_____








(800) 528-3335
NAEGELIUSA.COM

                        VIDEOTAPED DEPOSITION OF

                        MICHAEL SELVAGGIO

                                    TAKEN ON
                THURSDAY, OCTOBER 12, 2023
                                    9:16 A.M.


                        DAVIS WRIGHT TREMAINE LLP
        1300 SOUTHWEST FIFTH AVENUE, SUITE 2400
                        PORTLAND, OREGON 97201

1      Q.    And by that, do you mean, like, they're

2  not going to do it?  The 555 is not going to handle

3  the mailing?

4      A.    To -- what that means is that it was my

5  responsibility to execute that tactic, and that's

6  where that was left.  We did not go over details on

7  how I was going to do that.

8      Q.    Okay.  Who gave you that directive or

9  authorization to do that?

10     A.    Dan Clay.

11     Q.    Okay.  So that's the third conversation.

12  And you're -- you get that assignment directives.

13  What do you do next to accomplish that mailing?

14     A.    At that meeting, we had discussed the

15  messaging that we wanted to push out.  I designed

16  the exhibit you see in front of you.

17     Q.    Right.

18     A.    That went into envelopes.  A bunch of

19  address labels got put on the envelopes, and I put

20  stamps on the envelopes.

21     Q.    So you really did it, like -- you pretty

22  much did the whole thing, the design of the flyer,

23  the -- even putting it into the envelopes?

24     A.    Yes, sir.

25     Q.    Okay.  Sorry, I didn't mean to interrupt

1    you, but I was -- that's going to take a few

2    questions off the list. Okay.  So then what do you

3    do?

4         A.    Then I bundled up the sealed and stamped

5    and stuffed envelopes into a box, got on a plane to

6    Spokane, left the airport to get to a U.S. Postal

7    Service box, put them in there, and then went to

8    that restaurant up in North Spokane that looks like

9    a milk jug for a milkshake, and then went back to

10   the airport and went back to Portland.

11        Q.    Okay.  And during the third meeting, you

12   talked about messaging.  Could you tell me what --

13   what was discussed with respect to messaging on the

14   literature?

15        A.    That it was important members understood

16   that there would be the possibility of certain

17   individuals returning to UFCW adjacent work that had

18   had allegations against them and that we wanted to

19   make sure that that information was distributed.

20        Q.    Okay.  So there were certain individuals.

21   Were they returning to or wanting to return to UFCW

22   leadership positions?  Was that your understanding?

23        A.    I don't recall specifically, but --

24        Q.    Well, I'm sure --

25        A.    I don't -- I don't recall specifically.

1    Q.    Have you ever met Mr. Renner?

2    A.    I have not.

3    Q.    Okay.  Now, did you have a follow-up

4    meeting with Dan or Esai before you talked to Mr.

5    Emmons about this flyer?

6    A.    I'm sorry?  I need you to explain where

7    the commas are in that sentence.

8    Q.    Of course.  Let me -- that's a bad

9    question.  At some point, you talked to Mr. Emmons

10    about distributing this flyer?

11    A.    Correct.

12    Q.    Okay.  So what I'm getting at is, in

13    between the time that you had this update meeting,

14    but before you talked to Mr. Emmons, did you have

15    another conversation with Dan and Esai about doing

16    something additional on the project?

17    A.    Yes.

18    Q.    Okay.  Where -- where did that happen?

19    A.    That happened in Dan's office.

20    Q.    Okay.

21    A.    That was an in-person meeting with Esai

22    there, and that's the discussion we had.

23    Q.    Okay.  And was there a feeling like you

24    needed to do more to -- to satisfy the objective of

25    the project?

1      A.    I think that's a fair characterization.

2      **Q.    Okay.  And what was agreed?  What were you**

3   **going to do?**

4      A.    I suggested that if we wanted to localize

5   it, we could engage a -- I don't -- I don't recall

6   specifically if I used Joe's name or said Osprey,

7   but I suggested an in- person lit drop at work

8   sites, and it was clear that obviously it would not

9   be all over the entire state, but it could be

10  localized to the Spokane area.

11     **Q.    So more targeted?**

12     A.    Yes.

13     **Q.    Okay.  And in what -- how did they react**

14  **to that idea?**

15     A.    They agreed with it.

16         **MR. DILORENZO:**  Counselor, could I

17  interrupt us just for a second?  Can we go off the

18  record for a moment?

19         **THE VIDEOGRAPHER:**  Time is 12:38.  We're

20  off the record.

21         **(WHEREUPON, a recess was taken.)**

22         **THE VIDEOGRAPHER:**  We're on the record.

23  The time is 12:53.

24         **MR. MCGUINNESS:**  Okay.  Thank you.

25  **BY MR. MCGUINNESS:**

1        Q.    Mr. Selvaggio, when we broke, we were

2   talking about the follow-up meeting you had at Local

3   555 with Dan Clay and Esai before you talked to Mr.

4   Emmons.

5        A.    Correct.

6        Q.    Okay.  That's where we broke.  And at this

7   -- at this meeting, did Mr. Clay or -- or Esai tell

8   you anything new about -- that would support the

9   allegations that were contained in the flyer?

10       A.    No, that didn't come up.

11       Q.    Okay.  Did you have any additional

12   meetings with them before you talked to Mr. Emmons

13   about distributing the flyer?

14       A.    No.

15       Q.    Okay.  By the way, have you ever met

16   Michael Hines?

17       A.    No.

18       Q.    Okay.  So at some point, do you initiate

19   contact with Mr. Emmons to have a conversation

20   relating to a flyer that's been marked?

21       A.    Yes.

22       Q.    And did that happen in person or did that

23   happen on the phone?

24       A.    It happened over the phone.

25       Q.    Okay.  And tell me -- and did you have one

1  or more conversations with Mr. Emmons before he

2  distributed the flyers?

3      A.    I believe I had one phone conversation and

4  then a brief email conversation.

5      Q.    Okay.  So tell me what you remember about

6  the telephone conversation with Mr. Emmons.

7      A.    I described the nature of the project,

8  that we were looking for a quick one-day literature

9  distribution project, and that was going to be

10  limited to a flyer that I would provide and

11  probably, you know, anywhere from six to eight

12  supermarket work sites in the Spokane area.

13          And made it clear that this was not

14  something that I wanted him to -- to farm out

15  because it was a simple enough project that I didn't

16  think that we needed that additional level of middle

17  management and asked him if he was available to do

18  that over the next few days.

19      Q.    Okay.  And what did you say?

20      A.    He indicated that he was.

21      Q.    And did you tell him what the project

22  involved?

23      A.    Yes.  Then went on to describe that you're

24  going to be distributing flyers regarding a

25  potential merger of UFCW locals up in Washington and

1  that the flyers would be against the merger.  And we

2  wanted to push information out to UFCW members

3  regarding the allegations that were contained in the

4  flyers.

5      Q.    Okay.  Did -- did you talk to him about

6  the allegations?  Specific details about the

7  allegations in the flyer?

8      A.    Define specific.

9      Q.    During the telephone conversation, did you

10  tell him that the flyer is going to contain the

11  statements that you see in Exhibit --

12      A.    I don't know if I specifically read them

13  to him, but we did describe the -- the premise of

14  the content, and I -- and I don't recall, so I can't

15  say for certain that I didn't read it to him.  But

16  the nature of the content was made clear to him in

17  that call.

18      Q.    Did he express an interest in, like,

19  finding out whether the information was true or what

20  the basis for the allegations were?

21      A.    Yes, he indicated that -- or I should say,

22  he asked me, "Is this -- is this good information?

23  Is this solid?"  And I said yes.

24      Q.    Did you tell him the allegations were

25  true?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

1    A.    I told him that I had been told they were
2    true.
3    Q.    Okay.  And you had been told they were
4    true by Mr. Clay and Esai?
5    A.    That's correct.
6    Q.    Okay.  Did you mention to him the part
7    about there being an investigation?  That you were
8    told that there was an investigation?
9    A.    Yes.
10    Q.    Okay.  And did you -- did you tell them
11    that -- tell him it was sexual harassment
12    allegations?
13    A.    Yes.
14    Q.    And did anyone ever tell you that Ms.
15    Guenther was the subject of an investigation?
16    A.    I cannot recall.
17    Q.    Did you tell Mr. Emmons that the
18    investigation that you had been told about involved
19    Ms. Guenther?
20    A.    I believe that I told him that it involved
21    Ms. Guenther, but I don't think I indicated that Ms.
22    Guenther was the target of the investigation.
23    Q.    What was your understanding at the time
24    with respect to Ms. Guenther being involved in any
25    investigation over sexual harassment?

1        A.    My understanding was that as an officer of

2    one of the locals -- I again, can't remember which

3    one -- she would be overseeing the investigation.

4    And what had been conveyed to me was that the --

5    that that was somehow memorialized at the

6    international union level.  I don't exactly know

7    what kind of record keeping that would be, but I

8    felt -- I felt confident in the -- in the accuracy

9    of that statement.

10        Q.    Okay.  And you -- it sounds like you

11    really relied on the two people that are -- that

12    hold, you know, UFCW positions to convey this

13    information to you, Mr. Esai and Mr. Clay?

14        A.    Yes.

15        Q.    You didn't -- in other words, you didn't

16    talk to anybody at the international union to

17    determine whether what Mr. Clay and Mr. Esai had

18    told you was in fact true?

19        A.    That's correct.

20        Q.    And is it true that Ridgelark has never

21    done any business with Local 1439?

22        A.    That's correct.

23        Q.    And is it true that Ridgelark has never

24    done any business with USCW Local 367?

25        A.    That's correct.

1    Q.    And that Ridgelark has never done any

2    business with Local 3000 or Local 21?

3    A.    As far as I know, that's correct.

4    Q.    And that neither you nor Ridgelark had --

5    have had any involvement in the appointment of

6    officers to UFCW Local 367?

7    A.    That's correct.

8    Q.    Including Mr. Hines?

9    A.    Yes.

10    Q.    Okay.  So Exhibit 2, did you create this

11    document?

12    A.    I -- yes.  Yes, I did.

13    Q.    Okay.  And did you do it on your computer?

14    A.    I did.

15    Q.    And did you type in all the statements

16    that we see on Exhibit 2?

17    A.    I did.  Except the UFCW logo is in fact

18    not typed, but a pasted image.

19    Q.    And is this -- does this represent part of

20    what was dubbed Wagon Wheel?

21    A.    Yes, it does.

22    Q.    And did you print it?

23    A.    No.  Wait.

24    Q.    Oh, I'm sorry.

25    A.    Sorry, my apologies.  I printed the 1,000

1    that went out in the mail.

2        Q.    Mm-hmm.

3        A.    And that was -- that was it.

4        Q.    **How about this one?  Do you know who**

5    **printed that out?**

6        A.    This one right here?

7        Q.    **Yeah.**

8        A.    I think John's assistant.

9        Q.    **Oh, okay.  But when you talked to Mr.**

10    **Emmons about this flyer, and do he -- you know if he**

11    **printed it out before distributing, or did you --**

12        A.    It was his responsibility to print it out?

13    I assume --

14        Q.    **Okay.**

15        A.    -- that he's the one that did it.  If he

16    felt that he needed to get someone at the FedEx

17    counter to print it out for him, I wouldn't know

18    that.

19        Q.    **Okay.  And the follow up-email you had**

20    **with him because that's -- now we're transitioning**

21    **from the phone call to the email -- had this**

22    **attached?**

23        A.    That's correct.

24        Q.    **And it had a store list attached?**

25        A.    That's correct.

1    Q.    Okay.  So he knew, "I need to distribute

2   this flyer" that you had written up, you created,

3   and, "I need to do it at these stores"?

4    A.    The store list was not an absolute

5   requirement for him.  I said, you know, "Go to as

6   many of these stores as you can."

7    Q.    Okay.

8    A.    So I think -- I know that he did not

9   complete the list, which was to be expected.

10    Q.    And where did you get the store list from?

11    A.    The I can't remember if at the time it was

12   367 or 1437, but whatever local was representing

13   Spokane, their website.

14    Q.    Okay.  So you went and got the store list.

15   It wasn't -- Dan didn't give you the store list.

16   You went to a website?

17    A.    That's correct.

18    Q.    Okay.  And during the in-person telephone

19   conference with Mr. Emmons, the subject of

20   compensation was discussed?

21    A.    Yes.

22    Q.    Okay.  And did he bring that up or did you

23   bring that up?

24    A.    I brought that up.

25    Q.    Okay.  Tell me about how he was going to

1    be compensated.

2         A.    I budgeted out certain expenses, certain

3    third- party costs that he would need to incur in

4    the course of the distribution, went over that line

5    item by line item with him and ensured that it made

6    sense.  He indicated that it did.  And then I asked

7    him, "And then for your time and trouble, you know,

8    what would you be looking for in terms of

9    compensation?"  I can't remember what that was

10   exactly, but he said a number.  I said, "That sounds

11   fine."  And if memory serves, I think we settled on

12   $2,500 all --

13        Q.    All inclusive?

14        A.    All inclusive.

15        Q.    Okay.  And did you run that budget by

16   anybody?

17        A.    I ran the process by which I was going to

18   develop that budget by Dan and Esai.

19        Q.    Okay.  And when did that happen?

20        A.    At the meeting immediately preceding me

21   reaching out to Joe.

22        Q.    Got it.  So you guys kind of talked about,

23   in general, the compensation?

24        A.    Exactly.  I suggested what range I thought

25   it would be, which included $2,500, and said, "I

1  will work out that -- those details, and if it lands

2  in the -- in that range, then I will execute."

3      Q.   Okay.  And when you emailed Emmons, there

4  wasn't a second telephone conference.  It was just

5  an email exchange?

6      A.   I don't believe there's a second telephone

7  call until after the project was completed.

8      Q.   Okay, okay.  So he goes to Spokane to

9  distribute the flyers.  Did you tell him anything

10  about how he should act at the stores when he

11  distributed flyers?

12      A.   Yes, I believe so.  We told him that this

13  was not a persuasion effort, so he was not to go up

14  to members and begin having discussions about the

15  flyer, not least of all because they would be at

16  work, but that he would just simply leave them where

17  members would either find them or directly in front

18  of a member and say, you know, "Hey, here's

19  something.  Look at this," something to that effect.

20  But unlike a traditional political canvas where you

21  might hand a flyer to someone and say, "Let me talk

22  with you about Candidate X," it was much more

23  passive.

24      Q.   Okay.  Did you ask him or instruct him or

25  -- or discuss with him whether he should reveal to

1    people if asked, you know, who he was working for or

2    what the specifics of the project were?

3         A.    I think -- I don't know if we had that

4    discussion specifically, but to the best of my

5    recollection, he knew that it was for Ridgelark,

6    because I don't believe I explained, and nor did he

7    ask, the -- who Ridgelark's client was on it.

8         Q.    So you didn't have any conversation about

9    whether -- if a member asked or a manager asked or

10   anything like that, he was -- whether he could say

11   who was behind Project Wagon Wheel, Ridgelark --

12        A.    He wouldn't have been able to.  I mean, he

13   could have said Ridgelark, but that would have meant

14   nothing to them.  But I believe he -- I think he

15   indicated post- project that his -- if he didn't

16   talk to anyone, he just said, "Hey, here's

17   information about the union, information about the

18   merger," and then -- and then left.

19        Q.    So after Mr. Emmons distributed the

20   flyers, did you have a follow-up telephone

21   conversation with him?

22        A.    Yes.

23        Q.    Okay.  And tell me about that

24   conversation.  How long did it last and what was

25   said?

1      A.    I can't remember specifically, but it must

2   not have been longer than just a few minutes because

3   he confirmed that he had been to Spokane and

4   distributed flyers.  He indicated that he didn't get

5   to all the stores on the list.  I said, "That's

6   fine."

7            And he described his, you know, practice

8   of, "I went in there, and I'd leave it here, I'd

9   leave it there, and then I just go."  And I said, "I

10  think that sounds perfect," or something to that

11  effect, and that's where we left it.

