# EXHIBIT A




COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
AT SPOKANE


FAYE IRENE GUENTHER, an individual,

     Plaintiff,

v.                    No: 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually,
AND OSPREY FIELD CONSULTING, LLC,
a limited liability company,

     Defendants.
_____


VIDEOTAPED DEPOSITION OF

FAYE GUENTHER


TAKEN ON
MONDAY, MAY 13, 2024
9:59 A.M.


DAVIS WRIGHT TREMAINE, LLP
920 FIFTH AVENUE, SUITE 3300
SEATTLE, WASHINGTON  98104

```
 1  from undergrad in '98, and then --

 2       Q.   Okay.

 3       A.   -- I worked between '98 and 2008.

 4       Q.   Okay.  As an organizer.  Okay.

 5       A.   Yeah.

 6       Q.   And what attracted you then to the -- to the union

 7  movement?

 8       A.   Being an advocate for working people.

 9       Q.   Okay.  Now, when did you first go to work for

10  Local 21?

11       A.   In 2008.

12       Q.   2008.  And what were the circumstances for you

13  going to work for Local 21?

14       A.   Dave Schmitz was the president, and he asked me to

15  come and potentially become counsel for -- for Local 21.

16       Q.   Oh.  So did you practice as a lawyer for Local 21?

17       A.   No.

18       Q.   What did you do?

19       A.   I was a union organizer.

20       Q.   Okay.  Was there any reason why you did not choose

21  to become a counsel for 21?

22       A.   I liked -- I liked what I was doing, and the

23  attorneys were good, so.  Dave needed --

24       Q.   Who --

25       A.   Yeah.
```

1      A.    Yes.

2      Q.    Who was Mr. Crosby?

3      A.    He was the president of Local 21.

4      Q.    I see.  At the time you were secretary-treasurer?

5      A.    Yes.

6      Q.    Okay.  And how was it that you became president of

7  Local 21?

8      A.    I became president in May of 2019.

9      Q.    And how did that come to pass?

10      A.    Todd was offered a job at the international, and

11  -- and then I became the president because the board chose

12  me.

13      Q.    Okay.  Were you Mr. Crosby's preferred person to

14  become president?

15      A.    I don't know.  Maybe.

16      Q.    Did you know him very well?

17      A.    Yes.

18      Q.    Okay.  So he decides that he is going to take a

19  job at the international, and what do the -- what does your

20  local constitution say if the president is vacant? Who

21  assumes the office?

22      A.    The secretary-treasurer assumes both, holds both

23  offices for a period of time.

24      Q.    Okay.  So did that, in fact, happen with you?

25      A.    Yes.

1      Q.    Okay.  And then you're telling me the board

2   thereafter ratified --

3      A.    Yes.

4      Q.    -- you as president.

5      A.    Yes.

6      Q.    Okay.  And when was the next time you actually ran

7   for office, then, as president?

8      A.    I believe it was '20.  Yeah.  It was 2020, yeah.

9      Q.    2020.  Okay.  Tell me what -- because I -- I am

10  not all that up to speed on how local unions operate. What

11  is involved in running for office if you want to be

12  president?

13     A.    It's outlined in the bylaws.  And you need to

14  gather signatures, and there's nominations, and then you

15  run.

16     Q.    So you, in fact, did that?  You gathered

17  signatures?

18     A.    Yes, I did.

19     Q.    How many signatures did you gather?

20     A.    The requirement is 300.  I don't know exactly how

21  many I gathered, but it was more than 300.

22     Q.    I am going to guess it was more than 300.

23     A.    Yes.

24     Q.    All right.  And what kind of effort did you put

25  into gathering your signatures?

1  is struggling like with hazard pay or something, maybe the

2  rep's helping them move a petition in their workplace.

3      Q.    Okay.  And did you have like a regular newsletter

4  that you sent out to your members?

5      A.    Not at that time.

6      Q.    When did you -- at some point, did you start

7  sending out a regular newsletter?

8      A.    We don't really have a newsletter.  People don't

9  read them.  We -- we used to have one, but we don't anymore.

10     Q.    Okay.  How did you keep in touch with your

11  membership when you were president?

12     A.    Members generally pay attention during bargaining,

13  so we do bargaining updates about the issues that they care

14  about.  And we started doing an update from the board in --

15  later on, but it wasn't during that time.

16     Q.    Well, about when?

17     A.    One of our members requested it.  Probably in the

18  last six months we started doing that.

19     Q.    Oh, okay.  So this is recent.

20     A.    Yes.

21     Q.    All right.  So back in '20 and '21, did you have

22  an e-mail list of members?

23     A.    As the president?

24     Q.    Yes.

25     A.    Yes.

1      Q.    Okay.  And did you have occasion to send

2   communications to all your members?

3      A.    We try not to blast out general e-mails to all of

4   our members.  People get sick of it.

5      Q.    Okay.  But do you recall blasting out any

6   communications to your members that some might have gotten

7   sick of?

8      A.    I mean, we try to tailor our communications. So if

9   you're a nurse, you -- you talk about things nurses care

10  about.  If you're a grocery store worker, we'd try to talk

11  about things grocery store workers care about.

12     Q.    Okay.  And who would -- who would those

13  communications be from?

14     A.    The bargainer is generally the person who kind of

15  is closest, and they would work with folks in our

16  communications department.

17     Q.    Okay.  But are they from Faye Guenther?

18     A.    No.

19     Q.    They're not.

20     A.    They're not.  There -- there may be things from

21  me, but they're not -- like if it's a bargaining -- I'm not

22  the bargainer.  Why would I send a bargaining update out?

23     Q.    Okay.  Can you think of a communication in '20 or

24  '21 that you sent as president to all of your members?

25     A.    I think there's annual legal notices that have to

1    go out that may come on letterhead from -- from me.

2        Q.    Okay.    When was the next time you ran for

3    president?

4        A.    I ran for president again in 2023.    2023.

5        Q.    Okay.    But that wasn't as Local 21.

6        A.    Correct.

7        Q.    2023 was Local 3000.

8        A.    My next election was in '23.

9        Q.    Okay.    So you only ran for president once for

10    Local 21?

11        A.    That is correct.

12        Q.    Okay.    Why did Mr. Crosby leave?    Do you know?

13        A.    Because he was -- I -- I don't know.    I don't know

14    why.    I mean, I can guess, but you'd have to ask him, I

15    guess.

16        Q.    Did he ever talk to you about why he left?

17        A.    He did talk to me about why, what he was doing.

18        Q.    What did he tell you?

19        A.    That he was going to go become the International

20    Organizing Director.

21        Q.    Did he tell you why?

22        A.    Because he wanted to help grow the union.

23        Q.    There was nothing negative about his experience at

24    Local 21 that caused him to leave?

25        A.    I don't think so.

1      Q.    Okay.  And what's the substance of your

2  conversations?

3      A.    Niceties.  And he is on the mike at the -- asking

4  -- I'm asking questions from the audience.

5      Q.    Okay.  So do you have discussions or -- together

6  or are these just confrontational situations?

7      A.    I'm not -- I wouldn't say they're conversations,

8  but I also wouldn't say that they're confrontational.

9  They're tough conversations --

10      Q.    Okay.

11      A.    -- where we don't agree.

12      Q.    Okay.  Now let's go back to when you were

13  president of Local 21.  What was your role as the president?

14      A.    My role is defined in the bylaws and the

15  constitution.  It's to oversee the operations of Local 21.

16      Q.    Okay.  And how many staff did you have to

17  supervise?  I don't need to know the exact number, just

18  approximately.

