# EXHIBIT B

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**





FAYE IRENE GUENTHER, an individual,

        Plaintiff,

vs.                                                      NO. 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually, AND OSPREY FIELD CONSULTING, LLC, a limited liability company

        Defendants.
_____

**VOLUME**

**VIDEOTAPED DEPOSITION OF**

**FAYE GUENTHER**

**TAKEN ON**
**THURSDAY, JUNE 6, 2024**
**10:08 A.M.**

**920 FIFTH AVENUE**
**SEATTLE, WASHINGTON 98104**

```
 1  to see the -- what the dispute was about.
 2       Q.   I see.  Okay.
 3            And you are aware, at least now, that this
 4  agreement was executed by all the parties around October of
 5  2021?  Are those the dates?
 6       A.   Yes.  I mean, I can see it right there.
 7       Q.   Okay.  That will help us keep this in perspective
 8  as we take a look at Number 19.  And please don't be -- I'll
 9  put this back.
10            Whoops!  I'm sorry.
11            (Pause in the proceedings for a liquid spill
12  cleanup.)
13       Q.   Don't be put off by the size of this, because I'm
14  not going to ask you about the whole thing.  I'm just going
15  to ask you about a few pages.
16            This is Exhibit 19.  And Exhibit 19 was also
17  provided by the local, and it appears to be your
18  conversations with Mr. Renner on his phone that ends with
19  9637.
20            Does that appear to be what this is?  I don't need
21  you to read the whole thing, certainly, but I just want to
22  know basically what this is.
23       A.   (Witness peruses document.)
24       Q.   Do the "Sends" appear to be yours and the
25  "Receiveds" appear to be Mr. Renner?
```

```
 1      A.   Yes.  It's a weird format, but I think so.
 2      Q.   It is.  Okay.  And it's even a weirder format
 3 because --
 4      A.   I'm sorry.  Can you tell me where -- like, where
 5 were they?  Are they -- It's a very strange.
 6      Q.   Yeah.  This was the format that I was supplied.
 7      A.   Okay.
 8      Q.   And it's even stranger, because it goes from most
 9 recent to less recent.  So chronologically, we would start
10 at the last page.  And that's how I'm going to direct you to
11 a few of these.
12           At the lower right-hand corner, there are what are
13 called Bates numbers, and the very last page has a 030067 in
14 the right-hand lower corner.
15           Do you see that?
16      A.   Yeah.
17      Q.   Okay.  So we're at the same point.  And it starts
18 with January 8, 2020.
19           Your merger discussions began in December of 2021;
20 is that right?
21      A.   Yes.  Our merger discussions -- Eric's first call
22 to me was the very end of September, related to the merger.
23      Q.   September of 2021?
24      A.   Of 2021, yes.
25      Q.   Right.  Okay.  All right.
```

```
 1  is working on labor standards legislation with State
 2  Representative Ormsby," O-r-m-s-b-y.  "It is going to drop
 3  on Monday.  Are you okay with Laurel reaching out to your
 4  political director?"
 5          MR. MCGUINNESS:  I just want to make sure I'm
 6  following along.  Is there a question pending?
 7      Q.  Right.  No, I'm just calling your attention to it.
 8  So it says, "Laurel is doing a fantastic job. Cannot wait
 9  for you to meet her."
10          Had you not met Laurel Fish at the time?
11      A.  Yeah, and I hadn't -- I don't think I met Laurel
12  Fish until Aaron and I had coffee with her in December.
13      Q.  Okay.  So in January of 2021, was it your
14  impression that Mr. Renner was pleased with Ms. Fish's
15  performance?
16      A.  I think she's -- You could ask anyone.  She's a
17  hard worker.
18      Q.  All right.  Let's move forward to 30030.
19      A.  Three -- Say that again?
20      Q.  30030.
21      A.  Okay.
22      Q.  It's forward as opposed to backward.
23      A.  Okay.  Are you going to be switching -- any in
24  between text messages?
25      Q.  No, there's nothing in between.  There's a lot of
```

```
 1   business, but not any that I need to ask you about.
 2       A.   30030.  Okay.  I'll try to get there.
 3            October 20, 2021?
 4       Q.   Right.  Now --
 5       A.   Is that the time I'm looking at?
 6       Q.   Yes.  It would be October 19, 2021.
 7       A.   Okay.  And then what are you going to ask me
 8   about, and then I'll just quickly read.
 9       Q.   Well, first of all, I want to ask you about the
10   date.
11            So had Mr. Renner made his first call to you about
12   the merger by October 19, 2021; do you recall?
13       A.   I need to -- I mean, the deposition has, at the
14   very end --
15            MR. MCGUINNESS:  Well, you answered it five
16   minutes ago.
17       A.   Yeah.
18       Q.   All right.  On October 19, 2021, Mr. Renner says,
19   "Also need to ask you private question."
20       A.   Where are you?
21       Q.   On 30030.
22       A.   Okay.  Let me just read something, here.
23       Q.   Sure.
24       A.   (Witness peruses document.)  Okay.
25       Q.   Okay.  Do you remember what the private question
```