12      Q.    Okay.  And did you then report to Local

13  555 that the - the distribution had been completed?

14      A.    I would have certainly done so, yes.

15  Although I can't -- try as I might, I can't recall

16  that actual confirmation.  I would -- my best guess

17  is that it would have been a phone call immediately

18  after.  It may have come up in our next update

19  meeting, but I just can't gin up that particular

20  memory.  But it definitely would have happened.

21      Q.    Okay.  You would have told them that the -

22  - the follow-up action that you all had discussed

23  had been finished?

24      A.    That's correct.

25      Q.    Did you pay Mr. Emmons the compensation or

1    did local 555, if you know?

2         A.    Ridgelark did, through me.

3         Q.    And did you get reimbursed by Local 555 in

4    any respect?

5         A.    I did.

6         Q.    How so?

7         A.    He added a reimbursement line to my

8    invoice.

9         Q.    Your regular invoice?

10        A.    Yes.

11        Q.    And is this the same invoice that you

12   submit for your work as a political director?

13        A.    That's correct.  Although occasionally, if

14   it's very, very near to when I've submitted my last

15   invoice, I may gin up a specific reimbursement

16   invoice.  I can't say for certain whether that was

17   done in this particular case.

18        Q.    But in your judgment, you were working --

19   I mean, this project, the mailing, and the

20   distribution of this literature was part and parcel

21   of your role as political director?

22        A.    That's correct.

23        Q.    Okay.  And so you're submitting an

24   invoice, your normal compensation, I assume, and

25   then either separately or as part of that invoice,

1  you put the $2,500 reimbursement for the check you

2  wrote to Emmons?

3      A.    Correct.

4      Q.    Okay.  Got it.  And if I remember, Mr.

5  Emmons indicated that that may have been by a money

6  order.  Do you recall that?

7      A.    Yes, I believe so.

8      Q.    Okay.  Did you have any additional

9  conversations with Mr. Clay or Esai after the one we

10 just talked about where you confirmed the literature

11 had been distributed by Mr. Emmons?  Did you have

12 any follow up conversations about Project Wagon

13 Wheel?

14     A.    We -- only in the context of -- I believe

15 after the merger went through, we just kind of had a

16 conversation, something to the effect of, you know,

17 "Oh, well, remember Project Wagon Wheel?  Well, that

18 merger went through anyway."

19     Q.    Was Mr. -- you had a conversation with

20 Dan, Dan Clay or Esai?

21     A.    I believe it was with Dan --

22     Q.    Okay.

23     A.    -- and not Esai.

24     Q.    Okay.  Do you know -- do you recall

25 whether it was on the phone or in person?

1      A.    I don't.  I just remember that we

2  confirmed -- we had a short discussion confirming

3  that the merger had gone through.

4      Q.    Okay.  So at any point in the process, did

5  you have any basis to believe the allegations that

6  Ms. Guenther paid Mr. Gonzalez off to install her

7  puppet, Mike Hines, as president of Local 367?

8      A.    Other than being told that that was what

9  happened.

10     Q.    And who told you that happened?

11     A.    The -- when I had my in-person meeting

12  with Dan and Esai, they -- we had a discussion in

13  which there were certain talking points and factors

14  that we discussed that I would weave then into what

15  became this document, and -- and so this document is

16  based on notes that I took at that meeting.

17     Q.    Do you still have those notes?

18     A.    I do not.

19     Q.    What'd you do?

20     A.    I destroyed them.

21     Q.    When did you destroy them?

22     A.    In early December 2021.

23     Q.    Okay.  So after meeting with Dan and Esai

24  to get the talking points, you, at some point,

25  shredded in your notes or threw them away or

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    recycled them or whatever?

2        A.    That's correct.

3        Q.    Okay.  Did they -- did they tell you that

4    Ms. Guenther had paid off Mr. Gonzalez?

5        A.    They confirmed that after I had completed

6    this.

7        Q.    I see.

8        A.    I wanted to run it by Esai for a kind of

9    final approval and make sure that --

10       Q.    I see.

11       A.    -- everything was accurate as far as he

12   understood.

13       Q.    Okay.  I think I get it.  So you designed

14   it based on the talking points?

15       A.    Correct.

16       Q.    And then you ran it by Esai for accuracy

17   before the email -- or before the mailing, and

18   therefore the distribution of the flyers occurred?

19       A.    That's correct.

20       Q.    Okay.  And so, you know, just to try to be

21   efficient, is that the case for all of these

22   statements in the flyer, that you -- they come from

23   talking points that were developed in the

24   conversation with Esai and Dan, you designed them,

25   put them on the flyer, and then got confirmation for

1    accuracy from Esai?

2        A.    That is correct.

3        Q.    And other than -- I just want to walk out

4    of here and make sure I understand.  Other than the

5    information provided by those two individuals, it

6    sounds like you don't have a basis to believe these

7    statements are true?

8        A.    Other than the general statements such as

9    what the union should or should not be doing, or

10    that it's time to stop cover ups.  No, the specific

11    allegations all went through that process, as you

12    described.

13        Q.    Okay.  And at some point, I take it, you

14    learn that there may be -- there may be litigation

15    or the threat of litigation in connection with

16    Project Wagon Wheel?

17        A.    That's correct.

18        Q.    Okay.  And did that happen by, in our

19    world, what's called a litigation hold letter that

20    you received? Let me just ask you, how did you find

21    out?

22        A.    A private investigator sent me a letter

23    indicating that he was investigating me and 555 for

24    what we had termed Project Wagon Wheel.  And he

25    requested that I provide all associated documents to

1  respond?

2      A.    "Let's talk to John meeting John Bishop,

3  the in- house counsel.

4      Q.    Did you attend a -- okay.  Mr. Bishop's,

5  counsel for UFCW 555.  Okay.  I'm going to get

6  there.  At some point, as the owner of Ridgelark,

7  did you inform 555 that you thought the contract you

8  had with them, the indemnification clause was

9  triggered?

10     A.    At that point.

11     Q.    Okay.  And what did that mean to you?  Did

12  that mean to you that -- that they would -- that 555

13  would contribute to the defense of the -- of the

14  case in whole or in part?

15     A.    Yes.

16     Q.    Okay.  So that -- if I'm wrong about this,

17  just tell me, but would it be accurate to say that

18  Local 555, for example, would pay the attorney's

19  fees or reimburse you for paying Mr. Emmons's

20  attorneys?

21     A.    I believe the way it is structured is that

22  555 is to reimburse me for paying the fees.

23     Q.    Okay.  So you are paying the fees that

24  have been generated so far in Mr. Emmons' defense of

25  this lawsuit?

```
 1        A.    Yes.
 2        Q.    And then in turn, you are being reimbursed
 3  by 555?
 4        A.    That's correct.
 5        Q.    Okay, okay.
 6            MR. DILORENZO:   And at this point, let me
 7  interrupt and object for relevance, and I am
 8  presuming we have an agreement that I have a
 9  continuing --
10            MR. MCGUINNESS:   We do.
11            MR. DILORENZO:   -- objection for all of
12  these. Thanks.
13            MR. MCGUINNESS:   We do.
14  BY MR. MCGUINNESS:
15        Q.    Okay.  And at any point after the lawsuit
16  was filed, excluding conversations with counsel, did
17  you have any conversations with anyone about whether
18  the statements in the flyer are true or false?
19        A.    I'm trying to think.  I think at one point
20  -- at one point, I was having a discussion with Dan,
21  and I didn't so much as inquire whether the
22  allegations were true, but whether the truth of the
23  allegations, and as had been conveyed to me, was, in
24  fact, documentable --
25        Q.    Sure.
```

1  **does he run?**

2       A.    At the time, I believe he was between

3  jobs, but he was engaged in a -- he's a legislative

4  staffer for some time in Oregon.

5       **Q.    Okay.  Did he have something to do with**

6  **the mailing?  It says Rush Mailing List Research.**

7       A.    No, he knew that it was a mailing list --

8       **Q.    Okay.**

9       A.    -- but he just simply sent back a Google

10  spreadsheet.

11       **Q.    Google spreadsheet, okay.**

12       A.    And he did not know the nature of what he

13  was putting together.

14       **Q.    And did you pay him $500?**

15       A.    I did.

16       **Q.    And did you get reimbursed for that?**

17       A.    I believe I did.

18       **Q.    And by whom?**

19       A.    UFCW 555.

20       **MR. MCGUINNESS:**    Okay.  This should be

21  Exhibit 4.

22       Or is this 4 or 5?

23       **THE REPORTER:**    This is Exhibit 4.

24       **(WHEREUPON, Exhibit 4 was marked for**

25  **identification.)**

1  BY MR. MCGUINNESS:

2      Q.    Mr. Selvaggio, do you recognize this

3  document?

4      A.    Yes, I do.

5      Q.    Can you describe what it is?

6      A.    It is an email where I am responding to

7  Kyle, and initially, I was planning on paying him

8  through Venmo.  The other option, of course, is

9  handing him something, and so I'm telling him that

10  when I drop my son off to have a play date with his

11  son on Wednesday, or "Wednersday," I will bring him

12  the check.

13      Q.    Okay.

14          MR. DILORENZO:  Thank you.

15          (WHEREUPON, Exhibit 5 was marked for

16  identification.)

17  BY MR. MCGUINNESS:

18      Q.    Mr. Savage, do you recognize what's --

19  will be marked as Exhibit 5?

20      A.    Yes.

21      Q.    What is it?

22      A.    It appears to be a record of an electronic

23  withdrawal for $500 from the Ridgelark Strategies

24  business account.

25      Q.    Okay.

1        A.    And -- sorry.

2        Q.    **No, go ahead.  I don't want to interrupt**

3   **you.**

4        A.    I don't actually know what I was going to

5   say.

6        Q.    **Okay.  Does this reflect the payment of**

7   **the $500?**

8        A.    I believe it does, because the calendar

9   date is in that particular range, and the amount is

10  in that range, and I -- it certainly looks like it

11  does.

12       Q.    **Sure.  Is it cash?**

13       A.    No, this would have either been one of

14  those autopay things, or more likely, since my email

15  indicated -- and I'm sorry, I'm inducting here,

16  because I don't have specific recollection, but

17  based on these documents, it appears that I withdrew

18  either a check or money order and brought it to

19  Kyle, as I say, on Wednesday with the kid.

20       Q.    **Okay.  With your kid.  And then subsequent**

21  **to that, you would have submitted a reimbursement**

22  **invoice to 555?**

23       A.    That's correct.

24       Q.    **Okay.**

25            **(WHEREUPON, Exhibit 6 was marked for**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1    identification.)

2    BY MR. MCGUINNESS:

3        Q.    Mr. Selvaggio, I've handed you what's been

4    marked Exhibit 6 to your deposition.  Can you

5    describe this document?

6        A.    Yes, this is the email that I sent to Joe

7    Emmons, that was -- immediately after our discussion

8    of his willingness to accept his -- this job.  It is

9    two emails, the first of which was the agreement

10   about what our budget was like --

11       Q.    Mm-hmm.

12       A.    -- and that he was going to presumably

13   accept that.  And in addition, the flyer is attached

14   to that, and he had agreed over the phone that he

15   was going to be the one responsible for printing

16   hard copies of that.  And immediately following that

17   was a list of -- it looks like a certain number of

18   work sites, nine work sites, that we had suggested

19   he go to.

20           MR. MCGUINNESS:    Counsel, just wanted to

21   point out that the second page of the document

22   reflects, kind of, a copy of the list, I think, to

23   counsel.  I don't see -- I don't see communications,

24   but --

25           MR. DILORENZO:    I believe that's because

1    this was something that was sent to me.

2            MR. MCGUINNESS:  Okay.  You're fine with

3    it?

4            MR. DILORENZO:  I'm fine with it.  As long

5    as --

6            MR. MCGUINNESS:  Yep.

7            MR. DILORENZO:  -- you stipulate that does

8    not constitute a waiver.

9            MR. MCGUINNESS:  No, it does not.

10           MR. DILORENZO:  Okay.  Thank you for

11   catching that.

12           MR. MCGUINNESS:  Is this 6?

13           THE REPORTER:  7.

14           MR. MCGUINNESS:  Exhibit 7.

15           (WHEREUPON, Exhibit 7 was marked for

16   identification.)

17   BY MR. MCGUINNESS:

18       Q.   Mr. Selvaggio, do you recognize the

19   document that's been marked Exhibit 7?

20       A.   Yes, I do.  This is 7, right?  Yeah.

21       Q.   And what is it?

22       A.   This is a withdrawal receipt that I --

23   that represents the withdrawal that paid Joe Emmons

24   for the -- the $2,500 for executing his portion of

25   Project Wagon Wheel.  And initially, I thought that

1  it might have been a money order, but it looks like

2  it was a cashier's check, probably, given the --

3  given the notation on the --

4       Q.   **Right.**

5       A.   -- withdrawal form.

6       Q.   **If purchasing -- it says, "If purchasing a**

7  **cashier's check, provide payee name -- payee name,**

8  **Oscar --**

9       A.   That's not required on a money order.

10      Q.   **Okay.  I didn't know that.  And then this**

11 **is -- this syncs up with the reimbursement you --**

12 **you spoke of earlier that you would have sought from**

13 **555?**

14      A.   Correct.

15           MR. MCGUINNESS:  Okay.  Before I do this,

16 Counsel, is this duplicative to -- to your -- is

17 this the same as what's already been marked?  This

18 is a document that -- that Michael provided, I

19 think, today.  But is it the same as Exhibit 2?  Is

20 it -- if it is --

21           MR. DILORENZO:  Well, I think Exhibit 2

22 appears to be a photocopy --

23           MR. MCGUINNESS:  Okay.

24           MR. DILORENZO:  -- of something that's

25 been printed.  And this next item looks like it was

1  printed off of a --

2            MR. MCGUINNESS:  Yeah.

3            MR. DILORENZO:  Off of an email or

4  something.

5            MR. MCGUINNESS:  Okay.  So this is Exhibit

6  8?

7            THE REPORTER:  This would be Exhibit --

8  yes, correct.

9            (WHEREUPON, Exhibit 8 was marked for

10  identification.)

11  BY MR. MCGUINNESS:

12        Q.    Okay.  Mr. Selvaggio, do you recognize

13  Exhibit 8?

14        A.    Yes, I do.

15        Q.    What is it?

16        A.    This is a printout of the document of

17  which a photograph was taken in Exhibit 2.

18        Q.    Did you print this out?

19        A.    I printed out the document that is

20  photographed in Exhibit 2, but -- so I have printed

21  this out before, but I didn't print this one out.

22        Q.    Got you.  This is -- this is what was

23  attached to the email you sent Mr. Emmons --

24        A.    Correct.

25        Q.    -- in January of 2021?

1        **A.    Yes.**

2                **MR. MCGUINNESS:**  Do we got another one of

3    these?

4                **UNIDENTIFIED SPEAKER:**  No, this is the one

5    where the first page and the second page are

6    identical.

7                **MR. MCGUINNESS:**  Can we go off the record

8    just a minute?

9                **THE VIDEOGRAPHER:**  It's 1:38.  We're off

10   the record.

11               **(WHEREUPON, a recess was taken.)**

12               **MR. MCGUINNESS:**  Exhibit 9?

13               **THE REPORTER:**  Correct, Exhibit 9.

14               **(WHEREUPON, Exhibit 9 was marked for**

15   **identification.)**

16               **MR. MCGUINNESS:**  Thank you.

17   BY MR. MCGUINNESS:

18       **Q.    Mr. Selvaggio, I've handed you what's been**

19   **marked as Exhibit 9.  Can you identify the document?**

20       A.    Yes, this is an email that I sent to Dan

21   Clay to let him know that I was ready to update him

22   on -- it looks like four items, and his response

23   indicating that he'll ping me in a couple, indicates

24   that we probably had a telephone conversation about

25   that, about each of those items later in the day.