19      A.    As the president of Local 21?

20      Q.    Yeah.

21      A.    Probably 112-ish.

22      Q.    Okay.  How many members at 21 did you have?

23      A.    It fluctuated but around 44,000.

24      Q.    Forty-four thousand members of Local 21. Okay. And

25  what do you think the most significant thing you did while

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

15

1    you were president for the members of Local 21?  I mean,

2    looking back on your accomplishments, what you think you did

3    that was the most significant.

4         A.    Probably helped bring vaccine clinics in --

5         Q.    Okay.

6         A.    -- the local.

7         Q.    And did you communicate with your membership while

8    you were in the midst of that effort?

9         A.    Yes.

10        Q.    Okay.  And tell me real quick what that effort was

11   about.  I think I can guess, but what was the issue?

12        A.    Trying to make sure grocery store workers got

13   vaccinated and health care workers got vaccinated early on.

14   But grocery store workers struggled to get in line for the

15   vaccines.

16        Q.    Okay.  So it was an issue of priority?

17        A.    Mm-hmm.

18        Q.    Were there problems you encountered with respect

19   to desire -- whether people desired the vaccines?  In other

20   words, was there any resistance among your membership to

21   getting vaccines?

22        A.    Oh, I'm sure there was some, but most people

23   because they had been deemed essential, they were going to

24   work the whole time.

25        Q.    I see.

1    A.   And other groups who -- so we were trying to get

2  them vaccinated because they had to go to work every day.

3    Q.   Okay.  And I saw some reference to meetings you

4  had with Governor Inslee.

5    A.   Yes.

6    Q.   Were they about the vaccine issue?

7    A.   The original meetings were around masks and

8  wearing masks at -- trying to get people to wear masks

9  during COVID.

10    Q.   Okay.  And what was your involvement in that

11  issue?

12    A.   Promoting people wearing masks.  In the beginning,

13  the employers were prohibiting people from wearing masks,

14  and people were getting disciplined, so I was trying to stop

15  that from happening.  And then as soon as the mask mandate

16  happened, it was the opposite, where workers were getting

17  just threatened with discipline for refusing to wear masks,

18  so we were just trying to navigate, navigate that space.

19    Q.   Okay.  And then later, there was the priority

20  issue regarding vaccines?

21    A.   Yes.

22    Q.   And did you object to the governor's priorities at

23  the time?

24    A.   I -- no.  The governor was doing, in my opinion,

25  the best that he could do.

```
 1        Q.    Okay.   Were teachers receiving priority for
 2   vaccines over -- over grocery store workers?
 3        A.    Yes.
 4        Q.    Okay.   What was your view on that?
 5        A.    I did not agree with that.
 6        Q.    Okay.   And what were you able to accomplish in
 7   that regard?
 8        A.    Nothing.
 9        Q.    So you couldn't change the priorities.
10        A.    No.
11        Q.    What kind of communications did you have with your
12   members, your 44,000 members, during the course of your
13   efforts to change the priorities and work on the masking
14   requirements?
15        A.    We had, you know, people out talking to members,
16   and we had a safety -- like a -- it was a reporting thing, a
17   safety thing where you could report any safety issue. During
18   the courses of a few bargains where things were particularly
19   bad, we had a press conference.   So CHI, we had a press
20   conference to talk about the issues.
21        Q.    Okay.   And tell me about the press conference. Who
22   was involved from the press?
23        A.    I don't know who was involved from the press. It
24   was online, so I couldn't see who was involved.
25        Q.    Do you know how many outlets watched the press
```

1  conference?

2      A.   I don't know.

3      Q.   Okay.  And I presume you invited a significant

4  number of outlets to the press conference?

5      A.   I didn't invite anyone, but I'm -- I'm assuming

6  our com's person did, but I don't know the list.

7      Q.   I'm sorry, your com's person?

8      A.   Yeah.

9      Q.   That's your person -- your public relations

10  communications person?

11      A.   Well, it's not public relations, but it's the

12  person in our com's department at Local 3000.

13      Q.   Okay.  And it would have been that person's duty

14  to invite as many press people as they could?

15      A.   Mm-hmm.

16      Q.   Okay.  And who led the press conference?

17      A.   The bargaining team members.

18      Q.   Okay.  Did you have a role in the press

19  conference?

20      A.   I did.

21      Q.   What was your role?

22      A.   My role was to speak about what was happening at

23  CHI.

24      Q.   Okay.  And I presume you introduced yourself?

25      A.   I did.

1    Q.   Okay.  And were there questions from the press?

2    A.   I don't -- I don't -- I don't know.  There may

3  have been.

4    Q.   Did you field any?

5    A.   Yes.  If there was, I fielded the questions, but I

6  don't remember if there were questions.

7    Q.   Okay.  And, again, when was the date of that press

8  conference?  Do you remember?  I don't need an exact date,

9  but like the --

10    A.   It would have been --

11    Q.   -- time.

12    A.   -- in '20.  '20 or 2021 we were in CHI contract

13  negotiations.

14    Q.   All right.  So it would have been within the

15  pandemic.

16    A.   Yes.

17    Q.   Okay.  Okay.  Did you ever have occasion to send

18  letters or e-mails to your membership as a whole during that

19  period of time?

20    A.   You've -- you've asked me that a couple times --

21    Q.   Yeah.

22    A.   -- and I'm trying to think.  I know we have legal

23  -- a couple legal notices we have to send, and I think it's

24  on letterhead from me.  Generally, we communicate with like

25  -- like segments, right?  We don't --

1      Q.    Okay.  And do you recall ever having like a letter

2  from the president or anything like that on social media?

3      A.    Maybe.  I try not to do letters from the

4  president.  I don't -- I don't think people read that stuff.

5  But I could have the letter from the president.  I just --

6  that would not be my style.

7      Q.    Okay.  Have you had any communications while you

8  were president of Local 21 with the media on any topics that

9  you recall?

10     A.    Yes.

11     Q.    And what were they?

12     A.    The COVID vaccine that I discussed.

13     Q.    Right.

14     A.    The CHI situation.

15     Q.    Right.  That was the masks, right?

16     A.    That was the bar unit that was in bargaining.  They

17 almost were headed towards a strike.

18     Q.    Oh, okay.

19     A.    So -- yeah.  Thank you.  The masks.  I believe

20 there was a press release, some press releases or a press

21 release about the Black Lives Matter masks that I -- I'm in.

22 I feel like I'm missing something, but you may have it --

23     Q.    Okay.

24     A.    -- in your stack of papers and --

25     Q.    Okay.

1      A.    -- I'll verify.

2      Q.    Okay.  Okay.  Did you ever conduct any podcasts?

3      A.    Yes.

4      Q.    What were those about?

5      A.    They were very boring and nobody -- nobody read

6  them -- or listened to them.  One -- they were about the

7  variable annuity defined benefit pension that I negotiated.

8  They were about -- I think there were three series, three,

9  and the other one was about -- I think just about the local

10 and how we work together. And there was a third topic, and

11 maybe it was health care or maybe it was COVID, I'm not

12 sure, but they were not well -- not a lot of people looked

13 at them.

14     Q.    Were --

15     A.    If you looked at them, you're probably the fifth

16 person.

17     Q.    Were they accessible to your members?

18     A.    I don't -- maybe.  Maybe they were put up on the

19 Web.  I don't really know if they were or weren't.

20     Q.    We'll talk about these later --

21     A.    Yeah.

22     Q.    -- but there's quite a few communications that you

23 have had with presidents of other locals during that time.

24     A.    Yes.

25     Q.    What was your relationship, would you say? How



1  **would you categorize it among the presidents of the other**

2  **locals in Washington State?**

3      A.    For COVID, I helped negotiate a MOU that covered

4  our membership, and then I worked with the other presidents

5  to see if they wanted it to cover their membership as well.