1 was?
2    A.   No.
3    Q.   Up on that page, October 20, 2021, 1:12:25 p.m.,
4 he says, "Hi, Faye, I would like to have a follow-up phone
5 call with you prior to me reaching out to Kate.  I know
6 you're busy, but I think it is important that you and I talk
7 first."
8         Who is Kate?
9    A.   Kate Meckler is the regional director who, if I
10 could depose, I would probably say was involved in all of
11 this conspiracy.
12   Q.   Why does he have to reach out to Kate; do you
13 recall?
14   A.   I'm -- I don't know.
15   Q.   All right.  Well, right up above, you say, "100
16 percent agreed.  I think we should meet with Aaron first and
17 then maybe call her that day."
18        Is that a reference to Mr. Streepy?
19   A.   Yes.
20   Q.   Okay.  "That way, we have all our best arguments
21 written down and vetted.  What do you think? I am slammed
22 today.  Could call later tonight."
23        What was that concerning?
24   A.   I believed Kate Meckler would attempt to torpedo
25 or block us merging.

```
 1         Q.    Ah.    Okay.   And then right up above that, Mr.
 2   Renner says, "Meeting with Aaron first is probably best,
 3   problem being I told her that I would be able to talk about
 4   it this week.    I can probably hold off until next week.   Are
 5   you available for a brief conversation tomorrow or the next
 6   day?"
 7               By "it," is this a reference to the merger?
 8         A.    It couldn't have been, because we didn't tell her
 9   until October 28.
10         Q.    What was it a reference to?
11         A.    My guess is the Fred Meyer general merchandise --
12   the Fred Meyer organizing in Richland, that Kate was working
13   on and he was working on.
14         Q.    And why did you need to consult with Mr. Streepy
15   about that?
16         A.    I don't know.
17         Q.    Was Mr. Streepy working with you on the merger by
18   that time?
19         A.    The first time we met with Aaron was the last --
20   the Thursday-Friday of October, and it's in the deposition.
21   I think it's the 27th and 28th. But it's in that timeframe.
22               By the 2oth, we may have emailed him to set up the
23   meeting, and I was trying -- you know, I want to have my
24   trusted advisors with me when I talk about things such as
25   merging.
```