1          MR. MCGUINNESS:   Thank you.

2    BY MR. MCGUINNESS:

3          Q.    Mr. Selvaggio, at an earlier point in your

4    deposition, you described the Wagon Wheel project as

5    a passive project.   Do you recall that?

6          A.    Yes.

7          Q.    Okay.   Maybe that's not even really fair.

8    The -- Mr. Emmons distributing the flyers was to be

9    a passive -- he was to be passive --

10         A.    That's correct.

11         Q.    -- in doing that?   Okay.   That's a better

12   way, I think, of describing your testimony.   Who

13   decided that part of -- that it would -- that he

14   would take a passive role, if you remember?

15         A.    I don't recall.   I just don't recall.

16         Q.    When you mailed the flyers out, was there

17   a return address on the envelopes?

18         A.    No, there was not.

19         Q.    Was there any identification of who was

20   responsible for the mailing?

21         A.    No.

22         Q.    And that's true for the flyer that Mr.

23   Emmons distributed?

24         A.    That's correct.

25         Q.    And that was intentional?

1       A.    Yes.

2       Q.    Okay.  Now, you -- you spoke that -- spoke

3   about a conversation with Dan Clay after receiving

4   the letter from the investigator.  Do you recall

5   that?

6       A.    I do.

7       Q.    Okay.  And you indicated that the

8   conversation occurred very soon after that letter

9   was received.  Do you recall that?

10      A.    Yes.

11      Q.    When you say very soon, do you mean that

12  day, the day after?  Can you be more specific about

13  when that conversation happened?

14      A.    It was -- oh, you know, whatever the --

15  whatever the day before the UFCW International

16  Lobbying Conference was in 2022 -- was when we had

17  that conversation.

18      Q.    So it's tied to when you -- in your mind,

19  it's tied to --

20      A.    In my mind, it is tied to that just as a

21  matter of -- that's when it happened to occur, and I

22  recall that the next day was the conference.  So I

23  think that was the end of March or possibly April of

24  2022.

25      Q.    Okay.  Let me get to an exhibit here.  Do

```
1                          CERTIFICATE

2

3       I, the undersigned, Ron Pestes, am a videographer on

4   behalf of NAEGELI Deposition & Trial. I do hereby certify

5   that I have accurately made the video recording of the

6   deposition of Michael Selvaggio, in the above captioned

7   matter on the 12th day of October, 2023 taken at the

8   location of Davis Wright Tremaine LLP, 1300 SW 5th Ave.,

9   Ste. 2400, Portland, OR 97201.

10

11      No alterations, additions, or deletions were made

12  thereto.

13

14      I further certify that I am not related to any of

15  these parties in the matter and I have no financial

16  interest in the outcome of this matter.

17

18

19  _____

20                  Ron Pestes

21

22

23

24

25
```

CERTIFICATE


     I, Dan Kirdey do hereby certify that I reported all

proceedings adduced in the foregoing matter and that the

foregoing transcript pages constitutes a full, true and

accurate record of said proceedings to the best of my

ability.


     I further certify that I am neither related to

counsel or any party to the proceedings nor have any

interest in the outcome of the proceedings.


     IN WITNESS HEREOF, I have hereunto set my hand this

19th day of October, 2023.




                         Dan Kirdey

# EXHIBIT 8



Michael Selvaggio <mike@ridgelark.com>

## Mailing List Invoice
2 messages

**Kyle Linhares** <kjlinhares@gmail.com>                    Mon, Dec 13, 2021 at 10:42 AM
To: mike@ridgelark.com

Here you go :)
-Kyle

📄 **linharesridgelarkinvoice1.pdf**
43K

**Michael Selvaggio** <mike@ridgelark.com>                    Mon, Dec 13, 2021 at 10:51 AM
To: Kyle Linhares <kjlinhares@gmail.com>

Ah. My bank is not letting me put that much thru Venmo.  I'll bring you a check on Wednrsday with the kid?

On Mon, Dec 13, 2021, 10:42 AM Kyle Linhares <kjlinhares@gmail.com> wrote:
Here you go :)
-Kyle

EXHIBIT
4
DEPONENT NAME:
M. SELVAGGIO    DATE: 10/12/23

# EXHIBIT 9

12:12

  

FG

**FAYE** ›

Hi Mike I can see you are calling but I am in a plane will call when I land

Did this come out in Spokane or on the I5 corridor?

Spokane. Mailed from Spokane on Dec 13

Ok, so weird.

Yes. Very weird. They clearly don't know that angel hated me and I didn't want you to leave ufcw 21!!

And whomever it is is to scared to put a name to it.

Yeah. Total misinformation but to be expected. One of Eric's staffers I would suspect.

Can you send me Mizrahi's number? I need to talk about the medical with him.

Can't seem to find.

Yes....maybe someone who also is connected to Lindsay..

  iMessage 

       

Hines sub resp. 030

# EXHIBIT 10



RFP Resp No. 2 - 002095

# EXHIBIT 11

RFP Resp No. 2 - 002099



about. 😡 How disappointing.

6 hrs   Like   Reply   More

**Earl Greenlaw** replied   1 reply

**Charlotte Verdini**
So I have questions: tell me more about this forced merger stated on the leaflet

18 mins   Like   Reply   More

**Jessica Roach**
**Charlotte Verdini**
This flyer was mailed to Fred Meyer, addressed to the shop steward, the store director, and two assistants managers. It appears that UFCW Local 1439 in Spokane knows of our history and is experiencing very similar issues. Much like Denise did, their President appears to be making a back door deal with Faye, President of 21, in a desperate attempt to secure his employment. Also, much like our previous President, Angel, their President, Eric Renner, is being sued for sexual harassment. The evidence against him must be solid because this ,as WE KNOW, this is a desperate move. The evidence against Angel was so solid that Angel reigned. I've always thought there would be another merger attempt-but know I think the deals been made with Faye to just move 21 in gradually. We currently have four Local 21 people working at our Local. I think this flyer is meant to alert of us the corruption that is happening, perhaps, so we can start the conversation of how to combat it.

Just now   Like   Reply   More

Write a reply...

Save                    Share

# EXHIBIT 12

| | |
|---|---|
| **From:** | "Daniel Clay" <delay@ufcw555.org> |
| **Sent:** | Wed, 22 Dec 2021 19:00:02 +0000 (UTC) |
| **To:** | "Kate Meckler" <kmeckler@ufcw.org> |
| **Subject:** | Fwd: Merger Between 21 and 1439 and 367 |

Esai said you wanted a copy.

The blank "To" field means it was blind copied to me. That makes me suspect it was sent to bunch of people.

---------- Forwarded message ---------
From: **Collin Farthingworth** <collinfarthingworth@gmail.com>
Date: Tue, Dec 21, 2021 at 7:01 PM
Subject: Merger Between 21 and 1439 and 367
To:

Leaders of the UFCW the cover ups must stop. Fake Faye and her overlord Todd Crosby must be stopped. Fake Faye acting as Todd Crosby's "Maxwell" is continuing to help men in the Washington UFCW get away with protecting sexual harrassers. This must stop. First she protects Angel and now Eric. Eric and his staff sexually harrass members, organizers and other staff only to be given a merger and cushy job. Nothing has changed since I retired. We must not let Fake Faye and Todd Crosby destroy the UFCW by hiding sexual harasser friends. Ask the questions, why would ERic step down and still keep a job. Ask to see Eric's personal file and all agreements made with him. Vote no to Mergers with the harrassment club of 21.

UFCW-EMMONS_000925

# EXHIBIT 13



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

FAYE IRENE GUENTHER, an
individual,

      Plaintiff,

vs.                NO. 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually,
and OSPREY FIELD CONSULTING, LLC,
a limited liability company,

      Defendants.

_____

**VIDEOTAPED DEPOSITION OF**

**JOSEPH H. EMMONS**

**TAKEN ON**
**WEDNESDAY, SEPTEMBER 6, 2023**
**9:19 A.M.**

**920 FIFTH AVENUE**
**SEATTLE, WASHINGTON**

1      Q.    Mr. Emmons, prior to today, have you ever met the

2    plaintiff in this case, Faye Irene Guenther?

3      A.    No.

4      Q.    Have you met any current or ex-employees of UFCW

5    Local 21 or UFCW 3000?

6      A.    No.

7      Q.    Have you met any employees or ex-employees of UFCW

8    Local 1439?

9      A.    No.

10     Q.    Other than your lawyer, lawyers, have you spoken

11   to any person about the plaintiff in this case, Faye Irene

12   Guenther?

13     A.    Yes.

14     Q.    Okay.  Let's start with who you've spoken to.

15     A.    Michael Selvaggio, Ridgelark Services Strategies.

16   And the rest of the conversations have been with -- I'm

17   trying to think of how to phrase it, but conference calls

18   with attorneys.

19     Q.    Okay, yeah, and I'm not interested in those so

20   much.

21          So taking aside your lawyer and even people who

22   work for your lawyer, have you spoken to anybody other than

23   Mr. Selvaggio about the plaintiff in this case, Faye

24   Guenther?

25     A.    About the plaintiff, no.

1    Q.    You seem to -- About Faye Guenther?

2    A.    No.

3    Q.    How many times have you spoken to Mr. Selvaggio

4    about Ms. Guenther?

5    A.    I can't recall specific number.

6    Q.    More than once?

7    A.    Yes.

8    Q.    When do you first recall talking to Mr. Selvaggio

9    about Faye Guenther?

10   A.    When the lawsuit was filed and I read her name for

11   the first time.

12   Q.    Okay, when the lawsuit was filed.

13         Had you spoken to Mr. Selvaggio prior to that

14   date, about Faye Guenther?

15   A.    No.

16   Q.    Okay.  How did that conversation occur?  And by

17   that I mean was it a phone call, an email, a text that you

18   had with Mr. Selvaggio?

19   A.    I can't recall.

20   Q.    Do you know whether he initiated the contact with

21   you or you initiated the contact with him?

22   A.    I do not.

23   Q.    You don't remember?

24   A.    I do not remember.

25   Q.    Okay.  So when the lawsuit was filed and you had

1    Q.    Okay.  And did you describe the -- did he want you

2    to participate in the project?

3    A.    Yes.  He asked if I would like to be.

4    Q.    Did he describe what the project was so that you

5    would be able to answer that question?

6    A.    Yes.

7    Q.    Okay.  How did he describe the project?

8    A.    That there were individuals who previously had

9    sexual harassment allegations against them attempting to

10   come back into leadership, which is a personal issue for me.

11   Q.    Okay.  So there were individuals who had sexual

12   harassment allegations attempting to come back into

13   leadership; is that fair?

14   A.    To the best of my knowledge, yes.

15   Q.    Did he tell you who the individuals were?

16   A.    I don't recall if he said them by name.

17   Q.    So other than telling you the individuals who had

18   sexual harassment allegations attempting to come back into

19   leadership, what did he tell you about the project?

20   A.    That I'd be distributing fliers at grocery stores

21   to educate membership.

22   Q.    Did he tell you what membership?

23   A.    No.

24   Q.    The Teamsters?

25   A.    I mean, I'm personally familiar with what union

1    represents grocery store workers.

2        Q.    So you understood it to be the UFCW?

3        A.    I -- yes.  "The UFCW," if you could please

4    clarify?

5        Q.    Well, did you understand the project to involve

6    UFCW members?

7        A.    I mean, that they may potentially be UFCW members.

8        Q.    Okay.  And you say "potentially," because all you

9    know is it's grocery store employees?

10       A.    Yes.

11       Q.    Okay.  What else did he tell you about the

12   project?

13       A.    I can't recall, but I really didn't need to hear

14   much more.

15       Q.    You didn't need to hear much more?

16       A.    Huh-uh.

17       Q.    Did you make any inquires of him regarding the

18   project?

19       A.    Yes.

20       Q.    What did you say?

21       A.    I asked him about the credibility of the

22   accusations and involvement of individuals in the Spokane

23   region.

24       Q.    And what did he say?

25       A.    That there had been social media posts and that

1    the membership was talking about it.

2        Q.    Did he tell you what the posts were?

3        A.    Yes.

4        Q.    And who posted the social media posts?

5        A.    Not at that time.

6        Q.    What did he tell you about the posts?

7        A.    That this was an ongoing dialogue and that

8    distributing these fliers would educate membership.

9        Q.    And when you say this was an ongoing dialogue,

10   what do you mean?

11       A.    This subject, pertaining to the fliers.

12             (Indicating.)

13       Q.    Okay.  So in response to your inquiries about the

14   credibility of the allegations, he told you there were

15   posts, that this was an ongoing dialogue and would educate

16   membership?

17       A.    Yes.

18       Q.    What else did he tell you?

19       A.    I can't recall anything else specifically.

20       Q.    Did he tell you anything specifically about the

21   allegations against Mr. Renner?

22       A.    No.

23       Q.    And he didn't mention anything specific about the

24   allegations regarding Ms. Guenther?

25       A.    I can't recall specifically.

```
 1        A.    No, I have not.

 2        Q.    Were you or Osprey involved in any way in the

 3   elections or the appointment of persons in leadership

 4   positions for UFCW Local 367?

 5        A.    No.

 6        Q.    Okay.  And if I could have you turn your attention

 7   to Exhibit B.

 8              Is this the flier that Mr. Selvaggio mentioned to

 9   you in your first conversation?

10        A.    Yes.

11        Q.    When did you first see the flier?

12        A.    Early January 2021.

13        Q.    Did you have any involvement in the creation or

14   production of the flier?

15        A.    No.

16        Q.    Do you know who produced the flier?

17        A.    No.

18        Q.    Did anyone tell you who produced the flier?

19        A.    No.

20        Q.    Other than Mr. Selvaggio and your attorneys, did

21   you speak to any other person, individual, or corporation

22   about the flier before you distributed it?

23        A.    No.

24        Q.    And did Mr. Selvaggio indicate whether he was

25   asked to distribute the flier by any other person or entity?
```

1    A.    No.

2    Q.    So is it your testimony that your understanding is

3    that it was Mr. Selvaggio who wished to have this flier

4    distributed on his own behalf?

5    A.    On his own behalf, I can't be certain, but it was

6    through Ridgelark.

7    Q.    Is it your understanding that he hired you to

8    distribute the flier on someone else's behalf or some other

9    entity's behalf?

10    A.    No.

11    Q.    Okay.  With respect to Exhibit B, do you see the

12    heading "Attention UFCW Members"?

13    A.    Yes.

14    Q.    Have you spoken with anyone other than your

15    lawyers about the heading of the flier?

16    A.    No.  Michael Selvaggio, at the beginning, when I

17    read through it, but not really a discussion.

18    Q.    So help me understand.  When you had the first

19    telephone conversation with Mr. Selvaggio about the project,

20    at that point did you have a copy of the flier?

21    A.    No.

22    Q.    Okay.  So was there a time after that first

23    conversation that you were provided with the fliers?

24    A.    Yes.

25    Q.    Okay.  And about how long after the first

1    conversation you had with Mr. Selvaggio about the project

2    were you provided with copies of the fliers?

3        A.    Within a couple to a few days.  I can't be

4    certain.

5        Q.    Okay.  And how did you get the fliers?

6        A.    Email.

7        Q.    Email attachment?

8        A.    Yes.

9        Q.    From Mr. Selvaggio, to you?

10       A.    From his Ridgelark email address.

11       Q.    Okay.  So now you have the flier.

12             What did you do with it?  Did you print it out?

13       A.    Yes.

14       Q.    Using your own printer or Osprey equipment?

15       A.    No.

16       Q.    Which no?  How did you print it out?

17       A.    FedEx.

18       Q.    You went to a FedEx store?

19       A.    Uh-huh.

20       Q.    Which FedEx?

21       A.    No clue.

22       Q.    In Portland?

23       A.    Possibly.

24       Q.    You don't remember?

25       A.    No.

1    Q.    Did you make copies there?

2    A.    I printed copies.

3    Q.    How many copies did you print?

4    A.    I can't be certain.

5    Q.    Do you still have the email?

6    A.    Yes.

7    Q.    Okay.  So now you have the flier.

8          Do you arrange to have another conversation with

9    Mr. Selvaggio?

10   A.    No.

11   Q.    Maybe I misunderstood.  I thought your testimony

12   is that you went through the flier with Mr. Selvaggio.