6      **Q.    By MOU, you mean Memorandum of Understanding?**

7      A.    Yes.

8      **Q.    And what was the contents, basically, of the MOU?**

9      A.    Sick leave protections.    They were with Kroger and

10  Albertsons mostly.    And sick leave protections, leave

11  protections.    It was -- it was people's rights to wear

12  masks.    It was -- you know, I don't remember it all.    It was

13  about a page and a half of -- of provisions that protected

14  -- that did the best we could to protect workers during

15  COVID.

16      **Q.    Okay.    And did you get other unions to sign on?**

17      A.    Yes.

18      **Q.    Okay.    And do you think it's important for a union**

19  **local leader to form relationships with the other**

20  **presidents?**

21      A.    Yes.

22      **Q.    Okay.    And were you fairly successful at that?**

23      A.    Yes.

24      **Q.    Okay.    As Local 21 president, did you form any**

25  **relationships with public officials or did you strive to do**

1  **that?**

2      A.    To be honest, I'm not a huge fan of politicians,

3  but I -- Governor Inslee did have a lot of decision-making

4  power related to COVID, and so I attempted to keep lines of

5  communication open.

6      **Q.    Okay.  And what did that mean?**

7      A.    Whenever the hospital association was on a call, I

8  felt like the union should be on the call as well and --

9      **Q.    So you would participate in those calls.**

10     A.    Yes.

11     **Q.    Does Governor Islee know who you are?**

12     A.    Probably.

13     Q.    If you saw him in a room, would he recognize you,

14  do you think?

15     A.    I don't know.

16     Q.    You don't know.

17     A.    He knows a lot of people.  You know what I mean?

18  Like he -- he knows a lot of people.

19     Q.    So you're not on a first-name basis with him.

20     A.    Maybe.  I mean, I was on a press conference with

21  him for the masks.  Does he remember my name? Maybe.

22  Probably.

23     Q.    Okay.

24     A.    I'm not sure.

25     Q.    Okay.

 1      A.   I would say -- I would say he does, but I just --

 2  you just get -- there are so many people that you see, you

 3  know.

 4      Q.   All right.  How about state legislators?

 5      A.   I avoid Olympia as much as I can.

 6      Q.   Okay.

 7      A.   But name somebody, and maybe I would know them.

 8      Q.   Okay.  Do you have a lobbyist for your local?

 9      A.   Yes.

10      Q.   Okay.  I saw your name connected with Bernie

11  Sanders.

12      A.   Yes.

13      Q.   Tell me about that.

14      A.   My guess is it's related to the Kroger hazard pay

15  issue and Kim Cordova, who is the president of 7 and who,

16  yeah, asked if I would be on a letter with her and Bernie

17  Sanders, and I said yes.

18      Q.   Okay.  Have you met Bernie Sanders?

19      A.   Not then, but I met him with a whole bunch of

20  people during the Kroger-Albertsons merger hearing where we

21  went to oppose, and I was in an office with him and a whole

22  bunch of people.

23      Q.   Did you have a press conference together?

24      A.   No.

25      Q.   Now, have you ever run for International office?

1        A.    I put my name in.

2        Q.    For?

3        A.    For International office.

4        Q.    For what office?

5        A.    I'm not sure if I ever indicated the position, but

6  perhaps I did.

7        Q.    You can do that?

8        A.    You can.  You can do that.  And I have recently

9  put my name back in to run.

10        Q.    For what position?

11        A.    Presidency.

12        Q.    So are you currently running for International

13  president?

14        A.    According to the constitution, I am not.

15        Q.    What does that mean?

16        A.    I don't know what that means.  That's what I've

17  been told.

18        Q.    Are you seeking to run for International

19  president?

20        A.    Yes.

21        Q.    Okay.  And are there filing deadlines?

22        A.    Those have not been disclosed to me.

23        Q.    I see.  But once they're disclosed, you intend to

24  run.

25        A.    I'm not sure.

1    lawyer, so why don't you explain to me what you know about

2    it, anyway.

3        A.    What I learned about it is you have to wait for

4    the first slate of people to run so you know what position

5    they hold.  And then after they've all been nominated, you

6    can try to figure out which spot you want to run for.

7        Q.    I see.  And that happened in '21 also?

8        A.    No.

9        Q.    Okay.  What was the process in '21?

10       A.    Are you talking about the International?

11       Q.    The International.

12       A.    Are you talking about 2021 or '20?

13       Q.    2021.

14       A.    No, no, no.  The convention was in 2023.

15       Q.    Okay.

16       A.    Is that what you're talking about?

17       Q.    I heard that you had run for office in 2021 for

18   the International.  Is that not true?

19       A.    No, that's not true.

20       Q.    Okay.  So it's 2023.

21       A.    It's the 2023 convention.

22       Q.    Okay.

23       A.    Yeah.

24       Q.    All right.

25       A.    There's no other way to run.

```
 1        A.    I think prior to me being president there were

 2  reasons why it would have been good for the membership.

 3        Q.    And why is that?

 4        A.    Overlapping contracts, overlapping staff,

 5  overlapping interests.

 6        Q.    Was 1439's membership primarily on the east side

 7  of -- of the state?

 8        A.    Yes.

 9        Q.    And 21's was on the west side?

10        A.    No.

11        Q.    Where was 21's?

12        A.    All across the state of Washington.

13        Q.    All across.

14        A.    We have health care jurisdiction.

15        Q.    Okay.

16        A.    And cannabis jurisdiction.

17        Q.    Okay.  And you sat in on the depositions with Mr.

18  -- I think it was Garcia.  No, not Garcia, it was Mr.

19  Gonzalez.  No, I'm sorry.

20        A.    Say the first name.  I don't --

21        Q.    Was it Alex?

22        A.    Alex is --

23        Q.    Garcia?

24        A.    Alex Garcia.

25        Q.    Yeah.  That's right.  We took his deposition.
```

1    the idea of a merger.

2         **Q.    Well, how did the merger come to take place?**

3         **A.    On September 30th, or right around there, Eric**

4    **called me and asked if I would consider it.**

5         **Q.    September 30th he called you.  Okay.  And was this**

6    **like out of the blue?**

7         A.    Was it out of the blue.  We had been working on

8    COVID stuff and grievance stuff.  But --

9         **Q.    Right.**

10        A.    Was it out of the blue?  I think you could

11   describe it like that.

12        **Q.    Was it part of another conversation or did he make**

13   **a special call just for that?**

14        A.    He made a special call.

15        **Q.    Okay.  And what did you say?**

16        A.    I listened to him, and -- yeah.  I listened to

17   what he had to say.

18        **Q.    And what did he have to say?**

19        A.    He was overwhelmed, and he was talking to me about

20   his mom, who was not well.  And he was struggling to take

21   care of her, and he was feeling like he couldn't do it

22   anymore, run the local anymore.