1    Q.    Sure.  Take a look at the next page, which is
2    30029.
3    A.    300 --
4    Q.    You've got to go backward, yeah.  October 20,
5    2021, 1:18:59 p.m.  This is sent by you. "Kate may try to
6    mess with things.  Hopefully not.  So maybe we can ask Aaron
7    to draft up top ten reasons, or something, and then
8    specifically ask for her support."
9          Are you sure you're not talking about the merger?
10   A.    Well, October 20, 2021, would be -- yes, that's --
11   we'd be talking about the merger and Kate trying to mess it
12   up.
13   Q.    Okay.  So does this entire string that we've
14   talked about really reference the merger, as opposed to --
15   A.    Well, the Fred Meyer organizing -- I mean, I think
16   that when she's trying to call him, because she doesn't
17   know, it's probably about the Fred Meyer organizing.
18   Q.    I see.  And you're going to talk to her about the
19   merger then?
20   A.    Yeah.
21   Q.    I see.  So this will have been the first she will
22   have heard about it?
23   A.    Yes.
24   Q.    Okay.  I get it.  Okay.
25          And then if you can go almost to the front of this

```
 1   spelled M-i-c-h-e-a-u.
 2              It says, "Hi, Faye and Maria.  See attached 1439
 3   merger side commitments."
 4              And then the next page references those as Eric
 5   Renner Employment Agreement with UFCW Local 21 and
 6   successors.
 7        A.    Yes.
 8        Q.    Why was this a side commitment?
 9        A.    I already discussed this in our first
10   conversation, that the international didn't want -- they
11   just wanted to use their boilerplate language for the merger
12   agreement.
13        Q.    Right.  And so the side commitment --
14        A.    And this is not the final -- I don't -- I keep
15   seeing this.  It is not -- This is a rough draft.
16        Q.    Okay.  But was the purpose to provide employment
17   to Mr. Renner?
18        A.    I don't understand your question.
19        Q.    Well, the front page calls this a merger side
20   commitment.  And what's attached is Eric Renner Employment
21   Agreement, UFCW Local 21 and successors.
22              So was it your understanding that this is a draft
23   of what was supposed to be in the merger agreement, that
24   then got relegated to a side agreement?
25        A.    Yes.
```

```
 1      Q.    Does she still run -- I think it was a consortium
 2 of --
 3      A.    I have no idea.
 4      Q.    -- labor organizations?
 5      A.    I don't know.
 6      Q.    So you haven't kept track of her?
 7      A.    No.
 8            MR. DILORENZO:  All right.  Let's take a look at
 9 Number 24.  I'm going to change course for a second.
10            Well you know what?  Before we do that, we're
11 going to -- let's take a very quick break now.  Let's go
12 ahead and print that, because then we're going to move on to
13 Mr. Gonzalez and to two others.
14            THE VIDEOGRAPHER:  Please stand by.  We are off
15 the record at 11:14 a.m.
16            (Break in the proceedings.)
17            (Exhibit 65 marked for identification.)
18            THE VIDEOGRAPHER:  We are back on the record.  The
19 time is 11:30 a.m.
20            MR. DILORENZO:  Okay.  Thank you.  We're back on
21 the record.  I've just found what we believe is an
22 employment agreement, which we have marked as Exhibit 65.
23      Q.    And, Ms. Guenther, I think you noted that there is
24 no signed employment agreement with Mr. Renner and Local
25 3000, but you believe that you, by email, agreed to the
```

```
 1  terms of something.  And I'm asking you to take a look at
 2  this and see whether this is what, in fact, you agreed to.
 3        A.    (Witness peruses document.)
 4              I believe so.
 5        Q.    Okay.  And when was this agreed to?
 6        A.    I probably responded post-merger to this.
 7        Q.    Okay.  This was originally set up for Eric Renner
 8  to sign on behalf of Local 1439, for you to sign on behalf
 9  of Local 21?
10        A.    That looks accurate.
11        Q.    Right.  Is there any reason why you postponed
12  signing this until after the merger?
13        A.    I was focused on the merger agreement and the
14  forward votes.  And then when Emmons, Selvaggio, Dan Clay,
15  Isai, and others decided to distribute flyers throughout the
16  jurisdiction, I was dealing with that.
17              And so this, to me, was -- the content of this was
18  -- I was waiting until I could focus on it.  I wasn't going
19  to sign something I didn't have time to focus on.
20        Q.    Okay.  How long after the merger did it take for
21  you to agree to the terms of this agreement?
22        A.    I don't know when I responded.  I don't know.
23  August of 2022, probably.  I don't know.  Sometime after
24  March 1, 2022.
25        Q.    All right.  So if you can take a look at this
```

```
 1       A.   Oh.
 2       Q.   Mr. Dayan, D-a-y-a-n?
 3       A.   I have no idea what he did.
 4       Q.   Leon?