13         Is that not the case?

14   A.    No.  Over the email.

15   Q.    Oh, so you --

16   A.    There was a phone call involved, but the email as

17   well.

18   Q.    So in the email is there some communication

19   between you and Mr. Selvaggio about the allegations in the

20   flier?

21   A.    No.

22   Q.    Is it just, Here's the flier?

23   A.    Yeah.

24   Q.    So you never spoke to him about --

25   A.    Reading through it.

1    Q.    Okay.  I'm sorry.

2          You never spoke to Mr. Selvaggio about the

3    substance of the flier, the actual statements?

4    A.    No.  Like I said, we read through it when he had

5    emailed it over to me.  Previously he had given me an

6    informational conversation about the subject.

7    Q.    Okay.  And when you say you read through it, were

8    you on the phone with him when you got the email?

9    A.    I believe so.  It may have been after I received

10    it that we had a conversation about it.

11    Q.    Okay.  In any event, there's a second call?

12    A.    Yes.

13    Q.    Where now you have the flier?

14    A.    Yep.

15    Q.    And you can talk to him about it?

16    A.    Yep.

17    Q.    Okay.  And we know, I take it, that that

18    conversation occurred before you went to Spokane --

19    A.    Yes.

20    Q.    -- and distributed the file?

21    A.    Yes.

22    Q.    Okay.  Did you have a conversation with Mr.

23    Selvaggio about the heading, "Attention UFCW Members,"

24    during that second call?

25    A.    Not to the best of my recollection, not

1  specifically the header.

2      **Q.    How about the second statement right under the**

3  **heading, "The in-union 'Sexual Harassment Club' is at it**

4  **again"?**

5      A.    The conversation revolved around sexual harassment

6  allegations.  So I would assume that we -- I mean, we read

7  over it.

8      **Q.    Did you talk to him about a UFCW union being an**

9  **in- union sexual harassment club?**

10     A.    Yes.

11     **Q.    What did he say?**

12     A.    We read over the flier, and he said that there had

13  been investigations.

14     **Q.    Did he say anything about details of the**

15  **investigation?**

16     A.    Not to the best of my recollection, not details.

17     **Q.    So as you sit here today, it's your testimony that**

18  **with respect to the statement the union sexual harassment**

19  **club is at it again, he merely told you there had been**

20  **investigations?**

21     A.    Yes, to the best of my recollection.

22     **Q.    Okay.  Do you see the next portion of the flier,**

23  **that begins with the word "First"?**

24     A.    Yes.

25     **Q.    "First Faye Guenther (President of Local 21)**

1    helped former 367 President Angel Gonzalez cover up his

2    harassment charges and paid him off in exchange for

3    installing her puppet, Mike Hines."

4              Do you see that?

5       A.    Yes.

6       Q.    Did Mr. Selvaggio say anything to you about that

7    portion of the flier?

8       A.    Not in any more detail than that comment.

9       Q.    That there had been investigations?

10      A.    Uh-huh.  Yes.

11      Q.    Did he say anything to you about why the flier was

12   alleging that Faye Guenther paid Angel Gonzalez off?

13      A.    Not specifically.

14      Q.    At all?

15      A.    To the best of my knowledge.

16      Q.    Okay.  Do you see the next sentence, that says,

17   "Now she's helping Eric Renner (the Local 1439 President)

18   hide from sexual harassment charges and land a cushy new gig

19   with Local 21 through a forced merger"?

20             Do you see that?

21      A.    Yes.

22      Q.    Did Mr. Selvaggio say anything to you about that

23   portion of the flier?

24      A.    No.

25      Q.    Did he say anything to you about the remaining

1    portions of the flier?

2       A.    No.  Again, we read through it.

3       Q.    You read through the flier.  And I just want to

4    make sure I understand.

5             The sole basis that Mr. Selvaggio had for the

6    flier, that he communicated to you, was there had been

7    investigations?

8       A.    That was communicated to me.

9       Q.    From Mr. Selvaggio?

10      A.    Uh-huh.

11      Q.    Yes?

12      A.    Yes, from -- Yes, from Ridgelark.

13      Q.    And did you have any conversations with any other

14   individuals about any of the substantive portions of this

15   flier?

16      A.    No.

17      Q.    Okay.  And did you discuss the details of

18   distributing the flier with Mr. Selvaggio during the second

19   conversation?

20      A.    Did not discuss.  Actually, yes.

21      Q.    You had to know where he wanted you to distribute

22   it?

23      A.    Absolutely.  Just I'm not sure if that was

24   included in the conversation.

25      Q.    Well, how did you -- to the best of your

1  recollection, why did you go to Spokane and distribute the

2  fliers there?

3       A.    I was given the list of addresses via email.

4       Q.    And who provided that list?

5       A.    Michael Selvaggio, Ridgelark.

6       Q.    And do you still have that email?

7       A.    It is the same email referenced earlier.

8       Q.    So he gave you both the list and the flier?

9       A.    Yes.

10      Q.    And were you or Osprey offered any consideration

11  for distributing the flier?

12      A.    By "consideration" --

13      Q.    Money?

14      A.    Yes.

15      Q.    And who offered you the consideration?

16      A.    Ridgelark.

17      Q.    Through Mr. Selvaggio?

18      A.    He's the owner of Ridgelark.

19      Q.    So yes?

20      A.    Um -- (Indicating.)

21      Q.    Well, let me go back.

22            I mean, did you have any conversations with Mr.

23  Selvaggio about whether you would be compensated for

24  distributing the fliers?

25      A.    Yes.  The compensation didn't personally come from

1   Mr. Selvaggio.  It came from Ridgelark.

2        Q.    So tell me about the conversation you had with Mr.

3   Selvaggio.

4              Was that during the first or second call?

5        A.    About compensation?

6        Q.    Yeah.

7        A.    I can't recall which call it was covered in.

8        Q.    Okay.  Well, what do you recall Mr. Selvaggio

9   telling you about your compensation or Ridgelark providing

10  compensation for distributing the fliers?

11       A.    I remember we broke down a budget.  I made a

12  proposal, and it was accepted.

13       Q.    So what do you remember telling him about the

14  budget?

15       A.    I remember telling him what I would need, a dollar

16  amount for my personal compensation, and then in the email

17  he included a budget breakdown.  Or I should say for

18  Osprey's compensation, not my personal compensation.

19       Q.    What was the budget?

20       A.    I can't recall specifically.

21       Q.    Did the budget include reimbursing you for

22  expenses?

23       A.    Yes.

24       Q.    Like gas and lodging, if necessary?

25       A.    Yes.

1    Q.    And what did you charge Ridgelark for distributing
2    fliers?
3    A.    Again, I can't be certain right now.  It's been a
4    couple years.
5    Q.    You don't recall?
6    A.    Not an exact dollar amount, no.
7    Q.    Do you recall receiving a check from Ridgelark to
8    compensate you for your services for distributing the
9    fliers?
10    A.    Yes.
11    Q.    So how did you do it?  How did you distribute the
12    fliers?
13    A.    Can you clarify?
14    Q.    Well, did you drive to Spokane?
15    A.    Yes.
16    Q.    From Portland?
17    A.    Yes.
18    Q.    And your intention, I take it, was to distribute
19    the fliers in person to grocer employees?
20    A.    Yes.  Not to employees, no.
21    Q.    To who?
22    A.    To distribute them.
23    Q.    Distribute them to who?
24    A.    Not to individuals, but to leave them.
25    Q.    To leave them where?

1    A.    In various locations around the store.

2    Q.    **For grocer employees to find?**

3    A.    Yes.

4    Q.    **Okay.  So which stores did you distribute the**

5    **fliers to?**

6    A.    I have a list.  I can't remember their exact

7    addresses.  Safeways, Fred Meyer's, I believe one

8    Albertson's.

9    Q.    **Did you distribute fliers at all the stores on the**

10    **list you were provided?**

11    A.    No.

12    Q.    **How many stores did you visit with the fliers?**

13    A.    Approximately five to seven.

14    Q.    **And what time of day did you distribute the**

15    **fliers?**

16         **What time of day was it?**

17    A.    I believe that's included in the complaint.

18    Q.    **Yeah, I know it's included in the complaint, but**

19    **the complaint is a set of allegations.**

20         So I have to ask you:  What time of the day did you

21    distribute the fliers?

22    A.    Five to six p.m., roughly.

23    Q.    **Did you speak to anyone about distributing the**

24    **fliers after you accomplished your task?**

25    A.    Yes.

1     Q.    What did you say?

2     A.    I said Ridgelark.

3     Q.    And you didn't say anything to him about doing a

4  project involving the UFCW?

5     A.    I believe I mentioned that I wasn't certain, of

6  course, if they were involved, but it was a UFCW issue.

7     Q.    Did you think it was Mr. Selvaggio and Ridgelark

8  that wanted to conduct this project?

9     A.    That was my understanding.

10    Q.    Is that still your understanding, that it wasn't a

11 third party that requested that Ridgelark or Mr. Selvaggio

12 distribute the fliers or have someone distribute the fliers?

13    A.    I can't be certain.

14    Q.    At the time you distributed the fliers, did you

15 have any personal knowledge regarding the truth or falsity

16 of its statements?

17    A.    Any personal knowledge?  No.

18    Q.    Did anybody make any representations to you about

19 whether the statements in the fliers were actually true or

20 false before you distributed them?

21    A.    Yes.

22    Q.    And who did that?

23    A.    Michael Selvaggio, with Ridgelark.

24    Q.    Now, my understanding is he simply told you that

25 there had been an investigation.

1    lawsuit was filed.

2        Q.    Okay.  So you had a conversation with him about

3    the specific statements in the flier after the lawsuit was

4    filed.

5              Was this via telephone?

6        A.    Yes.

7        Q.    Okay.  And did you initiate the call?

8        A.    I can't recall.

9        Q.    Okay.  What do you recall about the conversation?

10        A.    That there was legitimacy to these things, that

11    there were investigations by International, and, yeah, that

12    these situations had been investigated.

13        Q.    Did he ever tell you that -- or claim that there

14    were investigations about Ms. Guenther's conduct as

15    described in the flier?

16        A.    Investigations about Ms. Guenther's --

17        Q.    Yeah.  I mean, you see the statements with respect

18    to Ms. Guenther.

19              Did he ever tell you that there were

20    investigations about whether she paid somebody off?

21        A.    I honestly can't recall.  I remember the

22    conversation being surrounding sexual harassment

23    allegations.

24        Q.    At the time you distributed the fliers, did you

25    have any basis whatsoever to believe the allegation that Ms.

1    Guenther paid Mr. Gonzalez off to install her puppet, Mike

2    Hines, as president of Local 367?

3        A.    Yes.

4        Q.    What was that?

5        A.    This.  (Indicating.)

6        Q.    The flier itself?

7        A.    The flier.

8        Q.    Anything else except for the flier you were

9    provided?

10        A.    No.

11        Q.    Did you do anything to determine whether the

12    statements were true or false -- statements about Ms.

13    Guenther were true or false before you distributed the

14    fliers?

15        A.    I had no reason to feel that they were false.

16        Q.    Okay.  But did you do anything other than talk to

17    Mr. Selvaggio to determine whether those statements about

18    Ms. Guenther in that flier are true or false?

19        A.    No.

20        Q.    Did you have any conversations with Mr. Selvaggio

21    regarding the proposed merger between UFCW Local 21 and

22    1439?

23        A.    I was made aware that it was in the works by,

24    again, this flier, talking about the merger.

25        Q.    It does.  It talks -- It says, "Vote no on any

1   merger," right?

2        A.    Uh-huh.

3        Q.    And it talks about a forced merger, right?

4        A.    Through a forced -- and land a cushy new gig with

5   Local 21 through a forced merger.

6        Q.    That's what the flier says?

7        A.    Yes.

8        Q.    Did you have any conversations with Mr. Selvaggio

9   specifically about that topic?

10       A.    No.  It was about the merger itself.

11       Q.    What did he say about the merger, if anything, to

12  you?

13       A.    That it was occurring.  I don't recall anything

14  else.  Oh, it was occurring, and that these people that had

15  these investigations and accusations against them were

16  coming back.

17       Q.    To your knowledge, was Osprey or Ridgelark hired

18  by any entity to provide services related to the merger or

19  proposed merger between Local 21 and 1439?

20       A.    Regarding the merger?

21       Q.    Yeah.

22       A.    No.

23       Q.    Do you know whether Mr. Selvaggio provides

24  services to -- or Ridgelark, to any labor organizations

25  other than Local 555?

1          I would like to make a disclosure which I reserve

2   the right to object to the relevance thereof at trial, but

3   it has to do with the last round of questions regarding

4   payment of Mr. Emmons' attorneys' fees.

5          Mr. Emmons and Ridgelark and Local 555 are parties

6   to a tripartite agreement whereby Ridgelark agrees to

7   indemnify and provide a defense to Mr. Emmons for this case,

8   and pursuant to Ridgelark's contract with 555, that 555, in

9   turn, agrees to indemnify and provide a defense to Ridgelark

10  with respect to this case.  It also includes a joint-

11  interest privilege agreement.

12          And so I make this disclosure because, number one,

13  you're entitled to know about it, and, number two, although

14  it's irrelevant, I think it will save you a lot of time in

15  your questioning, and I'm all for making efficient use of

16  our time.

17          So that's all I have to say about that.

18          MR. MCGUINNESS:  Just give me a minute.

19          MR. DILORENZO:  Oh, and I should add that that was

20  entered into at the inception of the case.

21          MR. MCGUINNESS:  Okay.  So just so I understand

22  it, there's a -- I think you termed it tripartite agreement

23  --

24          MR. DILORENZO:  Three-party agreement.

25          MR. MCGUINNESS:  -- between Ridgelark, UFCW Local

```
 1        Q.    Fair enough.

 2              When were you first made aware of the agreement?

 3        A.    I can't say specifically, as the case has been

 4   going on for a good long while --

 5        Q.    Around when the -- sorry.

 6        A.    But it was towards the beginning.

 7        Q.    Around when the lawsuit was filed?

 8        A.    Yes.

 9        Q.    Okay.  Mr. Emmons, do you own any vehicles?

10        A.    Yes.

11        Q.    How many?

12        A.    Two.

13        Q.    And what are they?

14        A.    A 1977 Pontiac Grand Prix and a 2009 Ford Escape.

15        Q.    And did you own those vehicles in January of 2022?

16        A.    Yes.

17        Q.    And did you take -- did you use one of them to

18   drive from Portland, to Spokane, to distribute the fliers?

19        A.    Yes.

20        Q.    And is that a personal vehicle or one that Osprey

21   issues to you?

22        A.    It's a personal vehicle.

23        Q.    Are you a sports fan?

24        A.    Yes, sir.

25        Q.    Do you follow any college sports?
```

1       A.    Go Ducks.

2       Q.    **Are you a Gonzaga basketball fan?**

3       A.    I mean, here and there, yeah.  They're a great

4  team.

5       Q.    **You don't have a favorite player or anything, do**

6  **you?**

7       A.    No.  I mean, it changes so darn much.

8       Q.    **Did you wear a baseball cap when you distributed**

9  **the fliers at the Spokane stores?**

10      A.    Yes.

11      Q.    **Was it a Gonzaga baseball cap?**

12      A.    Yes.

13      Q.    **And how long had you owned the cap, the baseball**

14  **cap?**

15      A.    I had recently purchased it.

16      Q.    **And where did you purchase it?**

17      A.    At a Fred Meyer's.

18      Q.    **In what city?**

19      A.    Spokane.

20      Q.    **On the same day that you distributed the fliers?**

21      A.    Yes.

22      Q.    **Did you wear sunglasses when you distributed the**

23  **fliers?**

24      A.    No.

25      Q.    **Where did you park your car?**

1    A.    In the parking lot of the store.

2    Q.    **Toward the front or the back?**

3    A.    I believe it was towards the back.  It was

4    whatever spot was first available.  I don't really do the

5    circling thing.