23        **Q.    Well, why wouldn't -- did you ask him, well, why**

24   **don't you find somebody to replace you then?**

25             MR. MCGUINNESS:  Objection as to form.

```
 1              MR. DILORENZO:  All right.

 2   BY MR. DILORENZO:

 3        Q.    I mean, did you have any -- I mean, did he say a

 4   merger was the only solution to those problems?

 5        A.    No.

 6        Q.    Well, normally, when people feel that they can't

 7   handle a particular position, they find someone else to take

 8   their place.  Did you ask him about that?

 9        A.    I didn't.  I didn't ask him about that, but he did

10   say he didn't feel like he had a team around him or people

11   that he could rely on.

12        Q.    Did he tell you that he was aware that various

13   people within his organization had filed a complaint against

14   him?

15        A.    No.

16        Q.    He did not.  Did you know at the time that various

17   people had filed a complaint against him?

18        A.    No.

19        Q.    Okay.  So what did you do next?  This is September

20   30, 2021, right?

21        A.    So it's a weird phrase, but I didn't want him to

22   think -- I didn't want to appear as if I was trying to push

23   a merger.  So I listened and then I hung up. And at some

24   point, I did call him back.  And I don't -- and then I --

25   yeah.  I called him back after that.
```

1      Q.    And what did you say?

2      A.    I said if you really think that you're interested

3   in a merger, I want you to know that I would be interested

4   as well.

5      Q.    Okay.  And then did you plan next steps?

6      A.    I had -- I think I wanted to let him sit with it

7   to see how -- if it was real or not to him.  I had planned a

8   vacation and a few other things.  And at some point, I don't

9   know if he called me or I called him.  We did set up a

10  meeting to meet face-to-face.

11     Q.    Okay.  Did you talk to any of your team members in

12  the interim about this?

13     A.    Yes.

14     Q.    And who did you talk to on your team?

15     A.    Joe Mizrahi.

16     Q.    And what did -- what was Mr. Mizrahi's position?

17     A.    What do you mean?

18     Q.    Did he have a position within your organization?

19     A.    Oh, I thought you meant -- he's my secretary-

20  treasurer.

21     Q.    I see.  Okay.  What did he think about a merger?

22     A.    He wanted us to have a merger.  He wanted us to

23  merge.

24     Q.    Okay.  What were the reasons to merge?  I mean the

25  objective reasons.



1    A.    The reason I wanted to merge, and Joe, is because

2    you can consolidate power within Albertsons and Kroger and

3    bargain better contracts.    And there were non-union Kroger

4    stores that undermine our bargaining position, so I wanted

5    to be able to organize those stores.

6    Q.    I see.    Okay.    And how many members did 1439 have

7    at the time?

8    A.    Approximately, 7800.

9    Q.    And you had quite a few.    You had?

10    A.    Approximately, 44,000.

11    Q.    You had 44,000.    Did anybody on your team oppose a

12    merger?

13    A.    Not that I'm aware of, but it's possible.

14    Q.    Did you speak with anybody at 1439 who was opposed

15    to the merger?

16    A.    The only person that I know that was opposed to

17    the merger -- this is afterwards, after December 14th -- was

18    Jeff Terpining.

19    Q.    Okay.    So December 14th.    What's the significance

20    of that date?

21    A.    That's when the boards voted.

22    Q.    I see.    Okay.    So you detailed the arguments for a

23    merger.    Were there arguments against?

24    A.    Are you talking in general about mergers or?

25    Q.    Just in general about 1439 and 21.    I mean,



 1  obviously, if there's a board discussion, there's going to

 2  be arguments in favor, and then there might be arguments

 3  against.  Were there any arguments against?

 4      A.  Mergers are hard.  I've been through several.

 5      Q.  Right.

 6      A.  And mergers can be hard, and they're -- in the

 7  beginning, they -- they are expensive.

 8      Q.  Okay.  And did the board discuss all that?

 9      A.  Which board are you referring?

10      Q.  Yours, 21.

11      A.  Yes, I believe -- I don't know all the details,

12  but we had thorough discussions of merging.

13      Q.  Okay.  Do you know what arguments were presented

14  to the 1439 board?

15      A.  I don't.  I would assume it would be similar, but

16  I do not -- I was not present.  I was present at the very

17  beginning of one board meeting to say hello and introduce

18  myself, but I did not stay.

19      Q.  Okay.  Now, in October, I think it was October

20  28th -- and we'll talk about this later.

21      A.  Yes.

22      Q.  You and Mr. Renner sought permission from Mr.

23  Perrone to engage in discussions about a merger?

24      A.  Yes.

25      Q.  Okay.

1       A.   Yeah.

2       Q.   Why did you have to do that?

3       A.   It's required by the constitution.

4       Q.   Okay.  Hadn't you already had discussions about a

5  merger?

6       A.   The constitution has a -- there's a merger kit

7  that you have to request permission to engage in formal

8  conversations.

9       Q.   Okay.  So tell me about informal conversations

10  that took place before that time but after September 30th

11  when Mr. Renner called you out of the blue.  What other

12  conversations did you all have?

13      A.   I think I detailed them for you besides the in-

14  person meeting that happened the day before the letter was

15  sent, which was October -- it was a Thursday, so it's -- I

16  think it's October 27th.  And Jim -- or not Jim, Aaron,

17  myself, Joe Mizrahi, and Eric met in person for the first

18  time face-to-face.

19      Q.   Okay.  Now, I don't want to ask you anything about

20  -- well, I might end up asking --

21      A.   I think you --

22      Q.   -- but I don't want you --

23      A.   I think you wish you could --

24      Q.   -- to respond --

25      A.   -- ask me about it.



Faye Guenther · May 13, 2024 · NDT Assgn # 74689                    Page 65

```
 1        A.    I -- if that's a Friday, yes.

 2        Q.    Okay.

 3        A.    I -- I don't have a calendar in my hand.

 4        Q.    And December 2nd, you received permission.

 5        A.    That is correct.

 6        Q.    All right.  All right.  So between those times,

 7   between September 30th and December 2nd, did you have

 8   meetings with Mr. Renner about a merger?

 9        A.    All of the meetings I had were with Aaron Streepy

10   present.

11        Q.    Okay.  And who did Aaron Streepy represent?

12        A.    Local 3000.

13        Q.    Well, Local 3000 hadn't been formed yet.

14        A.    Well, Local 21, sorry --

15        Q.    Okay.

16        A.    -- at this point.

17        Q.    Local 21.  All right.  Was Mr. Streepy also the

18   lawyer for 1439, as far as you know?

19        A.    On October 28th or 27th?

20        Q.    In-between September 30th and December 2nd.

21        A.    On October 27th was the first face-to-face meeting

22   I had that include Aaron Streepy.

23        Q.    Right.  Who was at the meeting?

24        A.    Aaron Streepy, Faye Guenther, Joe Mizrahi, and

25   Eric Renner.
```



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

35

1    Q.    Okay.  All right.  And Renner is speaking for

2    1439.

3    A.    Correct.

4    Q.    And you and Mizrahi are speaking for 21.

5    A.    Correct.

6    Q.    And who is Mr. Streepy representing?

7    A.    In that meeting, Aaron --

8    Q.    Don't tell me anything he said, just tell me what

9    -- who he is representing.

10    A.    He was representing Local 3000.

11    Q.    Local 3000 didn't exist.

12    A.    Local 21 --

13    Q.    Okay.

14    A.    -- at that point.

15    Q.    Okay.

16    A.    And I believe in that meeting he disclosed he had

17    been working on working with --

18        MR. MCGUINNESS:  Hang on.

19        So -- so we're getting into communications from

20    counsel.  Is there a way we can navigate --

21        MR. DILORENZO:  I just want to know who Streepy

22    was representing.

23        MR. MCGUINNESS:  So -- so the question for you is

24    did you know -- did you come to know was Streepy

25    representing someone other than Local 21.

Faye Guenther    May 13, 2024    NDT Assgn # 74689    Page 67

1          THE DEPONENT:   In that meeting?

2          MR. MCGUINNESS:   Yeah.

3          THE DEPONENT:   Yes.

4   BY MR. DILORENZO:

5      Q.   Okay.   Who was he also representing?

6      A.   1439.

7      Q.   All right.   So he was representing both parties.
    Is that -- as far as you knew.

8

9      A.   Yes.

10     Q.   Okay.   All right.   Okay.   And what happened as a
    result of that meeting?

11

12     A.   We drafted a letter requesting permission to
    engage in formal merger conversations.

13

14     Q.   Okay.   And then what happened between that time
    and December -- December 2nd, it looks like, when the
    International approved your opportunity to discuss?