 5       A.   I have no idea what he did.
 6       Q.   You have heard nothing from him after you sent
 7  this April 10, 2023, email?
 8       A.   No.
 9       Q.   Okay.  The final thing I want to talk about is
10  this email from to Mr. Perrone, to you.
11            Do you recall sending this to Mr. Perrone on July
12  29?  That was last year.
13       A.   I don't recollect it, but I will quickly read
14  this.
15       Q.   Sure.
16       A.   (Witness peruses document.)
17  Are you going to ask me questions from the first few pages?
18       Q.   No.  Toward the end.
19       A.   Oh, then I better keep reading.
20       Q.   Okay.  Well, all right.  So at Bates Number 2090,
21  your --
22            First of all, is this correspondence you wrote to
23  Mr. Perrone?
24       A.   Yes.
25       Q.   And I think you're outlining in here an
```

```
 1   explanation of why you have initiated this litigation.
 2              Is that the purpose?
 3       A.     Is that the purpose?   It looks like the purpose is
 4   in the last sentence, which is, "Will you help me?" But let
 5   me ...
 6       Q.     Well, why did you write it, first of all?
 7       A.     So that -- So he would help me try to deal with
 8   this situation.
 9       Q.     Okay.   And help you in what way?  What do you want
10   him to do?
11       A.     Let me finish reading the last part.
12       Q.     Sure.
13              MR. DILORENZO:  How much time is left?
14              THE VIDEOGRAPHER:  17 minutes.
15              MR. DILORENZO:  Okay.  Plenty of time. I'm not
16   going to take it.
17       A.     (Witness peruses document.)
18              Okay.
19       Q.     Okay.  Well, I notice that I'm mentioned at least
20   three times in your letter.
21       A.     I kind of skipped over that part.  I was trying to
22   get to the point.
23       Q.     Well, that isn't what I have questions about.
24              On 2090, right at the bottom, the last incomplete
25   sentence, it says, "You urged caution in proceeding down the
```

```
 1  litigation path.  I heard you, and possibly to my detriment,
 2  have declined to broaden the scope of the litigation to
 3  include Local 555, Dan Clay, Michael Selvaggio, and any
 4  other person that may have assisted them in producing and
 5  distributing the flyer."
 6          So are you telling Mr. Perrone that you've
 7  purposely refrained from naming them?
 8      A.  No.
 9      Q.  What are you telling him here?
10      A.  I'm telling him that I'm not going to broaden the
11  litigation until I'm certain that these people are involved.
12      Q.  Okay.  But your failure to broaden the litigation
13  is volitional, right?
14      A.  I don't know what that means.
15      Q.  In other words, you know what you're doing?
16      A.  I don't know that I know that I'm doing.
17      Q.  You decided, at least as of the date of this
18  letter, not to broaden the scope of the litigation.
19          Is that what you're saying?
20      A.  I think those are legal questions.  I'm not sure
21  I'm the right person to answer.
22      Q.  Well, you say that you have, possibly to your
23  detriment, declined to broaden the scope of the litigation.
24      A.  Yeah, because at this point, I had not -- I wasn't
25  a hundred percent sure -- I'll have to look at the date.
```

```
 1                      CERTIFICATE
 2
 3       I, the undersigned Valerie Barna, am a videographer
 4   on behalf of NAEGELI Deposition & Trial. I do hereby
 5   certify that I have accurately made the video recording
 6   of the deposition of Faye I. Guenther, in the above
 7   captioned matter on the 6th day of June, 2024 taken
 8   at the location of 920 5th Avenue, Suite 3300, Seattle,
 9   WA 98104.
10
11       No alterations, additions, or deletions were made
12   thereto.
13
14       I further certify that I am not related to any of
15   these parties in the matter and I have no financial
16   interest in the outcome of this matter.
17
18
19   _____
20       Valerie Barna
21
22
23
24
25
```

```
                            C E R T I F I C A T E

    STATE OF WASHINGTON )
                        ) ss.
    COUNTY OF KING      )


        I, the undersigned Washington Certified Court
    Reporter, hereby certify that the foregoing deposition
    upon oral examination of the witness named herein was
    taken stenographically before me and transcribed under
    my direction;

        That pursuant to RCW 5.28.10, the witness, before
    examination, was first duly sworn by me to testify
    truthfully; that the transcript of the deposition is a
    full, true, and correct transcript, to the best of my
    ability;
    That I am neither attorney for nor a relative or employee
    of any of the parties to the action or any attorney or
    counsel by the parties hereto nor financially interested
    in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand
    this 20th day of June 2024.



    _____
        Patricia A. Blevins
    Certified Court Reporter No. 2484
```