6    Q.    **Were you trying to conceal your identity when you**

7    **distributed the fliers?**

8    A.    No.

9    Q.    **You testified that you -- rather than hand the**

10    **fliers to individual employees, you left them?**

11    A.    Uh-huh.

12    Q.    **On counters?**

13    A.    Yeah, at various stations around the store.

14    Q.    **Why not hand it to the employees?**

15    A.    Because no one was at the stations when I arrived.

16    Q.    **At any of the stores?**

17    A.    There were people at the front registers, but, you

18    know, the meat department, whatnot, no, had closed.

19    Q.    **Do you know where Mr. Selvaggio got a list of**

20    **stores?**

21    A.    No.

22    Q.    **In addition to distributing the fliers in person,**

23    **by hand, did you distribute the fliers or participate in**

24    **distributing the fliers in any other way?**

25    A.    No.



CERTIFICATE

I, the undersigned, Joseph Kolber, am a
videographer on behalf of NAEGELI Deposition & Trial. I
do hereby certify that I have accurately made the video
recording of the deposition of Joseph H. Emmons,
in the above captioned matter on the 6th day of
September, 2023, taken at the location of 920 Fifth
Avenue, Suite 3300, Seattle, WA 98104.

No alterations, additions, or deletions were made
thereto.

I further certify that I am not related to any of
these parties in the matter and I have no financial
interest in the outcome of this matter.

_Joseph Kolber_
_____
Joseph Kolber

```
 1                    C E R T I F I C A T E

 2     STATE OF WASHINGTON )
                           ) ss.
 3     COUNTY OF KING      )

 4

 5          I, the undersigned Washington Certified Court
       Reporter, hereby certify that the foregoing deposition
 6     upon oral examination of the witness named herein was
       taken stenographically before me and transcribed under
 7     my direction;

 8          That pursuant to RCW 5.28.10, the witness, before
       examination, was first duly sworn by me to testify
 9     truthfully; that the transcript of the deposition is a
       full, true, and correct transcript, to the best of my
10     ability;
       That I am neither attorney for nor a relative or employee
11     of any of the parties to the action or any attorney or
       counsel by the parties hereto nor financially interested
12     in its outcome.

13          IN WITNESS WHEREOF, I have hereunto set my hand
       this 19th day of September 2023.
14

15

16

17

18     _____
                 Patricia A. Blevins
19     Certified Court Reporter No. 2484

20

21

22

23

24

25
```

# EXHIBIT 14

**From:**        "International President Marc Perrone" <marcperrone@ufcw.org>
**Sent:**        Mon, 15 Aug 2022 18:59:43 +0000 (UTC)
**To:**          "dclay@ufcw555.org" <dclay@ufcw555.org>; "faye@ufcw3000.org" <faye@ufcw3000.org>
**Subject:**     Locals 555 and 3000
**Attachments:** Locals 555 and 3000 8-15-22.pdf

Please see the attached.

Confidential                                                                   UFCW-EMMONS_000029



America's Food and Retail Union

**VIA ELECTRONIC MAIL**

August 15, 2022

Mr. Daniel Clay, President
UFCW Local No. 555
Post Office Box 23555
Tigard OR  97281-3555

Ms. Faye Guenther, President
UFCW Local No. 3000
5030 First Avenue South
Suite 200
Seattle WA  98134-2438

Dear Dan and Faye:

I have before me an unfortunate dispute regarding your two respective local unions and both of you as their primary officers (hereafter referred to in the third party for clarity).   Underlying this dispute is a handbill that was distributed to UFCW members, posted on social media, and mailed to several stores.  The handbill disparages the primary officers from UFCW Local No. 21 (Local 21), UFCW Local No. 367 (which is not a party to this dispute), and UFCW Local No. 1439 (Local 1439), in a failed attempt to prevent a merger between Local 21 and Local 1439, now together known as UFCW Local No. 3000 (Local 3000). The handbill is false, and I condemn it in the strongest terms.  It has no place in our Union, and I take some solace in knowing that it did not have its intended effect of deterring members from voting in favor of the merger.

As a result of the false and disparaging allegations in the handbill, Local 21's then President and now Local 3000 President Faye Guenther engaged in an effort to discover who was responsible for creating and distributing the handbill.  She hired a private investigator that ultimately sent a spoliation letter to a non-member, third party that has a contractual relationship with UFCW Local No. 555 (Local 555).  International Vice President and Local 555 President Dan Clay filed an official complaint as a result.  The complaint alleges President Guenther had ill intent in directing and/or permitting the investigator to send the spoliation letter.  Specifically, it alleges she: (1) violated the International Constitution; (2) interfered with an autonomous chartered body; and (3) violated harassment policies.  The International Union's investigation did not substantiate these claims. The investigation supports a finding that Local 3000 and its officers had a right to engage a private investigator, seek to discover who sent and distributed the

**Anthony M. Perrone,** *International President*
**Shaun Barclay,** *International Secretary-Treasurer*

United Food & Commercial Workers International Union, AFL-CIO, CLC
1775 K Street, NW • Washington DC 20006-1598
Office (202) 223-3111 • Fax (202) 466-1562 • www.ufcw.org

UFCW-EMMONS_000030

Mr. Daniel Clay                                                        August 15, 2022
Ms. Faye Guenther

-2-

handbill, and attempt to hold the party or parties responsible.  Further, and based on the evidence before me, I do not find the actions by Local 3000 or its President were done with ill intent, and I note the spoliation letter was not directed at Local 555 or any of its officers or members.

Since President Clay's letter was sent to members of the International Executive Board, I will, at President Guenther's request, send a letter to the International Executive Board of my findings in this regard.  I will also address, if requested to do so, the October 19, 2021, cease-and-desist letter that was referenced by President Clay in his letter, consistent with my letter of August 8, 2022.

President Guenther alleges, in turn, that President Clay sent the letter to members of the International Executive Board in an effort to "chill" Local 3000's investigation.  The allegation of ill intent by President Clay hinges primarily on information not currently available to the International Union.  Moreover, the investigation found that Local 555 and its President credibly deny any involvement in the creation or distribution of the handbill at issue.  It is also apparent that entities/individuals not associated with Local 555 had motive to prevent the merger between Local 21 and Local 1439, and Local 3000 has not yet concluded a full investigation of the matter that would eliminate other entities or individuals from suspicion.  Thus, and based on information currently available to me, I do not find the evidence supports a finding that President Clay sent the letter to me and members of the International Executive Board to "chill" the investigation.

Local 3000 and its President also seek redress for claims related to the disparagement in the handbill.  I recognize here, however, that the internal remedies afforded under the International Constitution cannot provide complete or full relief to Local 3000 or its officers for these claims, and I am hindered in investigating the facts at issue or fashioning an appropriate remedy at this point.

Local 3000 and its President have indicated the desire to use civil litigation to pursue the truth and hold the individual(s) that created and/or knowingly disseminated the handbill responsible.  They seek monetary damages, among other remedies.  They have a legal right to pursue such remedies under the Labor Management Reporting and Disclosure Act (LMRDA).  Local 555 and its President have indicated to the International Union they intend to defend against any lawsuit if one is brought.

Our internal remedies cannot substitute for civil litigation in these circumstances.  A court can compel witnesses, subpoena documents, and otherwise has access to tools that can assist in Local 3000's search for the truth that the International Union and I, as International President, do not.  Third-party, primary witnesses will not cooperate in our investigation.  Most significantly, an unnamed informant crucial to the investigation will not participate without a subpoena.  Other third-party witnesses will not cooperate due to the pending litigation or the threat of litigation, and the International Union has no authority over them.  Given these facts, I decline to exercise my authority under Article 10(E)1 of

Mr. Daniel Clay                                                        August 15, 2022
Ms. Faye Guenther

-3-

the International Constitution and impose a remedy on the parties for allegations related to the claims made by Local 3000 for the statements in the handbill. Local 3000 and its President are free to pursue litigation of these matters against the responsible party or parties without further deference to our internal remedies if they so choose.

That said, I want to state that I believe resorting to the legal system may result in unintended consequences and could be used as fodder by employers to weaken our Union. For these reasons, I encourage Local 3000 to proceed with due caution. Further, if both local unions and their respective officers were amenable to engaging in private and binding arbitration to resolve the legal claims and Local 3000 and its officers were willing to waive any right to sue Local 555 and its officers, the International Union would seek to facilitate it.

Finally, I urge all parties to explore any and all other available options to set aside their differences in the best interests of our Union family and I offer the International Union's assistance in this regard. Our time and resources are limited. Our energies are best served by staying focused on the members we are privileged to represent and those unorganized workers that deserve a voice in the workplace. Divisions between local unions only serve to empower the forces against us.

There is much work to be done and we will be able to accomplish much more if our collective efforts are dedicated to improving the lives of UFCW members and all working people.

In solidarity,

International President

# EXHIBIT 15

| From: | "International President Marc Perrone" <marcperrone@ufcw.org> |
|-------|-----------------------------------------------------------------|
| Sent: | Fri, 3 Nov 2023 13:55:18 +0000 (UTC) |
| To: | "Daniel Clay" <dclay@ufcw555.org> |
| Cc: | "Eduardo Pena" <epena@ufcw.org> |
| Subject: | Local 555 – Cease and Desist |

Dear Dan,

The International Union is in receipt of depositions in Guenther v. Emmons, No. 2:22-cv-0272-TOR (E.D. Wash.). The sworn testimony in the litigation establishes that UFCW Local No. 555 (Local 555) was responsible for a handbill distributed to UFCW Local No. 1439 (Local 1439) members as part of an attempt to undermine a merger between Local 1439 and UFCW Local No. 21 (Local 21), which formed UFCW Local No. 3000 (Local 3000). You previously denied Local 555's responsibility for the handbill.

Since Local 3000 has now provided undisputed evidence that Local 555 was in fact responsible for the handbill, I am issuing this letter as an official communication to cease and desist from interfering in the internal affairs of Local 3000 or any other UFCW Local Unions.

Further, as I earlier expressed to you, your dishonesty in an International Union investigation is unacceptable, and interfered with my ability to carry out my duties as International President under Article 10(E)1 of the International Constitution. As a member of the UFCW, you are expected to operate within the confines of the International Constitution. This is particularly true of International Officers who have a higher duty of care to the organization.

After considering your actions, I am reversing my earlier decision to award jurisdiction for the Oregon stores that were previously represented by Local 1439 to Local 555. Local 3000 will retain jurisdiction of all Oregon stores that were represented by Local 1439 prior to its merger with Local 21.

Finally, as I stated in my August 16, 2022 letter to both you and Local 3000 President Guenther, I believe the continued divisions between Local 555 and Local 3000, as exemplified by this dispute, only serve to empower those who seek to weaken our Union. Rather than focusing all of our collective energies on representing members and organizing new workers into the UFCW family, our Union has had to distract from its core mission and expend limited time and resources on a dispute that does not benefit workers. I continue to believe that it is in the interests of both parties, and the UFCW more generally, to try to bring resolution to this matter, and I continue to offer the International Union's assistance in this regard.

In solidarity,

Marc Perrone

UFCW-EMMONS_000936

# EXHIBIT 16

**From:** "International President Marc Perrone" <marcperrone@ufcw.org>
**Sent:** Fri, 3 Nov 2023 13:55:25 +0000 (UTC)
**Subject:** Notice to the UFCW International Executive Board

---

Greetings:

On August 29, 2022, at the request of UFCW Local No. 3000 (Local 3000) President Faye Guenther (Guenther), I forwarded to you a letter of August 15, 2022, regarding a dispute between Local 3000 and UFCW Local No. 555 (Local 555) and their primary officers. At the heart of the dispute was a handbill distributed to UFCW members, posted on social media, and mailed to several stores in a failed attempt to undermine a merger between UFCW Local No. 21 and UFCW Local No. 1439, now merged to form Local 3000. As detailed in the letter, the handbill was false, and I condemned it in the strongest terms. Fortunately, it did not serve its intended purpose of undermining the merger.

Following the merger vote, Local 3000 engaged in an effort to discover the party or parties responsible for creating and distributing the handbill. It hired a private investigator that ultimately sent a spoliation letter to a non-member, third party that has a contractual relationship with Local 555. International Vice President and Local 555 President Dan Clay (Clay) then filed an official complaint with the International Union alleging President Guenther acted with ill-intent, violating the International Constitution and harassment policies, and interfering with an autonomous chartered body, by sending the spoliation letter. President Clay sent the complaint to members of the International Executive Board. President Guenther alleged that President Clay sent the letter to try to "chill" Local 3000's investigation, sought monetary damages for the handbill, and asked the International Union to investigate.

The International Union undertook an investigation into both President Clay's and President Guenther's allegations. At the time, President Clay credibly denied any involvement in the handbill. Further, Local 3000 did not provide the International Union with any direct evidence that Local 555 was the responsible party. Local 3000 indicated there was a third-party, primary witness that would tie Local 555 to the handbill, but the witness declined to be interviewed or otherwise cooperate with the International Union's investigation. While the International Union offered binding arbitration to resolve the matter if Local 3000 waived its right to sue Local 555 and its officers, I recognized that the International Union's internal remedies could not provide a substitute for civil litigation under the circumstances, and that Local 3000 was within its rights to pursue litigation to uncover the truth and hold the responsible individual(s) accountable for their actions.

Local 3000 (which was later dismissed from the case) and Guenther personally, ultimately filed a lawsuit, Guenther v. Emmons, No. 2:22-cv-0272-TOR (E.D. Wash.) that resulted in depositions and sworn testimony that supports the original claim that Local 555 was responsible for the handbill. As a result, I have issued a cease and desist letter to President Clay. Further, I reversed my earlier decision to award jurisdiction for the Oregon stores that were previously represented by Local 1439 to Local 555. Local 3000 will retain jurisdiction of all Oregon stores that were represented by Local 1439 prior to its merger with Local 21.

Finally, as I stated in my August 16, 2022 letter to both President Clay and President Guenther, I believe the continued divisions between Local 555 and Local 3000, as exemplified by this dispute, only serve to empower those who seek to weaken our Union. Rather than focusing all of our collective energies on representing members and organizing new workers into the UFCW family, our Union has had to distract from its core mission and expend limited time and resources on a dispute that does not benefit workers. I continue to believe that it is in the interests of both parties, and the UFCW more generally, to try to bring resolution to this matter, and I continue to offer the International Union's assistance in this regard.

In solidarity,

Marc Perrone

# EXHIBIT 17

# ATTENTION **UFCW** MEMBERS

## The in-union "Sexual Harassment club" is at it again!!



First Faye Gunther (President of Local 21) helped former 367 President Angel Gonzalez **cover up his harassment charges and paid him off in exchange for installing her puppet,** Mike Hines.



Now she's helping Eric Renner (the Local 1439 President) **hide from sexual harassment charges and land a cushy new gig with Local 21 through a forced merger.**

## OUR UNION SHOULD BE LOOKING OUT FOR US <u>NOT PROTECTING HARASSERS!</u>

## <u>It's time to STOP THE COVERUPS!</u>



VOTE **NO** ON ANY MERGER!

# EXHIBIT 18

 Michael Selvaggio
Mail

Michael Selvaggio <mike@ridgelark.com>

## "Project Wagonwheel" stuff

4 messages

**Michael Selvaggio** <mike@ridgelark.com>                                  Wed, Jan 5, 2022 at 1:33 PM
To: Joe Emmons <joe@ospreyfield.com>

Joe --

FYI, I've been referring to this as "Project Wagonwheel" (Spokane has "spokes" like a wagon wheel.)