15

16

17     A.   We had -- I had a conversation with Marc Perrone,
    and I had a follow-up face-to-face meeting with Eric, Aaron,
    myself, and Joe Mizrahi.   Yeah.   That's the right sequence.

18

19

20     Q.   Okay.   And how did your meeting with Mr. Perrone
    go?

21

22     A.   It went well.

23     Q.   Okay.   And what did you tell Mr. Perrone?

24     A.   I laid out the reasons why I thought a merger
    would benefit both locals, and I asked for his support.

25

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

37

1    Q.    Okay.  So that's another meeting.

2    A.    Yes.

3    Q.    And is Mr. Streepy still representing both parties

4    at that meeting?

5    A.    It's very clear that he was representing both

6    parties unless there was a conflict and then we'd need to

7    seek our own.

8    Q.    Okay.

9    A.    You know, somebody else.

10   Q.    Okay.  And what happened as a result of that

11   meeting, that November 22nd meeting?

12   A.    What do you mean what happened?

13   Q.    Well, you met.

14   A.    Yes.

15   Q.    And then what did you do?

16   A.    I waited for Marc Perrone's formal letter.

17   Q.    Okay.  And then that arrives around December 2nd?

18   A.    Yes.

19   Q.    Okay.  And then what did you do?

20   A.    I proceeded to negotiate a merger agreement with

21   Eric.

22   Q.    Okay.  So what's involved in negotiating a merger

23   agreement?

24   A.    There's boilerplate language.

25   Q.    There's a kit, right?

1      A.   There's a kit.

2      Q.   Okay.  Do you have to -- now, if two parties

3  merge, they are responsible for each's liability, right?

4      A.   No.

5      Q.   They are not.

6      A.   No.

7      Q.   How does that work?

8      A.   The 1439 was merging into 21.

9      Q.   Okay.

10      A.   So 21 assumes the assets and buildings and all of

11  those sorts of things from the merged local.

12      Q.   What happens to 21's -- I'm sorry, to 1439's

13  obligations?

14      A.   We assume the obligations.

15      Q.   Has to take them on.  Was it important to you to

16  engage in any due diligence?

17      A.   Yes.

18      Q.   What did you do in the way of due diligence?

19      A.   The same thing that I've done in other mergers.

20      Q.   And what's that?

21      A.   Review all of the finances, make sure all the bank

22  statements are accurate, review the staff contracts and

23  staff pay, review all assets that are owned, review the

24  membership numbers, review -- just -- I'm trying to think of

25  the different things that I reviewed.  There are bylaws.

```
 1  Sometimes there is differences in the bylaws.

 2      Q.   Right.

 3      A.   And make sure if there is any pending litigation

 4  that I know about it.

 5      Q.   Okay.  And what did you discover with respect to

 6  pending litigation?

 7      A.   That there was no --

 8           MR. MCGUINNESS:  Objection as to form in terms of

 9  if it's going to elicit comments between Ms. Guenther and --

10           MR. DILORENZO:  Okay.

11           MR. MCGUINNESS:  -- Local 21's attorney.

12  BY MR. DILORENZO:

13      Q.   Did you receive disclosures from Local 1439 as to

14  pending litigation?

15      A.   I received -- I was notified that there had been

16  an internal dispute and that those disputes had been

17  resolved amongst all parties with nondisclosure and non --

18  and confidentiality agreements.

19      Q.   Okay.

20      A.   And that there was no pending litigation.

21      Q.   Okay.  And when did you discover that?

22      A.   December 2nd or 3rd, right around there.

23      Q.   Did you ask to examine the agreements?

24      A.   I was told there was nondisclosure confidentiality

25  and that I did not review the agreements.
```

1  details about Scott Habernicht's employment; and details

2  about Hofstader's employment.

3      Q.   Okay.  And what were the details about Renner's

4  employment that you asked to be -- or that Pedersen wanted

5  to be put into a different agreement? What were those about?

6      A.   I'm actually -- I'm actually not sure we had ever

7  put the employment stuff in the merger agreement, but

8  perhaps we had.  She just wanted the boilerplate language to

9  be in the merger agreement and anything else to be in a

10  separate agreement.

11      Q.   Okay.  Now, ultimately, Eric Renner signed your

12  merger agreement.

13      A.   Eric Renner signed the merger agreement, yes.

14      Q.   On behalf of 1439.

15      A.   Yes.

16      Q.   And you signed it on behalf of 21.

17      A.   That is correct.

18      Q.   And then it went to each board, is that right, for

19  approval?

20      A.   That is correct.

21      Q.   Okay.  So the merger agreement provided that there

22  would be a new union, a new local, 3000, and you would be

23  president, correct?

24      A.   Yes.

25      Q.   And it took many of the board members from Local

1      Q.    Did you inform your board that there were claims

2  outstanding that had been resolved and that were subject to

3  nondisclosure agreements prior to your board voting?

4           MR. MCGUINNESS:   Objection as to form.

5  BY MR. DILORENZO:

6      Q.    Did you -- let me rephrase it.   Did you tell your

7  board that there were resolved claims against Mr. Renner

8  prior to voting?

9      A.    No.

10     Q.    Did you inform your board that there were

11 settlement agreements that contained nondisclosure

12 agreements prior to your board voting?

13     A.    No.

14     Q.    Did you inform your board that one of the

15 conditions of the agreements was that Mr. Streepy was no

16 longer allowed to supervise people?

17          MR. MCGUINNESS:   Objection as to form.   I think

18 you meant Mr. Renner, just for the record.

19          MR. DILORENZO:   I'm sorry.   Excuse me.

20          MR. MCGUINNESS:   Just for the record.

21 BY MR. DILORENZO:

22     Q.    Mr. Renner was not allowed to supervise people.

23     A.    I'm sorry, can you state the --

24     Q.    Did you inform the board that as part of the

25 resolutions of those complaints that Mr. Renner would not be

1    allowed to supervise people?

2        A.    No.

3        Q.    Why didn't you let them know any of this?

4        A.    Why was it -- I didn't think it was relevant. He

5    wouldn't have been supervising.  I mean, it wasn't -- I

6    didn't think it was relevant.

7        Q.    Okay.  Prior to the board ratifying the merger

8    agreement, did you plan that Mr. Renner would have ongoing

9    employment with the new local?

10       A.    Can you say -- can you say it one more time.

11       Q.    Prior to asking your board to ratify --

12       A.    Yes.

13       Q.    -- did you have plans for Mr. Renner to continue

14   his employment with the new Local 3000?

15       A.    I had asked Eric to stay to help transition the

16   contracts to me.

17       Q.    And for how long was that employment going to

18   last?

19       A.    The conversations were vague, but we did -- we

20   were in the process of negotiating a separate merger

21   commitments document that included his employment.