1. I've attached the handout.

2. Here's my draft budget:

| Item | Cost | Recommended Vendor |
|------|------|--------------------|
| Round-Trip Airfare | 700 | Alaska Airlines |
| Hotel | 225 | The Davenport Grand Hotel |
| Car Rental | 100 | Thrifty at Spokane Int'l Airport GEG |
| Food and Incidentals | 100 | |
| Personal Fee (2 days) | 1300 | |
| TOTAL | 2425 | |

3. Locations on the way...

-M

--
Michael Selvaggio
RIDGELARK STRATEGIES
(503) 739-3629

*he/him/his*



 **flyer.pdf**
437K

EXHIBIT

6

DEPONENT NAME:
M. SELVAGGIO

DATE:
10/12/23

**Michael Selvaggio** <mike@ridgelark.com>                                  Wed, Jan 5, 2022 at 10:19 PM
To: Joe Emmons <joe@ospreyfield.com>

Locations:

| STORE | STREET | CITY |
|-------|--------|------|
| Fred Meyer | 400 S. Thor Street | Spokane, WA 99202 |
| Super 1 Foods | 830 E. 29th | Spokane, WA 99203 |
| Crown Foods | 1402 W. Northwest Boulevard, | Spokane, WA 99205 |
| Safeway #342 | 1616 W. Northwest Boulevard | Spokane, WA 99205 |
| Albertsons #206 | 9001 N. Indian Trail Road | Spokane, WA 99208 |
| Albertsons #265 | 6520 N. Nevada Street | Spokane, WA 99208 |

| Fred Meyer | 12120 N. Division Street | Spokane, WA 99218 |
| Huckleberry's Natural Market | 926 South Monroe | Spokane, WA 99204 |
| Safeway #1299 | 10100 N. Newport Highway | Spokane, WA 99218 |

[Quoted text hidden]

**Michael Selvaggio** <mike@ridgelark.com>                                    Mon, Oct 17, 2022 at 11:36 AM
To: John DiLorenzo <johndilorenzo@dwt.com>, "Kumar, Ambika" <AmbikaKumar@dwt.com>, "Fairchild, Sara"
<SaraFairchild@dwt.com>, John Bishop <jbishop@ufcw555.org>

[Quoted text hidden]

 **flyer.pdf**
437K

**Michael Selvaggio** <mike@ridgelark.com>                                    Mon, Oct 17, 2022 at 11:37 AM
To: John DiLorenzo <johndilorenzo@dwt.com>, "Fairchild, Sara" <SaraFairchild@dwt.com>, "Kumar, Ambika"
<AmbikaKumar@dwt.com>, John Bishop <jbishop@ufcw555.org>


---------- Forwarded message ---------
From: **Michael Selvaggio** <mike@ridgelark.com>
Date: Wed, Jan 5, 2022 at 10:19 PM
Subject: Re: "Project Wagonwheel" stuff
To: Joe Emmons <joe@ospreyfield.com>


[Quoted text hidden]

# EXHIBIT 19





RFP Resp No. 2 - 002112



RFP Resp No. 2 - 002113



RFP Resp No. 2 - 002114



RFP Resp No. 2 - 002115



# EXHIBIT 20

# CHASE ○ for BUSINESS®

Printed from Chase for Business

**$2,500.00**
Total

Jan 5, 2022
Post date

---

**CHASE ○**  **WITHDRAWAL**

CHECKING ☒
SAVINGS ☐
CHASE LIQUID ☐

Today's Date  Customer Name *(Please Print)*
1/5/2022  RIDGELARK STRATEGIES

R/T 500001017

If Purchasing a Cashier's Check Provide Payee Name
OSPREY FIELD SERVICES

N13081-CH (Rev 10/15)  19184299  09/21

Customer Signature
X  *[signature]*

▼ Start your account number here
31 9 622 160

TOTAL $

AMOUNT
2500.00

⑈086220182⑈ ⑆500001017⑉

---

JPMorgan Chase Bank, N.A. Member FDIC          ©2023 JPMorgan Chase & Co.          Equal Housing Opportunity

**EXHIBIT**

**7**

DEPONENT NAME:  DATE:
M. SELVAGGIO  10/12/23

# EXHIBIT 21

## COMMON INTEREST PRIVILEGE AGREEMENT

This COMMON INTEREST PRIVILEGE AGREEMENT (this "**Agreement**) is made as of June __29__, 2022 (the "**Effective Date**") by and between Michael Selvaggio, Ridgelark Strategies LLC, Joseph Emmons and Osprey Field Services ("**Potential Defendants**") and United Food & Commercial Workers Local 555 ("**Local 555**"), collectively ("**the Parties**").

### RECITALS

A. On or about May 7, 2022, UFCW Local 3000 ("**Local 3000**") sent Joseph Emmons a demand letter threatening to sue him for Defamation and other causes of action for statements allegedly made in a flyer which he allegedly distributed ("**the Potential Litigation**").

B. Emmons and his company, Osprey Field Services, were subcontractors to Ridgelark Strategies LLC ("**Ridgelark**"). Ridgelark is owned by Michael Selvaggio. Emmons was acting on behalf and under the supervision of Ridgelark at all relevant times.

C. Should Local 3000 file an action against Emmons, Ridgelark will provide Emmons a defense.

D. Ridgelark is a contractor for UFCW 555 and was acting on behalf of UFCW 555 at all relevant times.

E. On May 23, 2022, Local 555 agreed to honor its agreement with Ridgelark, including the indemnity provision of that agreement, insofar as it relates the threatened legal action.

F. As an indemnitor, Local 555 has a common interest in the defense of the threatened legal action.

G. The Parties desire to enter into this Agreement for purposes of maintaining the confidentiality and privilege of communications between the Parties.

### AGREEMENT

In consideration of the mutual covenants described below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Common Interest and Confidentiality.

    (a)    In order to pursue separate but common interests, effectively, the Parties have concluded that their mutual interests will be best served by confidentially sharing, among other related confidential information, (1) proposed litigation and political strategies; (2) opinions of consulting and testifying experts; (3) written drafts of briefs, pleadings, motions, memoranda in support of motions, affidavits, declarations, expert witness statements, and other court filings; (4) written drafts of public statements; (5) written drafts of correspondence; (6)

4876-6028-8546v.2 0050033-004127

written drafts and final versions of confidential mediation statements and their exhibits, if any, and (7) written research and analysis. Such materials (and all communications among the Attorneys that relate to these materials) and communications are referred to herein as "**Common Interest Privileged Material**." Neither this executed Agreement nor any executed agreement between Potential Defendants and Indemnitor shall be considered Common Interest Privileged Material under this Agreement.

(b)     The Parties will share Common Interest Privileged Material, as they deem appropriate, subject to the intention and understanding that any Common Interest Privileged Material so shared, regardless of whether such sharing occurred before or after the execution of this agreement and regardless of whether a written Common Interest Privileged Material is marked "Confidential," is protected from disclosure to any third party to the greatest extent permitted by law by the signatories' respective attorney-client privileges, counsel's work product privileges, and any other applicable privileges, including the common interest privilege as may arise from common law, statutes, this Agreement, or any combinations of these.

(c)     Subject to the terms of this Agreement, and except as required by law, no Party or its counsel will disclose Common Interest Privileged Material to anyone without first obtaining the written consent of the other Parties to this Agreement. Notwithstanding contrary provisions of this paragraph, Common Interest Privileged Material may be shared with (a) the Parties, (b) employees, board members, and committee members of the Parties who have a need to know, (c) legal staff and attorneys representing the Parties, but only to the extent necessary to render services in connection with the Litigation Effort, and (d) any independent consultants and experts retained by counsel and assigned any task related to the Potential Litigation, but only to the extent necessary to perform those tasks. Any firm or individual permitted access to Common Interest Privileged Material shall be specifically advised that any and all such material is privileged and subject to the terms of this Agreement, and shall agree to maintain the confidentiality of the material and be bound by the confidentiality terms of this Agreement or another confidentiality agreement, the provisions of which are at least as restrictive as this Agreement.

(d)     If any person or entity requests or demands, by subpoena or otherwise, any Common Interest Privileged Material, counsel for the Party receiving the request will immediately notify counsel for the other Parties, and all counsel will take steps necessary to permit the assertion of all applicable rights and privileges with respect to Common Interest Privileged Material. The Parties will cooperate with each other in any proceeding relating to the potential disclosure of Common Interest Privileged Material. When any Party is requested to produce in discovery any material that is subject to this

2

4876-6028-8546v.2 0050033-004127

 EMM_000002

Agreement, the Parties shall confer and, as appropriate, claim privilege under Federal Rule of Civil Procedure 26(b)(5) or state rules, depending on jurisdiction.

(e)    The Parties agree that all Common Interest Privileged Material received from the other Party, or their counsel, or consultants or experts retained for the pursuit of the Potential Litigation, shall be held in strict confidence by the receiving Party and by all persons to whom such information is revealed by the receiving Party in accordance with paragraph 2(c) of this Agreement.

(f)    The Parties acknowledge that disclosure of any Common Interest Privileged Material in violation of this Agreement will cause irreparable harm for which there is no adequate legal remedy. The Parties agree that immediate injunctive relief is an appropriate and necessary remedy for violation of the confidentiality provisions of this Agreement.

(g)    The Parties shall not be required to share or exchange any information they may possess.

(h)    Nothing in this Agreement shall prevent a Party from disclosing to others or using in any manner information which the Party can show was lawfully furnished to or was lawfully obtained by a Party in some manner other than pursuant to this Agreement without any restrictions on its disclosure.

(i)    The Parties agree that in entering into this Agreement, receipt of Common Interest Privileged Material pursuant to this Agreement or use of Common Interest Privileged Material shall not: (a) create any express or implied attorney-client relationship or (b) impose any duty of loyalty or other fiduciary duties with respect to either of the Parties.

(j)    This Agreement creates no obligation on either Party to enter into any further agreement or a further business relationship.

2.    Miscellaneous.

(a)    Failure of either Party at any time to require performance of any provision of this Agreement shall not limit such Party's right to enforce the provision, nor shall waiver of any breach of any provision constitute a waiver of any succeeding breach of that provision or a waiver of that provision.

(b)    If any provision of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, the validity, binding effect, or enforceability of the remaining provisions shall not be affected and shall continue in full force and effect as if this Agreement had been executed with the invalid provision eliminated or so modified.

3

4876-6028-8546v.2 0050033-004127

(c)   The successors and assigns of the Parties shall be bound by this Agreement.  No Party may assign this Agreement without the prior written consent of the other Parties.

(d)   This Agreement shall be governed by and interpreted by the laws and regulations of the State of Oregon without giving effect to the choice of law principles thereof that would result in the application of the laws of any other jurisdiction.

(e)   This Agreement constitutes the entire understanding between the Parties, and supersedes all previous understandings, agreements, communications and representations, whether written or oral, concerning same.  No modification of this Agreement or waiver of the terms and conditions hereof shall be binding upon any of the Parties unless approved in writing by an authorized representative of each Party.

(f)   In the event suit or action is filed by any Party to enforce this Agreement or with respect to a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to all other costs, damages and awards, its reasonable attorneys' fees at trial, and upon any appeal and petitions for review and any bankruptcy and insolvency proceeding.

(g)   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(h)   Notwithstanding the withdrawal of any Party pursuant to Section 1(c) of this Agreement, any covenants, promises, or obligations of this Agreement shall no longer bind any Party once the Potential Litigation Effort has completed (which shall be the date which any action is dismissed or of a final decision in the Potential Litigation, including exhaustion of all available appeals or periods for appeal), or a period of two years if no such litigation is filed.

4

4876-6028-8546v.2 0050033-004127

CONFIDENTIAL                                                        EMM_000004

In witness whereof, the Parties execute this Agreement as of the Effective Date.

**Ridgelark Strategies LLC**                              **Osprey Field Services**

By: _____                  By: _____
Its: _____                  Its: _____


_____                      _____
Michael Selvaggio                                Joseph Emmons


**United Food & Commercial Workers Local 555**

By: _____
Its: _____

5

4876-6028-8546v.2 0050033-004127

CONFIDENTIAL                                                          EMM_000005

In witness whereof, the Parties execute this Agreement as of the Effective Date.

**Ridgelark Strategies LLC**                          **Osprey Field Services**

By: _Michael Selvaggio_                               By: _____
Its: _Managing Member_                                Its: _____

_____                              _____
Michael Selvaggio                                     Joseph Emmons

**United Food & Commercial Workers Local 555**

By:_____
Its:_____

5

4876-6028-8546v.2 0050033-004127

**CONFIDENTIAL**                                                                                    EMM_000006

In witness whereof, the Parties execute this Agreement as of the Effective Date.

**Ridgelark Strategies LLC**                    **Osprey Field Services**

By: _____              By: _____
Its: _____              Its: _____

_____                    _____
Michael Selvaggio                          Joseph Emmons

**United Food & Commercial Workers Local 555**

By: _____
Its: _____

5

4876-6028-8546v.2 0050033-004127

Scanned with CamScanner

CONFIDENTIAL                                    EMM_000007

## FIRST AMENDMENT TO COMMON INTEREST PRIVILEGE AGREEMENT

The undersigned Parties to that certain Common Interest Privilege Agreement, dated as of June 29, 2022, hereby amend that Agreement to add Dan Clay and Esai Alday as additional Parties. Messrs. Clay and Alday agree to be bound by that Agreement as of the Agreement's Effective Date. Except as modified by this Amendment, the Agreement remains in full force and effect.

### SIGNATURES

RIDGELARK STRATEGIES LLC

By: MICHAEL SELVAGGIO
Its: PRINCIPAL

Michael Selvaggio

OSPREY FIELD SERVICES

By: Joseph Emmons
Its: Principal

Joseph Emmons

UNITED FOOD & COMMERCIAL WORKERS LOCAL 555

By: Sandy Humphrey
Its: Secretary-Treasurer

Dan Clay

Esai Alday

CONFIDENTIAL                              Scanned with CamScanner  EMM_000008

## FIRST AMENDMENT TO COMMON INTEREST PRIVILEGE AGREEMENT

The undersigned Parties to that certain Common Interest Privilege Agreement, dated as of June 29, 2022, hereby amend that Agreement to add Dan Clay and Esai Alday as additional Parties. Messrs. Clay and Alday agree to be bound by that Agreement as of the Agreement's Effective Date. Except as modified by this Amendment, the Agreement remains in full force and effect.

### SIGNATURES

RIDGELARK STRATEGIES LLC

By: MICHAEL SELVAGGIO
Its: PRINCIPAL

Michael Selvaggio

OSPREY FIELD SERVICES

By: _____
Its: _____

Joseph Emmons

UNITED FOOD & COMMERCIAL WORKERS
LOCAL 555

By: Sandy Humphrey
Its: Secretary-Treasurer

Dan Clay

Esai Alday

CONFIDENTIAL                                                                    EMM_000009

# EXHIBIT 22

*Beverly Grant* Law Firm, P.S.

| | |
|---|---|
| **Attorneys** | **Support Staff** |
| Beverly Grant* | Shannon Toppen, Sr. Litigation Paralegal |
| beverly@BevGrantLaw.com | stoppen@BevGrantLaw.com |
| Jeffery Bradley | Ieesha M. Irving, Legal Assistant |
| jefferybradley@BeyGrantLaw.com | ieeshairving@BevGrantLaw.com |
| | Nathan Grimsley, Law Office Assistant |
| | lawofficeasst@BevGrantLaw.com |

July 12, 2021

Attn: Denise Jagielo
**UFCW Local 367 President**
6403 Lakewood Drive W
Tacoma, WA 98467

   RE: ***Local Union 367 Member*** █████████

Dear Ms. Jagielo:

This office has been retained by Ms. ████████ regarding unwelcomed sexual harassment overtures made by your former President, Angel Gonzalez. The purposes of this letter are to: 1) ask that you forward this letter to legal counsel immediately; 2) preserve all documents and emails as indicated in attachment A; 3) take corrective action to ensure the safety and wellbeing of Ms. ████████ and other female union members and 4) compensate Ms. ████████ for the emotional distress she has endured.