22       Q.    Okay.  And when was that document completed?

23       A.    I think it was -- there were rough draft forms.  I

24   think we got into some place of completion but never signed

25   in mid-January, early February.

```
1        A.   I don't know if I looked at them.  And I did not
2   -- and I don't know if I looked at those until this
3   litigation.
4        Q.   Were they -- were they text messages that predated
5   the merger or postdated the merger?
6        A.   Predated.
7        Q.   Okay.  Did you talk to Mr. Renner about them?
8        A.   No.  I don't think I did.
9        Q.   Why didn't you talk with him about them?
10       A.   Because it seemed like the conduct was Armando's
11   conduct.
12       Q.   Okay.  So then how did you become aware of sexual
13   harassment allegations against Mr. Renner?
14       A.   It's possible that -- maybe I should have known
15   earlier, but it's possible that I didn't really understand
16   all of the different allegations until this litigation
17   commenced.
18       Q.   Okay.  I'm sorry, because I thought you said that
19   you became aware of sexual harassment allegations against
20   Mr. Renner shortly after the merger.  Did I mishear you?
21       A.   I -- I -- so December 2nd --
22       Q.   Right.
23       A.   -- I asked if there was pending litigation.  I
24   asked if there was -- and there was not and that there -
25            -
```

1    Q.    Right.

2    A.    -- had been an internal conflict.

3    Q.    Right.

4    A.    And I did not know what all the details of the

5    internal conflict were, and I knew that they were subject to

6    nondisclosure, non -- and confidentiality. And I -- I don't

7    know if I knew -- I don't believe I knew that it was sexual

8    harassment.  I knew that there was a conflict, though.

9    Q.    When did you first become aware that there were

10    sexual harassment allegations against Mr. Renner?

11    A.    So at some point after the merger took place

12    because of behaviors by Armando, I asked to see documents

13    related to Armando.  I am still not sure I was aware that

14    there -- I mean, I saw the text messages, so I assumed, you

15    know.  So that's -- that's what I know, and I'm not quite

16    sure when I became aware of the totality of the situation.

17    Q.    Well, when did you become aware of any part of the

18    situation with respect to Mr. Renner?

19    A.    Well, on December 2nd when I was told that there

20    was an internal -- internal problems that had been resolved.

21    Q.    Right, but did you know that the internal problems

22    involved allegations of sexual harassment?

23    A.    I'm not -- I don't think I did.

24    Q.    Okay.  When did you first know that?

25    A.    In March, I knew that Armando was involved in



1   BY MR. DILORENZO:

2        Q.   So that is a black-and-white version --

3        A.   Yeah.

4        Q.   -- of another exhibit that we talked about

5   throughout the depositions.  Can you tell me what that

6   depicts.

7        A.   What do you mean?

8        Q.   What is that?  What are you looking at?

9        A.   A flyer that was distributed.

10       Q.   And did you ever see that flyer?

11       A.   Yes.

12       Q.   Okay.  When was the first time you saw the flyer?

13       A.   We voted on the 14th.  I believe we -- I saw it on

14   the 15th.

15       Q.   You saw it on the 15th.

16       A.   Maybe the 16th.  15th or 16th.

17       Q.   So you saw it after the -- your board had voted.

18       A.   Yes.

19       Q.   Okay.  And what was the next process after your

20   board and the 1439 board both approved the merger? The next

21   process was to submit it to the rank-and-file?

22       A.   Yes.

23       Q.   Okay.  And what was the timeline for that?

24       A.   The members of 1439 would vote in January, and the

25   members of -- of 21 would vote in February.

```
 1   flyer.
 2        Q.   Did you not want to know?
 3        A.   I didn't think he was subject to harassment
 4   charges.
 5        Q.   But you knew at that time that he was prohibited
 6   from supervising other employees, right?
 7        A.   That doesn't mean he was charged with sexual
 8   harassment.
 9        Q.   But is the answer correct, that when you saw this
10   flyer you knew at that time that he was not allowed to
11   supervise employees?
12        A.   Yeah, to resolve an internal dispute.
13        Q.   Okay.  All right.  So you didn't ask him.
14        A.   I did not.
15        Q.   Okay.  All right.  How many of these flyers did
16   you personally see posted?
17        A.   Can you define posted.  I'm not sure.
18        Q.   Well, how many did you see?  You just saw one?
19        A.   I saw -- I saw several.
20        Q.   Okay.  And where did they come from?
21        A.   I don't know.  I still don't know.
22        Q.   No, no, but who sent them to you?  You -- you said
23   you saw several.
24        A.   Oh.  Eric sent me a copy of this.  Jessica Roach
25   posted it inside of a forum with 800 UFCW members in it.  My
```

1   -- a few of my shop stewards e-mailed this to me.  Employers

2   texted me copies.

3        Q.    Okay.  Who is Jessica Roach?

4        A.    She is a member of 367.

5        Q.    Okay.  Why did she post it?

6        A.    I don't know.

7        Q.    Did you call her and ask her, "Why did you post

8   this?"

9        A.    I don't have her phone number.

10        Q.    Do you even know who she -- I mean, do you know

11   her?  If you saw her, would you know who she was?

12        A.    I don't think I would.

13        Q.    Okay.  So you know there is a Jessica Roach who

14   posted something, but you don't know this person.

15        A.    I do -- I know her.  She was on a bargaining team

16   that I was part of in 2000 --

17        Q.    Okay.

18        A.    -- '10 or '13.  I can't remember what year.

19        Q.    Okay.  Have you had any disagreements with her?

20        A.    She -- there was an attempt between 21 and 367 to

21   merge that did not succeed.

22        Q.    Okay.  But what does that have to do with

23   disagreements?

24        A.    She did not want the merger to proceed.

25        Q.    I see.  And you did?

1      A.    My board instructed me to support the merger, so I

2   did.

3      Q.    Okay.  And have you had unfriendly conversations

4   with her?

5      A.    I don't -- I don't recollect any unfriendly

6   conversations.  Maybe.  Maybe during the 367-21 merger

7   attempt, but I don't recollect it specifically.

8      Q.    Okay.  So she was against that merger attempt with

9   367.

10     A.    Yeah.

11     Q.    And I didn't see your post.  Was she against this

12   merger also?

13     A.    Yes.

14     Q.    Okay.  Why?

15     A.    I don't know why.

16     Q.    Okay.

17     A.    What she was saying is because I was -- everything

18   that was on this flyer.

19     Q.    Did she say anything else about you?

20     A.    I'm sure you have the Facebook posts somewhere in

21   there, and it says -- I can't recollect everything, but it

22   wasn't a nice post about me.

23     Q.    Okay.  Was there a formal campaign against the

24   merger?

25     A.    Yes.

1    office.

2         **Q.    All right.   Okay.**

3         A.    Selvaggio also mailed these to 1,000 people,

4    including supervisors, management members.

5         **Q.    Okay.   Now, you sat and listened to Mr. Emmons'**

6    **deposition, right?**

7         A.    Yes.

8         **Q.    Okay.   Do you believe Mr. Emmons mailed flyers**

9    **also or do you think that was Mr. Selvaggio?**

10        A.    I think they were in a conspiracy in doing these

11   things together.

12        **Q.    Ah.   Now, you say in your complaint that you**

13   **experienced anguish, mental distress as a result of the**

14   **statements.   Do you remember?**

15        **A.    Yes.**

16        **Q.    Okay.   Do you have any symptoms?**

17        **A.    What do you mean?**

18        **Q.    Did you experience any physical symptoms?**

19        **A.    Anxiety, concern about who was behind all of this**

20   and whether they were going to come after my kids or come

21   after me in -- further than this and whether my members were

22   going to believe this and whether the employers -- you know,

23   I've spent 24 years building my reputation in this very

24   difficult line of employment.   Of the 500 UFCW presidents,

25   there's about 10 women. It's easy to be besmudge someone's

1      Q.    Did you seek board approval to authorize your

2  fees?

3      A.    Of course.

4      Q.    Okay.  And did you re-seek board approval when the

5  unions were dismissed from the case?