As a President of Local 367 you are entrusted to represent your union members and to ensure that no harm comes to them. It is of profound concern that a dues paying member of the Local 367 is being sexually harassed and solicited by a union officer, namely former President, Angel Gonzalez, who is also an attorney. It raises extreme concerns he has done this before and one wonders how many times he has violated other union members.

**FACTS**
Recently, Ms. ████████ father, a former homicide detective, passed away and Ms. ████████ became extremely depressed and vulnerable. She also has a learning disorder, which we believe Mr. Gonzalez preyed upon. She received her Pfizer covid vaccine on March 17, 2021 but was in and out of work due to the side effects. She is employed by Kroger but has been unable to return to work since March 24, 2021. Towards the end of March, Mr. Gonzales reached out to her stating that he had something for her and asked to meet with her. She told him that she was too sick to meet with him. Confused about the interaction from Mr. Gonzales, she spoke with her mother about this as it made her uncomfortable. Her mother reached out to Mr. Gonzalez via Facebook and gave him her mailing address. Shortly after, Ms. ████████ received a Fred Meyer gift card in the mail in the amount of $250.00, sent by Mr. Gonzalez as President of Local 367. Ms. ████████ impressions were that although it was a little weird, she thought it was nice of him to offer her help on behalf of the Local 367 Union.

After receiving a Facebook message from Mr. Gonzalez that said, "Don't worry I got you. I always got you," Ms. ████████ discussed the weird vibe she was getting from him with her mother, ████████ who advised that he may be grooming her due to her vulnerability. Ms. ████████

*Licensed in WA and CA http://BevGrantlaw.com

5808 100th Street SW, Suite A | Lakewood, WA 98499 | Phone: (253) 252-5454 | Facsimile: (253) 503-7509

Local 367 President
July 16, 2021
Page 2 of 3

came to our office seeking help to intervene so that Mr. Gonzalez would not prey upon her and others.

In late April 2021, Mr. Gonzalez continued to pursue her and added her on his social media accounts in Snapchat, TikTok, and Instagram[1]. Initially she accepted his requests as she thought he was trying to be nice. Despite her mother's warning, she perceived him as trying to follow through as a union President should in helping a union member. She would explain her issues which included seeking leave for domestic violence. He indicated that he believed that he could help her and she thought he was going to help her through the them.

Mr. Gonzalez continued to message her via snapchat checking in on her. Later, while in an alcohol induced stupor, Mr. Gonzalez asked her to have a "virtual drink" with him. She did not accept. He kept making sexual overtures to her such as calling her beautiful and offering her more money and asking to see her. He became very persistent and continued to prey upon her. She felt as if he was using his position and power to prey and groom her. She discussed this with her mother as she felt very vulnerable and violated. She told him to leave her alone as he was married but he continued to call her. She could not believe it was happening since he already knew that she was depressed from the loss of her father and being the victim of domestic violence. She did not engage in any type of communication with him, but he continued to reach out to her. On several occasions, Mr. Gonzalez asked her to participate in a virtual drink which she continued to refuse.

She continued to rebuff his overtures and told him to stop on several occasions. Toward the end of April 2021, Mr. Gonzalez sent video of himself masturbating. Ms. ▮▮▮▮ was disgusted, embarrassed and resented his persistent acts and thought it to be quite inappropriate for him to make these sexual overtures towards her and to this degree. She thought that if she stopped responding to him that he would quit and leave her alone. Unfortunately, he did not.

Starting early July 2021, she started taking pictures of their conversation with another phone to document and keep track of what was being said. She felt violated and very vulnerable and could not believe this was happening. Although she had ceased all communication, he continued his attempts to reach her. Upon receipt of further pictures from him of his genitalia, she came and sought legal assistance.

One of Mr. Gonzalez's last messages was profusely apologizing and claimed he was drunk and offered her money. She did not respond. There were two additional attempts to contact on July 5th and 6th inquiring how her mom was doing. After no response from Ms. ▮▮▮▮ he blocked her on Facebook with a final message stating he was drunk and that he was sorry. See attached.

---

[1] It is believed that Mr. Gonzalez specifically used these media sites because once a sent message is received and read, it disappears indefinitely. It also informs the sender if any screenshots are taken of the conversation.

Local 367 President
July 16, 2021
Page 3 of 3

As a result of this incident, Ms. ███████ has experienced further depression and trauma. She is still having problems with her employer and has no health insurance to seek counseling. Sexual harassment is a serious form of discrimination based on sex that breaches *Title VII of the 1964 Civil Rights Act and RCW 49.60.* Unwanted sexual advances, demands for sexual favors, and any physical or verbal activity of an inappropriate sexual nature that directly or indirectly affects the job of a person is sexual harassment. She wishes to resolve this matter amicably and without further litigation and to tender a demand of $150,000.00.

Sincerely,

BEVERLY GRANT LAW FIRM, P.S.

*Beverly G. Grant*

Beverly G. Grant
Attorney at Law

BGG/sdt

Cc:      client
Encl.    Attachment A

**Attachment A:**

<u>DEFINITIONS</u>

"**Document**" or "**documents**" includes without limitation any written, typed, printed, recorded, or graphic matter (however preserved, produced, or reproduced) of any type or description, regardless of origin or location, including without limitation any binder, cover note, folder label, certificate, letter, correspondence, record, table, chart, analysis, graph, schedule, report, test, eliminate materials, course materials, study memorandum, note, list, diary, log, files (including but not limited to official and unofficial personnel records and otherwise), calendar, telex, message (including, but not limited to, inter-office and intra-office communications), computer/electronic data, meta data, E-mail, questionnaire, bill, purchase order, shipping order, contract, memorandum of contract, agreement, conciliation or settlement agreement with any municipal, state, federal or governmental entity, assignment, license, certificate, permit, ledger, ledger entry, book of account, check, order, invoice, receipt, statement, financial data, acknowledgment, computer or data processing card, computer or data processing disk, computer-generated matter, photograph, photographic negative, sound recording, transcript or log of an such recording, projection, videotape, film, microfiche, IPhone, IPad, "CLOUD" but not limited to Solid State Drive (**SSD**), Static Random Access Memory (**SRAM**), Dynamic Random Access Memory (**DRAM**), Universal Serial Flash Bus Drive (**USB Flash Drive**), text messages, and all other data compilations from which information can be obtained or translated, reports or summaries of investigations, drafts and revisions of drafts of any documents and original preliminary notes or sketches, no matter how produced or maintained, in your actual or constructive possession, custody or control, or the existence of which you have knowledge, and whether prepared, published or released by you or by any other person. If a document has been prepared in several copies, or additional copies have been made, or copies are not identical (or which by reason of subsequent modification of a copy by the addition of notations or other modifications, are no longer identical), preserve each non-identical copy as a separate document.

**Electronic Data.**   The term "electronic data" means information system platform (e.g., workstations, servers, storage area network, switches, firewalls, routers, virtualization, or cloud computing) that makes up the information technology infrastructure, the original (or duplicate, identical copies when originals are not available), and any non-identical copies (whether different from the originals because of notes made on such copies or otherwise) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Additional electronic data includes, but is not limited to: fundraising data, plans, systems, programs, investments and any related documents relating thereto; credit card information (e.g., name of the issuer, name of the account holder, account number, expiration date, security number, PIN or any combination of that information); bank account information (e.g., name of bank, name of account holder, account number, PIN or any combination of that information);physical as well as email addresses; telephone numbers; birth dates; government issued identification numbers, social security numbers, tax identification numbers, driver's license numbers or passport numbers; biometric information; and passwords. Such writings may include, but are not limited to, computer programs (whether private, commercial or work-in-progress), programming notes or instructions,

electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, meta data, charts, graphs and outlines, electronic mail, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drivers, PIF files, batch files, any and all ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment. Electronic data includes any and all items stored on computer memories, internal and external hard disks, floppy disks, Optical, CD-ROM/DVD drives, Bernoulli Box drives and their equivalent, magnetic tape of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to Solid State Drive (SSD), Static Random Access Memory (SRAM), Dynamic Random Access Memory (DRAM), Universal Serial Flash Bus Drive (USB Flash Drive), or on or in any other vehicle for digital data storage and/or transmittal. The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each such aforesaid original and/or copy

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible such as Terminate and Stay Resident (TSR) memory, and ROM/RAM Memory. You are obliged to preserve potentially relevant evidence from all of these sources of ESI, even if you do not anticipate producing such ESI. The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure 37 that have been approved by the United States Supreme Court, you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible. Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive the plaintiffs of their right to secure the evidence or the Court of its right to adjudicate the issue.

**Rotation.** The term "rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival, retrieval or other electronic data storage purposes, particularly is such re-use results in the alteration and/or destruction or degaussing of the electronic data residing on said device prior to its re-use.

**Electronic Media.** The term "Electronic Media" means any type of device that stores and allows distribution or use of electronic information. This includes television, radio, Internet, fax, CDROMs, DVD, and any other electronic medium magnetic or other storage media device used to record electronic data that takes advantage of electronic technology and any other medium that requires electricity or digital encoding of information. Additional electronic media devices may include, but are not limited to, computer memories, Internal and External hard disks, floppy disks, magnetic tape of all types, microfiche, computer chips or in any other vehicle for digital data storage and/or transmittal.

**Active File.** The term "active file" means any digital or manual files actively used by an organization to operate on a daily basis to include electronic data file that can be utilized by an electronic data processing system in any manner without modification and/or re-construction. An active file is any electronic data file that has not been erased or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

**Deleted File.** The term "deleted file" means any electronic data file that has been erased or deleted from the electronic media on which it resided. A deleted file is any file whose File Allocation Table (FAT/FAT32) New Technology File System (NTFS) entry has been modified to indicate the file as being deleted and/or which is not readily visible to the operating system and/or the software with which it was created.

**File Integrity.** The term "file integrity means" When a computer file is not changed or deleted and is stored the same way since starting without being altered in anyway.

**Meta Data.** The term "Meta Data" means any file system which stores information associated with the file—including the file name, the length of the contents of a file, and the location of the file in the folder hierarchy—separate from the contents of the file.

**File Fragment.** The term "fragmentary file" refers to individual or single files being broken into multiple pieces any electronic data file that exists as a subset of an original active file. A fragmentary file may be active or deleted. The cause of fragmentation resulting in the fragmentary file can include, but is not limited to, manual intervention, electronic surges, and/or physical defects on electronic media.

# EXHIBIT 23



**2 People** ›

Jul 15, 2021 at 5:28 PM

I'm driving home. Let me know if any updates. I have none.

Scott powers texted me asking if angel is still the Pres of 367. Hahah. He said someone asked him if he had heard that angel left the local.

Jul 19, 2021 at 1:06 PM

Dan Clay - Cell

We can wait I think.

Jul 27, 2021 at 10:41 PM

Esai Alday

Sounds like Powers called Fye

Would he classify angel as a "no call no show" last week? Or insinuate that he bailed or something?

Esai Alday

Just talked to Hines
No way anyone else but him and Annmarie knew about the envelopes

Jul 28, 2021 at 1:49 PM

iMessage

# EXHIBIT 24



Hines sub resp. 009

# EXHIBIT 25



1:19 🔢

Angel
(253) 312-7156

Sunday, July 25, 2021

A  It's done.  9:10 AM

Ok. Who have you spoken with so
I know how to proceed? How are
9:43 AM  you doing?

A  No one at all. I left a resignation
letter for you and a letter for the
board and staff  9:44 AM

You haven't talked to Kate or
9:45 AM  Marc?

A  I left you a bag of 367 shirts
and jackets that can be used by
anyone who'd want it

All properties are on the desk and
the generator I was storing is in
the conference room  9:45 AM

A  I've not spoke to anyone  9:46 AM

A  I don't wish to speak with anyone.
I'm trying to stay out of the

# EXHIBIT 26

## CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT

This Confidential Settlement and Release Agreement ("Settlement Agreement") is made and entered into by and between the United Food and Commercial Workers Union, Local No. 367 ("UFCW 367"), and _____ (the Claimant") (collectively, the "Parties") with reference to the following facts and terms of settlement:

### RECITALS

The Claimant is a member of UFCW 367.

The Claimant, through her counsel, Beverly Grant, presented a demand letter to UFCW 367 on or about July 12, 2021, alleging certain acts of misconduct against her, by former UFCW 367 President Angel Gonzalez. Counsel for the parties have investigated the facts described in that demand letter and conferred with their respective clients about mutually acceptable settlement terms to avoid the expense and inconvenience of anticipated litigation.

The terms of that settlement include providing the Claimant with a payment in consideration of the promises and covenants of the Employee, as contained herein, which include but are not limited to the Claimant's agreement to release any and all claims she has against the UFCW 367 and its past and present employees and officers.

Based on the foregoing facts and in consideration of and in exchange for the promises, covenants, and releases contained herein, UFCW 367 and the Claimant mutually agree as follows:

### AGREEMENT

1.    Effective Date. This Settlement Agreement shall be effective on the date on which it is fully executed by the Parties.

2.    Settlement Payment by UFCW 367. UFCW 367 will pay Employee the total amount of FIFTY THOUSAND DOLLARS AND NO CENTS ($50,000.00) (the "Settlement Payment"). Said payment shall be mailed or delivered to Claimant's attorney Beverly Grant of the Beverly Grant Law Firm P.S at 5808 100th St SW Ste. A Lakewood, WA 98449 within twenty-one (21) calendar days of the effective date of this Settlement Agreement. The check is to be made payable to Beverly Grant Law Firm P.S. with annotation in the memo: Trust Fund for Emily Salvatore.

Neither Beverly Grant Law Firm P.S nor UFCW 367 makes any representations to the Claimant concerning the taxability of the settlement payment. UFCW 367 shall file and submit any necessary and appropriate tax forms to the Internal Revenue Service appropriate to this payment. The Claimant agrees to indemnify and defend UFCW 367 against any and all claims against it made by any taxing authority with respect to taxes owed under the Settlement Payment.

3.    Release by the Claimant. Except as provided herein, in return for the Consideration provided in Paragraph 2 of this Settlement Agreement, the Claimant does hereby unconditionally release, discharge, and hold UFCW 367 and all of its current and former officers,

8S

parent organization, board members, current and former employees, agents, attorneys, successors, or assigns (hereinafter the "Released Parties") harmless from, and covenants not to sue upon, each and every action, claim, right, liability, charge, or demand of any kind or nature the Claimant had, has now, or might hereafter claim to have against the Released Parties as of the Effective Date of this Settlement Agreement including, but not limited to, any and all claims in connection with her membership with UFCW 367, and further from any actions, claims, rights, liabilities, charges, grievances, or demands of any nature whatsoever which may be raised pursuant to any law, constitution, statute, regulation, or any common law theory, whether in tort, contract, equity, or otherwise (with all of the foregoing collectively referred to as the "Claim(s)").

(a)  Without limiting in any way the foregoing general release, this release specifically includes the following:

(i)  all Claims that relate in any way to UFCW 367's duty of fair representation to the Claimant under the National Labor Relations Act;

(ii)  all Claims, whether in tort, contract, by statute, or on any other basis, whether in law or in equity, whether civil, criminal, or administrative, whether known or unknown, for damages or monies owed by Releasees, including compensatory damages, emotional distress damages, pain and suffering, punitive damages, liquidated damages, attorneys' fees, costs, and interest, including all claims for back pay, front pay, overtime pay, severance pay, notice pay, health benefits, disability benefits, retirement benefits, all other benefits, vacation pay, holiday pay, sick pay, commissions, bonuses, relocation expenses, loans, expense reimbursements, benefits due under any collective bargaining agreement, or other monies due;

(iii)  all rights and Claims under the following laws, as amended: Section 1981 of the Civil Rights Act of 1866; Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act; the Labor Management Relations Act; the Washington State Law Against Discrimination (RCW 49.60 et seq);

(iv)  all rights and Claims under any other federal, state or local law, regulation or ordinance, including for discrimination on any basis, hostile working environment, retaliation, breach of express or implied contract, breach of collective bargaining agreement, breach of implied covenant of good faith and fair dealing, detrimental reliance, promissory estoppel, defamation, negligence, negligent or intentional misrepresentation, invasion of privacy, interference with economic gain or contractual relations, and intentional and negligent infliction of emotional distress or "outrage."