6      A.    Of course.

7      Q.    Now, Interrogatory Number 4, if you've

8  communicated about Angel Gonzalez.  Can you identify for us

9  who Angel Gonzalez is.

10     A.    I'm sorry, let me just read this.  Okay.

11     Q.    Who is Angel Gonzalez?

12     A.    Angel Gonzalez was the installed trustee of 367.

13     Q.    Okay.  And why was he an installed trustee?

14     A.    The local had been trusteed for improprieties of

15  some kind of.

16     Q.    Okay.  And then did he ultimately become president

17  of --

18     A.    Yes.

19     Q.    -- Local 367?

20     A.    Yes.

21     Q.    Okay.  And he resigned as president?

22     A.    Yes.

23     Q.    And do you know what the circumstances were?

24     A.    Not at the time.

25     Q.    What do you know now?

1    A.    Angel was not a very nice person, and so I had

2    challenges dealing with him.  And so probably -- yeah.

3    **Q.    What -- what conversations did you have about him**

4    **with Dan Clay?**

5    A.    Angel Gonzalez and Dan Clay -- so prior to him

6    becoming president, we were working on COVID MOU's together.

7    And then -- yeah.  So that's probably what I was talking

8    about with Dan Clay.

9    **Q.    But not about grievances against Angel Gonzalez?**

10    A.    Well, your -- your question -- it's all

11    grievances.

12    **Q.    Pardon me.**

13    A.    Identify all persons whom you have communicated

14    about any grievances.  So we have --

15    **Q.    Formal or informal related to or concerning Angel**

16    **Gonzalez.**

17    A.    My -- my guess is with Dan, most of the work I was

18    doing with Dan and Angel was around COVID MOU's and the CCK

19    grievance that we collaborated on.

20    **Q.    Ah.  Okay.**

21    A.    So I think that's probably what I was talking to

22    Dan Clay about with Angel.

23    **Q.    How about Marc Perrone and Lisa Pedersen?**

24    A.    I think they -- well, Marc Perrone supervises Kate

25    Meckler.  Kate Meckler was a regional director, and there



1        A.    I don't know.  I don't know why.

2        Q.    **You didn't discuss with these people the**

3    **grievances that were subject to the complaints and the**

4    **resolution of those complaints?**

5        A.    No.  I did talk to Laurel Fish on like December

6    12th or 11th about the merger and if she had questions, and

7    she was supportive.  And then I think the day after the

8    merger she called -- or Joe -- or Aaron and I and was upset

9    that Eric was staying on staff. Maybe it was that, but I'm

10   -- forcing collective bargaining, so that's the CCK.

11       Q.    **Okay.**

12       A.    Labor grievances.

13       Q.    **Yeah.  And we'll ask you about her notes.**

14       A.    Yeah.

15       Q.    **Because she made some notes of that conversation.**

16   **Okay.**

17       A.    I spoke with --

18       Q.    **The last interrogatory is Number 6, and we just**

19   **wanted you to identify all your speaking engagements, media**

20   **appearances, public speaking events between January 2019 and**

21   **the present.  And you augmented some of this with her**

22   **preliminary conversations --**

23       A.    Yeah.

24       Q.    **-- that we talked about.  Other than that, are you**

25   **still making media appearances?**

1    A.    To my great chagrin, yes, I am.

2    Q.    Okay.  And are there any after May 10th, 2023,

3    that you've been engaged in?

4    A.    May 10th, 2023.  So there was the Macy's. There is

5    the Providence strike, and I -- I did a press conference for

6    that.  I -- I don't know if I did anything formal with --

7    with the Macy's strike, but it's possible.

8    Q.    These are all about labor issues?

9    A.    Yes.

10    Q.    This whole -- this entire list?

11    A.    Do you want me to go one by one?

12    Q.    No, you don't need to do that, just -- first of

13    all, I just want to make sure that these are all accurate

14    and that they are about labor issues in general.

15    A.    I don't know why David -- Dave Schmitz's memorial

16    is on there.  I was -- I was -- that was not a public event,

17    but.

18    Q.    Okay.

19    A.    The safety summit was not a public event.  I don't

20    know if that -- I don't know if that matters, but it wasn't.

21    I'm sorry, what was your question again?

22    Q.    Are those accurate?

23    A.    Yes.

24    Q.    And are they generally about labor issues?

25    A.    Yes.

```
 1              THE REPORTER:  I have something in my eye.

 2              MR. DILORENZO:  Let's take a break.

 3              THE REPORTER:  Thank you.

 4              MR. DILORENZO:  I'll use the moment to --

 5              THE VIDEOGRAPHER:  Please stand by.  We are --

 6              THE REPORTER:  Very sorry.

 7              THE VIDEOGRAPHER:  We are off the record at 2:26

 8  p.m.

 9              (WHEREUPON, a recess was taken.)

10              THE VIDEOGRAPHER:  We are back on the record at

11  p.m.

12              MR. DILORENZO:  Thank you.  Back from a little

13  break.

14              Let's look at Exhibit 8.  It's a two-sided -- I'm

15  sorry.

16              (WHEREUPON, Exhibit 8 was marked for

17  identification.)

18  BY MR. DILORENZO:

19       Q.    Do you recognize what has been marked as Exhibit

20  8?

21       A.    Yes.

22       Q.    Okay.  And is this the joint letter you and Mr.

23  Renner sent seeking approval to begin discussions about a

24  merger?

25       A.    Yes.  Aaron Streepy, myself, Jim -- or Aaron
```

1  Streepy, myself, Joe, and Eric drafted this.

2      Q.    Okay.  And had you already spoken with Mr. Perrone

3  and let him know that this was coming?

4      A.    No.

5      Q.    So you invite Mr. Perrone to not hesitate to

6  contact either of you should he have any questions.  That's

7  at the end of the letter.  Did he or any of his staff

8  contact you after they received this letter?

9      A.    I hand delivered this same letter to his -- one of

10 his staff people.

11     Q.    Oh, who was that?

12     A.    Kate Meckler.

13     Q.    And what does Kate Meckler do for Mr. Perrone?

14     A.    She is the regional director and reports to him.

15     Q.    Okay.  And where did you hand deliver this to?  In

16 Portland or in -- or, I'm sorry.  In Seattle or in --

17     A.    In Tacoma at the Region 7 office.

18     Q.    Okay.  Mr. Perrone works out of Washington DC,

19 right?

20     A.    That is correct.

21     Q.    Okay.  So did you explain anything to Ms. Meckler

22 when you handed this to her?

23     A.    I went through what the letter said.

24     Q.    Okay.  So you gave her a briefing --

25     A.    Yes.

1      Q.    -- about what would be in the letter.  As far as

2  you know, is this the first time that the international

3  union knew of your thoughts concerning merging?

4      A.    Yes.

5      Q.    Who contacted you in response to this letter?  If

6  anyone.

7      A.    I -- I think I called Marc Perrone and asked him

8  -- to meet with him to discuss.

9      Q.    Okay.  And did you in fact meet with him?

10      A.    Yes.

11      Q.    Okay.  And what was the discussion?

12      A.    The discussion was what was in this letter.  And I

13  requested he support the merger.

14      Q.    And I think you already talked about that a little

15  bit.

16      A.    Yes.

17      Q.    That meeting.

18      A.    Yes.

19      Q.    And he was supportive at that time?

20      A.    Yes.

21      Q.    Okay.  And that was a friendly meeting?

22      A.    Yes.

23      Q.    And now you're hesitating.  Why are you

24  hesitating?