(b)  Except as may be necessary to enforce this Agreement, and to the fullest extent permitted by law, the Claimant agrees not to permit, authorize, initiate, encourage, support, join or continue any lawsuit, administrative charges or complaints (including charges of discrimination), arbitrations or proceedings (collectively, "Proceedings") against any of the Releasees based in whole or in part on any Claim covered by this Agreement. The Claimant represents that she has no pending Proceedings, whether internal or external, related to such matters.  Notwithstanding the above, nothing in this Agreement shall be construed to prohibit the Claimant from filing a charge with or participating in an investigation or Proceeding conducted by the EEOC, NLRB, or

any similar state or federal agency; however, the Claimant waives any right to any personal recovery in any action or proceeding that may be commenced on the Claimant's behalf with any federal or state agency in any way arising out of or relating to the matters released in this Agreement.

**Waiver of Unknown Claims.** The Parties expressly agree that the Release given by this Agreement applies to all unknown, unsuspected and unanticipated claims, liabilities and causes of action that the Parties may have against each other which have arisen, occurred or existed at any time prior to the Effective Date of this Agreement. The Claimant certifies that she has read all of this Settlement Agreement, including the Release provisions contained herein and fully understands all of the same.

4.  **Mutual Non-Disparagement.** The Claimant agrees that she will refrain from making any derogatory or disparaging statements about UFCW 367 and any of its officers and employees, and further that she will not act in any manner that damages the operation or reputation of UFCW 367, except as may be required by law or in the course of an active investigation by any governmental agency or similar lawful authority. Likewise, UFCW 367 agrees not to make any similarly derogatory or disparaging statements about the Claimant and UFCW 367 agrees that neither union or claimant will make any disparaging or derogatory remarks to disparage and/or retaliate claimant.

5.  **Confidentiality.** The Claimant agrees that she will keep the financial terms/ amount of this Settlement Agreement completely confidential, and that she will not hereafter disclose that information to anyone. Notwithstanding this Confidentiality provision, the Claimant may make such disclosure to her immediate family and professional representatives (e.g., attorneys, accountants, auditors, and tax preparers), all of whom must be informed of and agree to be bound by this Confidentiality clause, as well as any other disclosure required by law.

6.  **Ownership of Claims.** The Claimant represents and warrants that she is the sole and lawful owner of all rights, title, and interest in and to all released matters, claims, and demands referred to herein. The Claimant further represents and warrants that there has been no assignment or other transfer of any interest in such matter, claims, or demands which the Claimant may have against the UFCW 367.

7.  **Binding Nature.** This Settlement Agreement, and all the terms and provisions contained herein, shall bind the heirs, personal representatives, successors, and assigns of the Claimant, and only inure to the benefit of UFCW 367, its agents, officers, employees, servants, successors, past officers and employees and assigns.

8.  **Construction.** This Settlement Agreement shall not be construed in favor of one Party or against the other.

9.  **Partial Invalidity.** Should any portion, word, clause, phrase, sentence, or paragraph of this Severance Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.

10.    **Compliance with Terms.** The failure to insist upon compliance with any term, covenant, or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant, or condition, nor shall any waiver or relinquishment of any right or power contained in this Settlement Agreement at any one or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

11.    **Governing Law and Jurisdiction.** This Settlement Agreement shall be governed by the laws of the State of Washington, both as to interpretation and performance. Any dispute arising under this Settlement Agreement shall be subject to binding arbitration pursuant to the employment arbitration rules of the American Arbitration Association.

12.    **Section Headings.** The section and paragraph headings contained in this Settlement Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Settlement Agreement.

13.    **Counterparts.** This Settlement Agreement may be executed in two (2) counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.    **No Admissions.** It is understood and agreed by the Parties that this Settlement Agreement shall not be construed to be an admission of any liability or obligation by either Party to the other Party or any other person. UFCW 21 enters into this Settlement Agreement only to avoid the time, expense, and inherent risks of litigation, and for valid corporate purpose.

15.    **Voluntary and Knowing.** This Settlement Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto.



Page 4 of 5

**IN WITNESS WHEREOF,** the Parties have executed this Settlement Agreement on the respective dates set forth below.

Dated: _8/10/21_

**UFCW LOCAL NO. 367**

Signature _Michael Hines_

Print Name _Michael Hines_

Title _Secretary Treasurer_

Dated: _8-19-2021_

Signature

Print Name

Title _CLAmant_

Dated: _8/19/2021_

**BEVERLY GRANT** agrees to as to form only.

_Beverly Grant_

Page 5 of 5

# EXHIBIT 27



**Angel F González Irizarry, President**                    Michael Hines, Secretary/Treasurer

Thursday July 29, 2021                Time: 5:00-6:00 PM (5:06 pm)

## Call to order-Michael                          Quorum Yes / No

## Roll Call of Officers – Mike Sherman

| President | Angel | Gonzalez-VACATION | Vice President #10 | Greg | Buttner |
|---|---|---|---|---|---|
| Secretary/Treasurer | Michael | Hines (person) | Vice President #11 | Terri | Warren-Calvillo |
| Recorder | Mike | Sherman (person) | Vice President #12 | Julee | Richards (person) |
| Vice President #1 | Mike | Solberg (person) | Vice President #13 | Shay | Winget—WORKING |
| Vice President #2 | Joann | Gardner (zoom) | Vice President #14 | Veronica | Armstrong (person) |
| Vice President #3 | Mary | Hutson (zoom) | Vice President #15 | Michael | Whalen (zoom) |
| Vice President #4 | Albert | Leggett (zoom) | Vice President #16 | Renee | Bushnell (zoom) |
| Vice President #5 | Ray | Bennett (person) | Vice President #17 | Darcy | Ide |
| Vice President #6 | Darrin | Hale—CAMPING | Vice President #18 | OPEN | |
| Vice President #7 | Theresa | Durnan Brown (zoom) | Vice President #19 | Cheryl | Aquino (zoom) |
| Vice President #8 | Lisa | O'Neil | Vice President #20 | OPEN | |
| Vice President #9 | Nancy | Donnell (person) | Vice President #21 | Heather | Herness (person) |

Mike Hines instructed the Board Members present that the contents of this meeting are to be kept private and not to be shared with the General Membership or the Local Staff and Representatives nor the organizing department. The contents of this meeting are strictly confidential.

## Special Report – Michael

- Mike Hines shared with the board that UFCW Local 367 President Angel Gonzalez had submitted a letter of resignation. Angel explained in the letter that he was resigning due to ongoing health issues that he has struggled with for some time. Angel explained that he needed to focus his time and efforts on his health and family. Angel requested if staff and members would provide him and his family privacy.

- Mike continued stating the Local had received a notice from an attorney containing an Allegation of Sexual Misconduct by a member by Angel Gonzalez. He indicated he has invited Aaron Streepy to come speak to the board this evening and to answer any questions they might have. A brief discussion ensued until Aaron's arrival.

- Aaron Streepy (legal counsel for local 367) brought forward that the local had received legal documentation, containing accusation of sexual misconduct on the part of Angel Gonzalez. Aaron Streepy set forth several scenarios for us to consider, however, he encouraged us to come to a settlement agreement with the member to limit the exposure the union would have if this matter went to trial. He also indicated if the matter were settled, we would also obtain a non-disclosure agreement to protect the Local and Angel. Much discussion followed.

- Joanne Garnder motioned to authorize $50,000.00 as a settlement agreement. Discussion followed and Mike Solberg amended the motion to authorize $50,000 to settle the matter and up to $75,000 pending approval from our insurance provider. – Veronica Armstrong seconded the motion. Motion carried unanimously.

- Mike reviewed the by-laws and noted they require a 30-day moratorium before we can appoint a new president for our local. He asked for a motion for the Executive Board to convene our next regular meeting on August 25th, 2021, at 5pm. Cheryl Aquino motioned to move our meeting to August 25th, 2021. Renee Bushnell seconded the motion. Motion carried unanimously. The question was asked if the meeting could be held on a hybrid basis

# EXHIBIT 28



Angel F González Irizarry, President                              Che'ri Farrington, Secretary/Treasurer

Thursday July 1, 2021              Time: 6:00-8:00 PM (6:00 PM)

## Call to order-Angel                     Quorum Yes / No

## Roll Call of Officers – Mike Sherman

| President | Angel | González | Vice President #10 | Greg | Buttner |
|---|---|---|---|---|---|
| Secretary/Treasurer | OPEN | | ~~Vice President #11~~ | ~~Terri~~ | ~~Warren Calvillo~~ |
| Recorder | Mike | Sherman | Vice President #12 | Julee | Richards |
| Vice President #1 | Mike | Solberg | ~~Vice President #13~~ | ~~Shay~~ | ~~Winget~~ EXCUSED |
| ~~Vice President #2~~ | ~~Joann~~ | ~~Gardner~~ | Vice President #14 | Veronica | Armstrong |
| Vice President #3 | Mary | Hutson | Vice President #15 | Michael | Whalen |
| Vice President #4 | Albert | Leggett | ~~Vice President #16~~ | ~~Renee~~ | ~~Bushnell~~ |
| Vice President #5 | Ray | Bennett | Vice President #17 | Darcy | Ide |
| Vice President #6 | Darrin | Hale | Vice President #18 | OPEN | |
| Vice President #7 | Theresa | Durnan Brown | Vice President #19 | Cheryl | Aquino |
| Vice President #8 | Lisa | Gasser | Vice President #20 | OPEN | |
| ~~Vice President #9~~ | ~~Nancy~~ | ~~Donnell~~ | Vice President #21 | Heather | Herness |

## Presidents Report – Angel

This meeting was called to nominate and install a member to the position of Secretary Treasurer for local 367.

- Angel Gonzalez expressed the need to change our monthly meeting day and time as the present day is conflicting with our board members being able to attend the Pierce County Labor Council meetings. After much deliberation it was agreed upon to meet monthly on the third Wednesday of each month at 5pm.

- Angel Gonzalez next focused on our need to nominate a person for the position of Secretary Treasurer. He addressed the Bylaws requirement to fill the position within 90 days of the vacancy. Angel thanked Ray Bennett for stepping up to help in the signing of checks. Veronica Armstong nominated Michael Hines (currently the Executive assistant to the President) for the position of Secretary Treasurer of Local 367. Julee Richards seconded the nomination. Michael Whalen nominated Michael Solberg for the position to which Michael Solberg declined the nomination at this time. Seeing no other nominations being brought forward, Angel closed the nominations and called for a vote on Michael Hines to fill the vacancy of Secretary Treasurer. All 16 voting members voted to appoint Michael Hines as Secretary Treasurer of UFCW Local 367.

  - Angel Gonzalez reached out to Michael Hines to join us via Zoom. Angel gave Michael Hines the Oath of Office in a swearing in ceremony in the presence of all 16 Executive Board members. Michael Hines agreed to uphold and faithfully follow the UFCW bylaws. He pledged his devotion and energies to move our local forward under the guidelines of the Executive Board of directors.

- Briefly discussed were the two open positions (#18 and #20) on the E-Board. Angel asked the board members to consider members to appoint to these positions. We will bring nominations to the next meeting on July 21st, 2021, at 5pm.

- Michael Whalen will be replacing Kris Bauer on the appeals Committee.

## UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL NO. 367

6403 Lakewood Drive W • Tacoma, WA 98467-3331 • (253) 589-0367 • Outside Pierce Co. (800-562-3645) • FAX (253) 589-1512


**BUILDING A BETTER LIFE**

Angel F González Irizarry, President                    Che'ri Farrington, Secretary/Treasurer

Veronica Armstrong motioned to adjourn,
Michael Whalen Seconded the motion — Motion Carried,
meeting adjourned at 6:37pm.


Mike Sherman
Recording Secretary
UFCW Local 367


_____

Mike Sherman: Recording Secretary UFCW Local 367


_____

Angel Gonzalez, President UFCW Local 367


UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL NO. 367

6403 Lakewood Drive W ▪ Tacoma, WA 98467-3331 ▪ (253) 589-0367 ▪ Outside Pierce Co. (800-562-3645) ▪ FAX (253) 589-1512



Angel F González Irizarry, President                                    Che'ri Farrington, Secretary/Treasurer

Wednesday June 16, 2021          Time: 6:00-7:00 PM (6:00 pm)

## Call to order-Angel                          Quorum Yes / No

## Roll Call of Officers – Mike Sherman

| | | | | | |
|---|---|---|---|---|---|
| President | Angel | González | Vice President #10 | Greg | Buttner |
| ~~Secretary/Treasurer~~ | ~~Che'ri~~ | ~~Farrington~~ | Vice President #11 | Terri | Warren Calvillo |
| Recorder | Mike | Sherman | Vice President #12 | Julee | Richards |
| Vice President #1 | Mike | Solberg | ~~Vice President #13~~ | ~~Shay~~ | ~~Winget~~ |
| ~~Vice President #2~~ | ~~Joann~~ | ~~Gardner~~ | Vice President #14 | Veronica | Armstrong |
| ~~Vice President #3~~ | ~~Mary~~ | ~~Hutson~~ | Vice President #15 | Michael | Whalen |
| Vice President #4 | Albert | Leggett | Vice President #16 | Renee | Bushnell |
| Vice President #5 | Ray | Bennett | Vice President #17 | Darcy | Ide |
| ~~Vice President #6~~ | ~~Darrin~~ | ~~Hale~~ | ~~Vice President #18~~ | OPEN | |
| ~~Vice President #7~~ | ~~Theresa~~ | ~~Durnan-Brown~~ | Vice President #19 | Cheryl | Aquino |
| ~~Vice President #8~~ | ~~Lisa~~ | ~~Gasser~~ | ~~Vice President #20~~ | OPEN | |
| ~~Vice President #9~~ | ~~Nancy~~ | ~~Donnell~~ | Vice President #21 | Heather | Herness |

## Presidents Report – Angel

- Angel Gonzalez announced to the board that UFCW 367 Secretary Treasurer Che'ri Farrington was stepping down voluntarily from her eBoard position due to ongoing health reasons. Che'ri will still be employed at the local as a Union Representative but is stepping away from the Secretary Treasurer duties and responsibilities. Angel addressed the board as to their responsibility to fill the Secretary Treasurer position within 90 days to follow the Union Bylaws. He further stated that he would like to have this position filled with a very capable and competent individual. He expressed that he believed we could accomplish this during the July e-Board meeting.

  Discussion followed regarding whether Che'ri would be able to assist in the transition, to which Angel assured the board that she is willing and able to. Question arose regarding the term time limit on this midterm appointment. Angel stated in accordance with the bylaws the term would be through 12/31/2022.

  Angel was asked who he thought would be a qualified person to fill the board position…. Angel was hesitant to answer but did put forth that he thought Michael Hines would be well qualified to fill this position. Discussion Followed. Ray Bennett made a motion to elect Michael Hines, discussion followed with the thought that we should wait until the July Meeting – Ray Bennett withdrew his motion to elect Michael Hines at this time. There was no second to his original motion.

  Angel expressed that he was looking forward to the July meeting when we could all meet in person.

Call to Adjourn by Cheryl Aquino
Second by Albert Leggett
Motion Carried: 6:27 PM

_____          _____

Mike Sherman: Recording Secretary          Angel González, President

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL NO. 367
6403 Lakewood Drive W • Tacoma, WA 98467-3331 • (253) 589-0367 • Outside Pierce Co. (800-562-3645) • FAX (253) 589-1512