25      A.    It was a friendly meeting.

 1      A.    That's a pretty good characterization of him.

 2      **Q.    Okay.  So were you surprised that he listened to**

 3  **you?**

 4      A.    No, I wasn't.

 5      **Q.    Why not?**

 6      A.    Because of the healthcare plans and the pension

 7  plans and the joint jurisdiction and Kroger and Albertsons

 8  being difficult employers to bargain against.  I think Marc

 9  has wanted pensions and healthcare plans to be consolidated

10  and for unions to be -- unions that represent Albertsons and

11  Kroger to be working together more.

12      **Q.    So you thought the merits of the deal sold itself,**

13  **basically?**

14      A.    Yes.  I do -- I did.

15          **MR. DILORENZO:  Okay.  Let's look at -- take a**

16  look at number nine.

17          **(WHEREUPON, Exhibit 9 was marked for**

18  **identification.)**

19  **BY MR. DILORENZO:**

20      **Q.    So this is number nine.  It purports to be a**

21  **letter from Mr. Perrone back to you on December 2, 2021. Do**

22  **you recall receiving this?**

23      **A.    Yes.**

24      **Q.    Why did it take two months to get an approval**

25  **letter to discuss a merger with -- between 1439 and 21?**

1          A.    Because Kate Meckler, the regional director, has

2    to release it.    And she had not released it yet.

3          Q.    Do you know why?

4          A.    She told me that there was a Fred Meyer in

5    Richland that was organizing and set for an election

6    sometime around Thanksgiving.    And she didn't want there to

7    be confusion about which local would be representing the

8    workers.    So she wanted to hold this until after the

9    election.

10          Q.    Okay.    As far as you knew, it had nothing though

11    to do with the merits of the merger?

12          A.    No.

13          Q.    Okay.    And along with that came a kit?

14          A.    Yes.

15          Q.    To merge.    So did you all do your best to follow

16    the format?

17          A.    Will you be asking me questions inside this?

18          Q.    No, I'm just -- I'm just asking.    There's --

19    there's a template of a merger agreement.    It's called model

20    local union merger agreement.    Did you try to follow that as

21    you drafted your merger agreement?

22          A.    Yes.

23          Q.    Okay.    And you said you worked with Ms. Pedersen

24    about -- on this too?

25          A.    I think Aaron and Lisa probably worked together.  I

1    may have talked to her, but mostly I think Aaron and Lisa

2    worked together.

3         Q.    Did you have any other discussions with anybody

4    from the international while you were drafting the merger

5    agreement?  If you recall.

6         A.    I delivered this to Kate on the 28th.  I met with

7    Marc Perrone.  And, in the meeting with Marc Perrone, Lori

8    Warner was in that meeting.  And Sean Barkley may have been

9    in that meeting, but I -- I don't recollect.  But I did talk

10   to Sean Barkley about this.

11        Q.    And what was the topic of that conversation?

12        A.    Sean had been our regional director and I

13   bargained with him.  And I asked him -- he knows the

14   geography really well and he knows the contracts really

15   well.  And so I asked him to -- I asked him to talk to Marc

16   Perrone and explain just the geography and the overlap to

17   Marc, prior to me meeting with Marc face-to-face.

18        Q.    And did he say he would do that?

19        A.    Yes.

20        Q.    And did he in fact do that?

21        A.    I saw them talking, but I don't know.  I think

22   yes, but I don't know for sure.

23        Q.    Okay.  And did Sean favor the merger concept?

24        A.    Yes.

25             MR. DILORENZO:  Okay.  Here's a large document.

```
 1        A.   Yes.

 2        Q.   Okay.  And I presume for ballot measures and

 3   things like that, it would be the board, too?  Is that

 4   right?

 5        A.   I'm not -- I know -- I'm not exactly -- can you

 6   restate the question?

 7        Q.   Well, you said one of the points of contention was

 8   how politics would work.

 9        A.   I think it's an endorsement of candidates, to be

10   specific.

11        Q.   Okay.  All right.  Any other points of contention?

12   Was there any points of contention about who the officers

13   would be?

14        A.   There was.  We had to work through Jeff

15   Hofstader's position.  He had been absent because his wife

16   was dying, and we weren't sure if he was coming back or,

17   like, what he was -- what his role would be.  So we were

18   trying to figure that out.  And because of the 367

19   situation, I wanted to make sure he felt like he had a place

20   if he was going to stay.

21        Q.   Okay.  Was there any discussion as to why Mr.

22   Renner was not going to be an officer?

23        A.   No.  I was --

24        Q.   None at all?

25        A.   No.  He had to comport with his agreement that he
```

1  had made.

2      Q.    Okay.  But you didn't know what was in his

3  agreement at that time, did you?

4      A.    December 2nd, I was told he could not supervise

5  and that he needed to work mostly outside of the office.

6      Q.    And you were told that, and how about not being

7  able to be an officer?

8      A.    I was told he was not able to be an officer as

9  well.

10      Q.    Okay.  And did that information come to you from

11  anyone other than your legal counsel?

12      A.    No.

13      Q.    Okay.  Did you find that odd?

14      A.    I don't go looking for trouble.  And it seemed

15  like they'd all gotten themselves into some trouble and

16  they'd reached a negotiated solution and they'd signed

17  agreements.

18      Q.    Okay.  I'm counting each page as one.

19      A.    Okay.

20      Q.    If you can turn to four.  And this is the one that

21  starts with "Hi Faye" on December 30th.

22      A.    Okay.  Let me read the text around it.

23      Q.    Well, actually, the one I'm going to ask you about

24  is going to be the December 30th text at 7:17 p.m.

25      A.    What?  Can you read the text you're going to ask

1    Q.    Okay.  So then on April 23, in response to Mr.

2  Renner saying, "To hell with him, we are going to prove who

3  did this," you say, "Absolutely.  And in some ways this

4  brings it right to the surface.  On Monday, we will get

5  together with Aaron and Jim and decide what to do.  This may

6  be when you and I get an attorney and sue Dan and 555

7  personally if we can link to Dan.  I also think because he

8  is threatening my job, he has a new set of problems."

9    A.    I don't know where you're at.

10    Q.    The big bubble.

11    A.    Got it.

12    Q.    Why didn't you sue Mr. Clay and 555 then?

13    A.    I did not have -- I had Dan denying it.  I had

14  Selvaggio denying it.  I'm sure there's a letter in there

15  that talks about this.  And the constitution requires that

16  you have to go through an internal process when it's member

17  to member.

18    Q.    When what's member to member?

19    A.    When there's conflict that's member to member

20  before litigation.  So, at this point, I didn't have enough.

21  I wasn't sure.  And I -- I'm still not sure.

22    Q.    So you can sue a member's employee without going

23  through that process, but not a member?

24    A.    You can't do -- I can't -- no UFCW member can do

25  anything to any other UFCW member without first completing



1                          CERTIFICATE

2

3          I, the undersigned Valerie Barna, am a videographer

4    on behalf of NAEGELI Deposition & Trial. I do hereby

5    certify that I have accurately made the video recording

6    of the deposition of Faye Guenther, in the above

7    captioned matter on the 13th day of May, 2024 taken

8    at the location of Davis Wright Tremaine LLP, 920 5th

9    Avenue, Suite 3300, Seattle, Washington, 98107.

10

11         No alterations, additions, or deletions were made

12   thereto.

13

14         I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20                    Valerie Barna

21

22

23

24

25

1                              CERTIFICATE

2

3          I, Kacey Hall, do hereby certify that I

4     reported all proceedings adduced in the foregoing matter

5     and that the foregoing transcript pages constitutes a

6     full, true and accurate record of said proceedings to the

7     best of my ability.

8

9          I further certify that I am neither related to

10    counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    17th day of May, 2024.

15

16

17

18    _____

19         Kacey Hall

20

21

22

23

24

25