1   Dmitri Iglitzin, WSBA No. 17673
    Darin M. Dalmat, WSBA No. 51384
2   Gabe Frumkin, WSBA No. 56984
    BARNARD IGLITZIN & LAVITT LLP
3   18 W Mercer St, Suite 400
    Seattle, WA 98119
4   (206) 257-6003
    iglitzin@workerlaw.com
5   dalmat@workerlaw.com
    frumkin@workerlaw.com
6
    Aaron Streepy, WSBA 38149
7   Jim McGuinness, WSBA 23494
    STREEPY LEMONIDIS CONSULTING & LAW GROUP, PLLC
8   2800 First Avenue, Suite 211
    Seattle, WA 98121
9   Telephone: (253) 528-0278
    Fax: (253) 528-0276
10  aaron@slglc.com
    jim@mcguinnessstreepy.com
11
    *Attorneys for Plaintiff Faye Guenther*
12

13              **UNITED STATES DISTRICT COURT**
             **EASTERN DISTRICT OF WASHINGTON**
14                      **AT SPOKANE**

15  FAYE    IRENE    GUENTHER,    an | No. 2:22-cv-00272-TOR
    individual,
16                                    | **SECOND DECLARATION OF**
                          Plaintiff,  | **COUNSEL DARIN M. DALMAT**
17        v.

18  JOSEPH   H.   EMMONS,  individually,
    and  OSPREY   FIELD   CONSULTING
19  LLC, a limited liability company,

20                         Defendants.

SECOND DECLARATION OF COUNSEL
DARIN M. DALMAT – Page 1
Case No. 2:22-cv-00272-TOR

I, Darin M. Dalmat, hereby declare and state as follows:

1. I am one of the attorneys representing Plaintiff Faye Irene Guenther.

2. On October 10, 2024, I ran the following search in Westlaw's "News" content page: "ufcw and (21 /s 1439) and merge!". This search yielded three articles.

3. The first, a true and correct copy of which is attached as **Exhibit 29**, is a November 16, 2009, AP Alert titled, "Washington State's Largest Employee Union Participates in Pilot." That article mentions that UFCW 21 was formed in October 2005 through a merger between Local 1001 and 1105. It does not have anything to do with the merger between Local 21 and 1439.

4. The second, a true and correct copy of which is attached as **Exhibit 30**, is an April 30, 2022, article in the Tacoma-based News Tribune, titled "Puget Sound-area grocery workers ratify new three-year contract that target pay disparities." That article is about Local 3000's ratification of a labor contract with various grocery store companies. By way of background, it references Local 3000's formation through the merger of Local 21 and 1439, without discussing any public debate on that topic.

5. The third, a true and correct copy of which is attached as **Exhibit 31**, is a May 7, 2024, article by Supermarket News, titled "Spokane Kroger, Albertsons workers ratify contract." That article is about Local 3000's ratification of a labor contract with Kroger and Albertsons owned grocery stores in the Spokane area. By

SECOND DECLARATION OF COUNSEL
DARIN M. DALMAT – Page 2
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400 **BARNARD**
SEATTLE, WASHINGTON 98119 **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132 **LAVITT LLP**

1  way of background, it references Local 3000's formation in 2022 through the merger

2  of Locals 1439 and 21, without discussing any public debate on that topic.

3      6.    My search yielded no additional hits. I did not limit my search by

4  timeframe.

5      7.    Guenther produced written discovery in this case on a rolling basis,

6  beginning December 19, 2023, and continuing through May 12, 2024.

7      8.    Between her own production and the production produced by Local

8  3000, Guenther produced over 4,875 pages of responsive documents along with

9  three videos.

10      9.    To date, Emmons has not issued the clarification or correction Guenther

11  sought before filing this lawsuit.

12      10.    Attached as **Exhibit 32** is a true and correct copy of excerpts from the

13  transcript of the deposition of Faye Guenther taken on May 13, 2024.

14      11.    Attached as **Exhibit 33** is a true and correct copy of excerpts from an

15  exhibit, deposition exhibit 10, introduced at the deposition of Faye Guenther taken

16  on May 13, 2024.

17      12.    Attached as **Exhibit 34** is a true and correct copy of excerpts from the

18  transcript of the deposition of Faye Guenther taken on June 6, 2024.

19      13.    Attached as **Exhibit 35** is a true and correct copy of excerpts from the

20  transcript of the deposition of Aaron M. Streepy taken on June 6, 2024.

SECOND DECLARATION OF COUNSEL
DARIN M. DALMAT – Page 3
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

1

2

14.    Attached as **Exhibit 36** is a true and correct copy of excerpts from the transcript of the deposition of Adam Jackson taken on March 11, 2024.

3

4

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

5

Executed on this 25th day of October 2024.

6

7

8

9

*s/Darin M. Dalmat*
Darin M. Dalmat, WSBA No. 51384
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6028
dalmat@workerlaw.com

10

11

12

13

14

15

16

17

18

19

20

SECOND DECLARATION OF COUNSEL
DARIN M. DALMAT – Page 4
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

1

## DECLARATION OF SERVICE

2

I hereby certify that on the date noted below, I electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system, which will send

4

notification of such filing to those attorneys of record registered on the CM/ECF

5

system.

6

| PARTY/COUNSEL | DELIVERY INSTRUCTIONS |
|---|---|
| Ambika Kumar<br>Sara A. Fairchild<br>Davis Wright Tremaine LLP<br>920 Fifth Ave., Ste. 3300<br>Seattle, WA 98104<br>ambikakumar@dwt.com<br>sarafairchild@dwt.com | ☐ Hand Delivery<br>☐ Certified Mail<br>☐ Facsimile<br>☐ E-mail<br>☐ U.S. Mail<br>☒ E-Service |
| John A. DiLorenzo<br>Davis Wright Tremaine LLP<br>560 SW 10th Ave., Ste. 700<br>Portland, OR 97205<br>johndilorenzo@dwt.com | ☐ Hand Delivery<br>☐ Certified Mail<br>☐ Facsimile<br>☐ E-mail<br>☐ U.S. Mail<br>☒ E-Service |

DATED this 25th day of October 2024 at Seattle, Washington.

By: _____
Esmeralda Valenzuela, Paralegal

DECLARATION OF SERVICE
Case No. 2:22-cv-00272-TOR

18 WEST MERCER ST., STE. 400 **BARNARD**
SEATTLE, WASHINGTON 98119 **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132 **LAVITT LLP**

# EXHIBIT 29

**News**Room

11/16/09 AP Alert - Med. 17:56:43

AP Alert - Medical
Copyright © 2009 The Associated Press

November 16, 2009

Washington State's Largest Employee Union Participates in Pilot

Program to Offer Members Quality Health Care at Lower Costs With Qliance

Washington State's Largest Employee Union Participates in Pilot Program to Offer Members Quality Health Care at Lower Costs With Qliance

Sound Health and Wellness Trust Allows Members to Select Qliance as Direct Primary Care Medical Home

(http://www.qliance.com)

Qliance Medical Management Inc., which operates insurance-free direct primary care clinics -- also known as "direct primary care medical homes" -- in Washington state, today announced it has been selected by the Sound Health & Wellness Trust to pilot a healthcare program for its members, including the United Food and Commercial Workers (UFCW) Local 21, Washington state's largest employee union.

The Qliance program, offered through its clinics in Seattle and Kent, WA, provides UFCW and other Trust members access to comprehensive primary, preventive and chronic management care for one low monthly fee. Current enrollment is now being offered for the 2010 benefits to Trust members and their families, who include employees of union grocery stores and health care facilities.

"We are thrilled to give our members in Seattle and Kent the option to choose Qliance for their health care, which will offer them unparalleled access to their doctors, no co-pays for office visits, and unhurried appointments," said David Schmitz, president of UFCW Local 21, a participating local in the Trust. "We are piloting this program because we strongly believe Qliance will enable our members to have access to high-quality primary care services, and that this model can save the Sound Health and Wellness Trust a significant amount of money down the road."

Trust members who join the Qliance Plan will pay approximately $3 per week ($156 per year) to receive all of the benefits of membership in the direct primary care medical home, including unrestricted primary and preventive care for everyday things like vaccinations, checkups, pneumonia, minor fractures, routine women's health exams, and ongoing care for chronic illnesses such as diabetes, hypertension or obesity. Other benefits will include:

-- Unhurried 30- to 60-minute office visits -- Same- or next-day appointments for urgent care needs -- Open 7 days per week, with 24 hour cell phone and email access to a

physician -- On-site x-ray, laboratory and "first-fill" prescription drug

dispensary -- Coordination of care throughout the rest of the health care system

Participants in the program will also receive full wrap-around insurance coverage (for those rarely needed specialist or emergency services that Qliance does not provide) with an annual $150 deductible, and a $1,000 out-of-pocket maximum.

"This plan provides amazing value for some of the highest-quality health care available in the country and we look forward to welcoming the UFCW and other local Trust members to our medical homes," said Garrison Bliss, MD, Chief Medical Officer and co-founder of Qliance Medical Management. "The Trust has taken an important step to explore health care outside of traditional insurance programs that is already proving to reduce costs for employers and individuals. We hope legislators in the other Washington look to this pilot as a model for an effective hybrid option that should be included in the proposed insurance exchange so more Americans can enjoy the benefits."

The Sound Health and Wellness Trust program is the first Taft-Hartley health care program in the nation to offer a direct primary care medical home package to its members. The Trust has more than 30,000 members statewide, with approximately 5,500 living within a 10-mile radius of either Seattle or Kent, making them eligible to participate in the Qliance Plan pilot program.

In addition to its relationship with Sound Health & Wellness Trust and the UFCW, Qliance works with many local small to mid-size businesses to offer their employees health care at substantial savings over traditional insurance-only health care. For example, one Kent non-profit that employs 75 full-time people projects to save more than $1 million over the next five years by moving employees from traditional insurance plans to a local direct primary care medical home that is supplemented by lower-premium insurance for emergency and catastrophic care.

Qliance Medical Management Inc. was founded in 2006. In 2007, the Washington State legislature recognized direct primary care as an innovative health care delivery model not to be regulated as insurance, paving the way for all Washingtonians to have access to affordable quality health care.

For more information about Qliance, visit http://www.Qliance.com (http://www.Qliance.com) .

About Qliance Medical Management

Qliance Medical Management was founded in 2006 and provides operating and management services to Qliance Medical Group of Washington PC. Qliance direct primary care offers people of all ages and incomes unrestricted access to all types of primary, preventive and chronic illness care for one monthly membership fee, ranging between $39 and $79, depending on age. Qliance does not exclude anyone for pre-existing conditions and offers unhurried same- and next-day appointments 7-days per week. Through Qliance, patients and employers are getting exceptional care and saving between 20 and 50 percent on comprehensive health care costs when bundled with wrap-around insurance. For more information, visit http://www.Qliance.com (http://www.Qliance.com) .

About Sound Health & Wellness

The Sound Health & Wellness Trust provides employees across Western Washington with comprehensive health benefits along with an innovative health and wellness program that encourages participants to achieve and maintain a healthy lifestyle. The Sound Health & Wellness Trust is a Taft-Hartley trust managed jointly by unions and employers and provides benefits to more than 50,000 participants and their families. Participating unions include: UFCW Local 21, UFCW Local 81, UFCW Local 1439, Teamsters Local 38, and UFCW Local 367. Participating employers include union grocery stores and health care facilities.

About United Food and Commercial Workers (UFCW) Local 21

United Food and Commercial Workers (UFCW) Local 21 is the largest private-sector local union in the state of Washington, with over 35,000 members working in grocery store, retail, health care, and other service jobs. UFCW 21 represents more retail and grocery employees and more professional and technical health care employees than any other union in the state. UFCW 21 was formed in October 2005, when a merger between UFCW Local 1001 and Local 1105 went into effect.

Add to Digg (http://digg.com/submit?phase2&urlhttp://www2.marketwire.com/m /re lease_html_b1?release_id558576) Bookmark with del.icio.us (http://del.icio.us/post?v4&noui&jumpclose&urlhttp://www2.mar etw ire.com/mw/ release_html_b1?release_id558576) Add to Newsvine (http://www.newsvine.com/_tools/seed&save?uhttp://www2.marketwi e.c om/mw/release_html_b1?release_id558576)

---- Index References ----

Company: TRUST CO LTD; UNITED FOOD AND COMMERCIAL WORKERS PENSION FUND; UNITED FOOD HOLDINGS LTD; UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 99/CA

News Subject: (Labor Unions (1LA31); HR & Labor Management (1HR87); Business Management (1BU42))

Industry: (Insurance (1IN97); Health Insurance (1HE18); Healthcare Cost-Benefits (1HE10); Financial Services (1FI37); Press Releases (1PR19); Healthcare (1HE06))

Region: (North America (1NO39); USA (1US73); Americas (1AM92); Washington (1WA44))

Language: EN

Other Indexing: (DIRECT PRIMARY CARE MEDICAL; QLIANCE MEDICAL GROUP; QLIANCE MEDICAL MANAGEMENT; QLIANCE MEDICAL MANAGEMENT INC; TAFT HARTLEY; TRUST; UFCW; UNITED FOOD) (Add; David Schmitz; Garrison Bliss; Health; Qliance; Select Qliance; Sound Health) (United States; USA; North America) (GlobalDistribution)

(f); (Medical); (Business); (Municipal); (Travel); (Labor); (Legal); (Philanthropy)

Word Count: 1397

---

**End of Document**                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.



# EXHIBIT 30

**News**Room

4/30/22 Morning News Trib. (Tacoma Wash) 294
2022 WLNR 13671651

News Tribune, The (Tacoma, WA)
Copyright (c) 2022 McClatchy-Tribune Information Services. All Rights Reserved.

April 30, 2022

Puget Sound-area grocery workers ratify new three-year contract that targets pay disparities

By Debbie Cockrell, The News Tribune

A major Puget Sound grocery workers union announced ratification of a new three-year contract, raising hourly wages $4-$9 over the life of the agreement.

UFCW 3000, now representing the unions formerly known as UFCW 21 and UFCW 1439 after a merger in March, announced that its grocery workers voted overwhelmingly to ratify a new contract.

In addition to the wage increase, the contract bolstered workers' health care coverage and pensions with more funding, among other improvements.

"Over the life of this new three-year contract, grocery store workers will see their wages increase $4 to $9 an hour, gain safety and training, maintain a quality health plan with no increased costs, and have a secured pension and more," the union said in a release.

The contract eliminated lower pay scales in departments such as deli, bakery, fuel, and e-commerce, "which are disproportionately staffed by women, immigrants, and people of color," the release noted.

"This new wage scale moves us one step closer to having a single pay scale for everyone in the store. An hour of work is an hour of work, regardless of what department you are in, and we deserve to be compensated equally," said Kyong Barry, an Albertsons Auburn grocery store worker and bargaining team member.

Workers from grocery chains including Fred Meyer, Safeway, Albertsons, QFC, Metropolitan Market and Town & Country were involved in negotiations.

The union represents more than 50,000 workers in the grocery, food processing, retail, and health care industries, among others, in Washington and parts of Oregon and Idaho.

Separately, members with UFCW 367, representing grocery workers primarily in Pierce and Thurston counties among other areas, are set to vote on their contract next week, with a tentative agreement also reached. The members work at many of the same grocery chains as UFCW 3000 members.

**---- Index References ----**

Company: UFCW EMPLOYERS BENEFIT PLAN OF NORTHERN CALIFORNIA GROUP ADMINISTRATION, LLC; ALBERTSONS COMPANIES, INC.; Zhejiang China Light & Textile Industrial City Group Co., Ltd.; SAFEWAY INC.; Metropolitan Market; TOWN AND COUNTRY FINANCIAL CORPORATION

News Subject: (Business Management (1BU42); Compensation (1CO80); HR & Labor Management (1HR87); Labor Relations (1LA21); Labor Unions (1LA31))

Industry: (Food & Beverage Distribution & Services (1FO39); Retail (1RE82); Supermarkets (1SU04))

Language: EN

Other Indexing: (Fred Meyer; UFCW 367; Albertsons Auburn; QFC; Safeway; Metropolitan Market; Town & Country) (Kyong Barry)

Word Count: 301

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT 31

**News**Room

5/7/24 Supermarket News (No Page)
2024 WLNR 6270698

Supermarket News
Copyright (c) 2024 Penton Media

May 7, 2024

Spokane Kroger, Albertsons workers ratify contract

Mark Hamstra

Grocery workers in Eastern Washington state have ratified a new, three-year contract that includes wage increases and other benefit improvements, and no increases to health care premiums or deductibles.

The contract, which covers workers at Kroger- and Albertsons-owned stores in the Spokane area, was the first to be negotiated by United Food and Commercial Workers 3000, which was formed in 2022 by the merger of UFCW Local 1439 and UFCW Local 21. UFCW Local 3000 now represents 50,000 workers across much of Washington, northeast Oregon, and northern Idaho.

"This is our first union negotiations since we became UFCW 3000, and our combined strength has helped us win a contract with record wages and major contract improvements," the union said in a statement on its website.

The contract covers meat, grocery, and checkout workers at Fred Meyer, Safeway, and Albertsons stores in the area. It includes wage increases of $4 or more for journey positions, and retroactive payment going back to the Jan. 20 contract expiration, the union said. It also includes increases in wage escalators, which trigger pay increases when the minimum wage goes up and when workers move through the apprentice rates.

The contract also includes terms around vacation pay to ensure that workers earn vacation based on hours worked, and automatic pension funding increases that increase in tandem with wage increases.

Also included is money dedicated to fund training and development, and stronger safety language to address key safety issues, the union said.

According to local reports, the union had been seeking large pay increases in the negotiations, which began last November. Workers picketed outside stores in March, claiming that union grocery workers in Western Washington state were paid at a higher scale.

At that time, the retailers were offering pay increases of $2 per hour, the reports said.

Neither the union nor the retailers could be reached for comment.

Meanwhile, UFCW Local 3000 also said a vote on a new contract has been scheduled for May 13 for Safeway meat and grocery department workers in the Cheney, Wash., area, following six months of negotiations. The union bargaining committee will

present a tentative agreement from Safeway, and union members will have the opportunity to discuss the terms of the offer before voting, the union said.

---- Index References ----

Company: ALBERTSONS COMPANIES, INC.

News Subject: (Business Management (1BU42); Compensation (1CO80); HR & Labor Management (1HR87); Labor Relations (1LA21); Minimum Wage (1MI39))

Industry: (Food & Beverage Distribution & Services (1FO39); Retail (1RE82); Supermarkets (1SU04))

Region: (Americas (1AM92); North America (1NO39); U.S. West Region (1WE46); USA (1US73); Washington (1WA44))

Language: EN

Other Indexing: (Spokane Kroger; Albertsons)

Word Count: 370

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 32



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

FAYE IRENE GUENTHER, an individual,

      Plaintiff,

v.                                    No: 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually,
AND OSPREY FIELD CONSULTING, LLC,
a limited liability company,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF

FAYE GUENTHER

TAKEN ON
MONDAY, MAY 13, 2024
9:59 A.M.

DAVIS WRIGHT TREMAINE, LLP
920 FIFTH AVENUE, SUITE 3300
SEATTLE, WASHINGTON  98104

1      A.    I would say -- I would say he does, but I just --

2  you just get -- there are so many people that you see, you

3  know.

4      Q.    All right.  How about state legislators?

5      A.    I avoid Olympia as much as I can.

6      Q.    Okay.

7      A.    But name somebody, and maybe I would know them.

8      Q.    Okay.  Do you have a lobbyist for your local?

9      A.    Yes.

10     Q.    Okay.  I saw your name connected with Bernie

11  Sanders.

12     A.    Yes.

13     Q.    Tell me about that.

14     A.    My guess is it's related to the Kroger hazard pay

15  issue and Kim Cordova, who is the president of 7 and who,

16  yeah, asked if I would be on a letter with her and Bernie

17  Sanders, and I said yes.

18     Q.    Okay.  Have you met Bernie Sanders?

19     A.    Not then, but I met him with a whole bunch of

20  people during the Kroger-Albertsons merger hearing where we

21  went to oppose, and I was in an office with him and a whole

22  bunch of people.

23     Q.    Did you have a press conference together?

24     A.    No.

25     Q.    Now, have you ever run for International office?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1       A.   I put my name in.

2       Q.   **For?**

3       A.   For International office.

4       Q.   **For what office?**

5       A.   I'm not sure if I ever indicated the position, but

6    perhaps I did.

7       Q.   **You can do that?**

8       A.   You can.  You can do that.  And I have recently

9    put my name back in to run.

10      Q.   **For what position?**

11      A.   Presidency.

12      Q.   **So are you currently running for International**

13   **president?**

14      A.   According to the constitution, I am not.

15      Q.   **What does that mean?**

16      A.   I don't know what that means.  That's what I've

17   been told.

18      Q.   **Are you seeking to run for International**

19   **president?**

20      A.   Yes.

21      Q.   **Okay.  And are there filing deadlines?**

22      A.   Those have not been disclosed to me.

23      Q.   **I see.  But once they're disclosed, you intend to**

24   **run.**

25      A.   I'm not sure.

1    Q.    Okay.  But you -- I -- I'm confused.  So you

2   desire to run for International president; is that correct?

3    A.    I desire for there to be new leadership at the

4   International.

5    Q.    Okay.  And you have put your name in to run for

6   International president; is that right?

7    A.    That is correct.

8    Q.    Okay.  And how did you do that?

9    A.    By sending an e-mail to Marc Perrone.

10    Q.    To Marc Perrone.  Did you copy anyone else?

11    A.    I don't know.

12    Q.    Okay.  And when did you send this e-mail to Marc

13   Perrone?

14    A.    Probably -- probably right after the convention,

15   but I'd have to -- I'd have to check.

16    Q.    Okay.  Did you run for International president in

17   '21?

18    A.    I don't think I indicated any position.

19    Q.    Okay.  But you ran for a position.

20    A.    I did.

21    Q.    Okay.  And how did that work?  People would elect

22   you to an undefined position?

23    A.    It's very confusing and complicated.  I don't know

24   how.  I mean, it's very confusing and complicated.

25    Q.    Okay.  Well, with all due respect, you're a

1   lawyer, so why don't you explain to me what you know about

2   it, anyway.

3        A.   What I learned about it is you have to wait for

4   the first slate of people to run so you know what position

5   they hold.  And then after they've all been nominated, you

6   can try to figure out which spot you want to run for.

7        Q.   I see.  And that happened in '21 also?

8        A.   No.

9        Q.   Okay.  What was the process in '21?

10       A.   Are you talking about the International?

11       Q.   The International.

12       A.   Are you talking about 2021 or '20?

13       Q.   2021.

14       A.   No, no, no.  The convention was in 2023.

15       Q.   Okay.

16       A.   Is that what you're talking about?

17       Q.   I heard that you had run for office in 2021 for

18   the International.  Is that not true?

19       A.   No, that's not true.

20       Q.   Okay.  So it's 2023.

21       A.   It's the 2023 convention.

22       Q.   Okay.

23       A.   Yeah.

24       Q.   All right.

25       A.   There's no other way to run.

1      Q.   Okay.  But we're in 2024 now.  So what happened in

2   2023?

3      A.   The convention occurred and what I was describing,

4   which is you have to wait for the 55 people to be nominated.

5   And then if you want to run, you have to figure out what

6   spot they got nominated for and then you have to try to run

7   for that spot.

8      Q.   Okay.  And what happened?

9      A.   I never ran.

10     Q.   Oh, okay.  And did the 55 people get nominated?

11     A.   I believe so, yes.

12     Q.   Okay.  And then what did you do after that?

13     A.   I don't -- what do you mean what did I do?

14     Q.   Well, you said once the 55 people are nominated

15  then you have to decide where you could fit in and where you

16  --

17     A.   I informed them prior to the convention starting

18  that we weren't going to nominate.

19     Q.   Okay.  And who is we?

20     A.   There was a group of us that were running.

21     Q.   Okay.  And were you a slate?

22     A.   We were a slate.

23     Q.   Okay.  And were you the same group that was part

24  of the Reform UFCW movement?

25     A.   I think we called ourselves -- and you may have it

```
 1   in your stuff -- the Meet the Moment slate.

 2        Q.   Meet the Moment slate.

 3        A.   Yeah.

 4        Q.   And tell me about that.  What was the Meet the

 5   Moment slate all about?

 6        A.   It was about a group of people who wanted to see

 7   change at the International.

 8        Q.   And what kind of change did you want to see?

 9        A.   First day strike pay and one member one vote and

10   investment in organizing.

11        Q.   Okay.  And what were your complaints for the

12   current leadership other than not being in favor of those

13   things?

14        A.   Those were the complaints.

15        Q.   Okay.  Did you have any other complaints with

16   them?

17        A.   Do I have any other complaints?  Those are the

18   things that matter the most.

19        Q.   Okay.  All right.  So let's go back to when you

20   were president of Local 21.  At some point, you must have

21   thought it desirable to merge with Local 1439; is that

22   right?

23        A.   Yes.

24        Q.   Okay.  When did you first begin to think there

25   would be benefits to merging with 1439?
```

1    Q.    And he said he would give you his support?

2    A.    He said he'd give me the support if I would agree

3 to transfer the Oregon stores to -- to 555.

4    Q.    Okay.  And why did he ask for that?

5    A.    I don't know.

6    Q.    Did he tell you why?

7    A.    No.

8    Q.    And what did you tell him?

9    A.    I said that that seemed fair.

10    Q.    Okay.  And did you know why 555 was interested in

11 this?

12    A.    I assume it's because they have the meet in the

13 back of the store and because the members were on their

14 health care.

15    Q.    Okay.  All right.  So you said that sounds okay.

16    A.    Mm-hmm.

17    Q.    And then what happened?

18    A.    Then I waited for the letter.  Marc Perrone had

19 given verbal confirmation.  And I met with Aaron Streepy,

20 Eric Renner, myself, and Joe Mizrahi right before.  I think

21 it was before Thanksgiving, so like April 22nd.

22    Q.    November 22nd?

23    A.    I'm sorry.

24    Q.    That's okay.

25    A.    Yeah, November 22nd.

Faye Guenther    May 13, 2024    NDT Assgn # 74689                    Page 80

```
1            MR. DILORENZO:  That's a very polite way of asking
2    for a break.
3            THE REPORTER:  The time is 11:31.  We are off the
4    record.
5            (WHEREUPON, a recess was taken.)
6            THE REPORTER:  We are on the record.  The time is
7    11:42 a.m.
8    BY MR. DILORENZO:
9        Q.   Okay.  We are back from our break.  It's given me
10   a chance to consolidate some of my questions.  So let's talk
11   about the period of time when you had been drafting together
12   the merger agreement but prior to confirmation by your
13   boards.
14       A.   So December -- December 2nd to December 14th?
15       Q.   Yeah, in that time period.  You -- I think you
16   said that you were aware that there were complaints of some
17   sort that had been resolved.
18       A.   I was aware as of December 2nd that there had been
19   -- I'm not sure if I used the word complaints, but there had
20   been an internal conflict that had been resolved.
21       Q.   Okay.  But you didn't know who the parties were.
22       A.   I'm pretty sure I did not know who the parties
23   were.
24       Q.   Okay.  And you did not ask to look at the
25   settlement agreements.
```



Faye Guenther    May 13, 2024    NDT Assgn # 74689                    Page 81

```
 1        A.   I was told they were subject to a nondisclosure

 2   confidentiality agreement, and I -- I did not request them.

 3   I was not the president of 1439 at the time, and I did not

 4   request them.

 5        Q.   Okay.

 6        A.   I -- I believe.  It's possible, but I just -- I

 7   don't think I did.

 8        Q.   So you don't remember asking to look at them.

 9        A.   No.

10        Q.   Okay.  Did you know how many there were?

11        A.   No.

12        Q.   And you didn't know anything about the underlying

13   complaints?

14        A.   No.

15        Q.   Do you know whether Ms. Pedersen was aware of

16   them?

17        A.   Lisa?  Lisa Pedersen?

18        Q.   Yeah.

19        A.   I -- I do not know.

20        Q.   Was Ms. Pedersen made aware of the fact that there

21   were complaints that had been resolved?

22        A.   At -- at the time?

23        Q.   Yeah.

24        A.   Apparently, she did know, but I did not know.

25        Q.   Apparently, she knew?
```

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

1      A.   According to all these documents.

2      Q.   Okay.  But at the time, did you have any reason to

3   suspect that she knew?

4      A.   No.

5      Q.   Okay.  But you are now aware that she knew.

6      A.   Yes.

7      Q.   And do you know whether she actually examined the

8   settlement agreements?

9      A.   She's the attorney for Marc Perrone.  I have no

10  idea what she knows or didn't know or what she was doing.

11  She does not work at my direction.

12     Q.   Okay.  Prior to attaining your confirmation vote

13  by your board, prior to that time, did you talk about the

14  merger with Mr. Crosby?  Excuse me.

15     A.   Did I talk about the merger with Mr. Crosby. I

16  don't -- I don't think so.

17     Q.   Okay.

18     A.   I -- I can't be 100-percent certain, but I -- I

19  don't think so.

20     Q.   Did you discuss these claims and the resolutions

21  that you weren't allowed to look at with Ms. Pedersen prior

22  to --

23     A.   No.

24     Q.   No?

25     A.   No.

1    Q.   Did you inform your board that there were claims

2  outstanding that had been resolved and that were subject to

3  nondisclosure agreements prior to your board voting?

4          MR. MCGUINNESS:  Objection as to form.

5  BY MR. DILORENZO:

6    Q.   Did you -- let me rephrase it.  Did you tell your

7  board that there were resolved claims against Mr. Renner

8  prior to voting?

9    A.   No.

10    Q.   Did you inform your board that there were

11  settlement agreements that contained nondisclosure

12  agreements prior to your board voting?

13    A.   No.

14    Q.   Did you inform your board that one of the

15  conditions of the agreements was that Mr. Streepy was no

16  longer allowed to supervise people?

17          MR. MCGUINNESS:  Objection as to form.  I think

18  you meant Mr. Renner, just for the record.

19          MR. DILORENZO:  I'm sorry.  Excuse me.

20          MR. MCGUINNESS:  Just for the record.

21  BY MR. DILORENZO:

22    Q.   Mr. Renner was not allowed to supervise people.

23    A.   I'm sorry, can you state the --

24    Q.   Did you inform the board that as part of the

25  resolutions of those complaints that Mr. Renner would not be

Faye Guenther    May 13, 2024    NDT Assgn # 74689                    Page 84

1    allowed to supervise people?

2        A.    No.

3        Q.    Why didn't you let them know any of this?

4        A.    Why was it -- I didn't think it was relevant. He

5    wouldn't have been supervising.  I mean, it wasn't -- I

6    didn't think it was relevant.

7        Q.    Okay.  Prior to the board ratifying the merger

8    agreement, did you plan that Mr. Renner would have ongoing

9    employment with the new local?

10       A.    Can you say -- can you say it one more time.

11       Q.    Prior to asking your board to ratify --

12       A.    Yes.

13       Q.    -- did you have plans for Mr. Renner to continue

14   his employment with the new Local 3000?

15       A.    I had asked Eric to stay to help transition the

16   contracts to me.

17       Q.    And for how long was that employment going to

18   last?

19       A.    The conversations were vague, but we did -- we

20   were in the process of negotiating a separate merger

21   commitments document that included his employment.

22       Q.    Okay.  And when was that document completed?

23       A.    I think it was -- there were rough draft forms.  I

24   think we got into some place of completion but never signed

25   in mid-January, early February.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

1    Q.    Okay.  Did you -- were there drafts that you were

2    discussing of that document, that document being the Renner

3    employment document?

4    A.    There was a draft sent to me on -- along with the

5    merger agreement in, I think, December 13th or 14th.

6    Q.    Okay.  And who prepared the draft of the Renner

7    employment agreement?  Where did that come from?

8    A.    That was back and forth between -- between Eric

9    and I.  And I believe Aaron was in some of those

10   conversations or all of them.

11   Q.    Do you know who drafted the agreement?

12   A.    I'm actually not sure who drafted it.

13   Q.    How long -- and I'm still at that period of time

14   before -- right before your board votes to accept the

15   merger.

16   A.    Yes.

17   Q.    Okay.  What did the drafts anticipate Mr. Renner's

18   employment was going to look like?

19   A.    That he would be bargaining all of the former 1439

20   contracts.

21   Q.    For how long?

22   A.    I'm sure you have the document in there.

23   Q.    Yeah.  We'll talk about it.

24   A.    Yeah.

25   Q.    I'm just wondering what you recall.

Faye Guenther    May 13, 2024    NDT Assgn # 74689                                    Page 86

1       A.   I think it was -- I wanted to get through a couple

2  of rotations of bargaining the contracts with him, so

3  probably five to seven years.

4       Q.   **Five to seven years.**

5       A.   Yeah.

6       Q.   **And we'll talk about his salary and all that, but**

7  **was he to become an officer of the new --**

8       A.   No.

9       Q.   **He's an officer today.**

10      A.   No, he's not.

11      Q.   **He's not?**

12      A.   No.  He's not an officer.

13      Q.   **What's his title?**

14      A.   Vice president of such and such.

15      Q.   **Oh, isn't a vice president an officer?**

16      A.   No.  Absolutely not.  The only vice presidents we

17  have are the elected vice presidents of our local.

18      Q.   **Well, then, how is he a vice president?**

19      A.   It's a title.  There's a couple of people who have

20  that title.

21      Q.   **Oh, really?  Does he sign documents as vice**

22  **president?**

23          **MR. MCGUINNESS:**  Objection as to form.

24  **BY MR. DILORENZO:**

25      Q.   **Do you know whether he signs documents?**

1    A.    What documents would he sign?

2    **Q.    Any kind of documents as vice president.**

3    A.    I -- I think the main documents that people sign

4  are contracts, which as soon as I take the contract, I sign

5  the contracts.  Maybe you have something with his signature

6  on it, but I don't know what he'd be signing.

7    **Q.    Why does your local have employees who are -- who**

8  **have the titles vice president when they're not officers?**

9    A.    Is every vice -- I mean, is every vice president

10 of every organization an officer?  I don't know.  Sometimes

11 titles are important when you're working with other people.

12    **Q.    Why was the title important to Mr. Renner?**

13    A.    You'd have to ask him.  I don't know.

14    **Q.    Did he -- was he referred to as a vice president**

15 **right after the merger was approved?  In other words, has he**

16 **had any other title besides vice president?**

17    A.    I don't think so.

18    **Q.    Okay.  All right.  We'll talk more about that**

19 **later.  In your complaint, you are seeking compensatory**

20 **damages.  Do you recall that?**

21    A.    Yes.

22    **Q.    Okay.  Let's look at number three.  I've skipped**

23 **two for now, but.**

24    **THE REPORTER:**  If it works for you moving forward,

25 if you could hand it to me and I'll stick it and then --

NAEGELI
DEPOSITION & TRIAL
*Celebrating 40 Years in Business*
(800)528-3335
NAEGELIUSA.COM

1     A.    I don't know if I looked at them.  And I did not

2  -- and I don't know if I looked at those until this

3  litigation.

4     **Q.    Were they -- were they text messages that predated**

5  **the merger or postdated the merger?**

6     A.    Predated.

7     **Q.    Okay.  Did you talk to Mr. Renner about them?**

8     A.    No.  I don't think I did.

9     **Q.    Why didn't you talk with him about them?**

10     A.    Because it seemed like the conduct was Armando's

11  conduct.

12     **Q.    Okay.  So then how did you become aware of sexual**

13  **harassment allegations against Mr. Renner?**

14     A.    It's possible that -- maybe I should have known

15  earlier, but it's possible that I didn't really understand

16  all of the different allegations until this litigation

17  commenced.

18     **Q.    Okay.  I'm sorry, because I thought you said that**

19  **you became aware of sexual harassment allegations against**

20  **Mr. Renner shortly after the merger.  Did I mishear you?**

21     A.    I -- I -- so December 2nd --

22     **Q.    Right.**

23     A.    -- I asked if there was pending litigation.  I

24  asked if there was -- and there was not and that there -

25         -

1       Q.    Right.

2       A.    -- had been an internal conflict.

3       Q.    Right.

4       A.    And I did not know what all the details of the

5   internal conflict were, and I knew that they were subject to

6   nondisclosure, non -- and confidentiality. And I -- I don't

7   know if I knew -- I don't believe I knew that it was sexual

8   harassment.  I knew that there was a conflict, though.

9       Q.    When did you first become aware that there were

10  sexual harassment allegations against Mr. Renner?

11      A.    So at some point after the merger took place

12  because of behaviors by Armando, I asked to see documents

13  related to Armando.  I am still not sure I was aware that

14  there -- I mean, I saw the text messages, so I assumed, you

15  know.  So that's -- that's what I know, and I'm not quite

16  sure when I became aware of the totality of the situation.

17      Q.    Well, when did you become aware of any part of the

18  situation with respect to Mr. Renner?

19      A.    Well, on December 2nd when I was told that there

20  was an internal -- internal problems that had been resolved.

21      Q.    Right, but did you know that the internal problems

22  involved allegations of sexual harassment?

23      A.    I'm not -- I don't think I did.

24      Q.    Okay.  When did you first know that?

25      A.    In March, I knew that Armando was involved in

1    A.    I don't know.  I don't know why.

2    **Q.    You didn't discuss with these people the**

3 **grievances that were subject to the complaints and the**

4 **resolution of those complaints?**

5    A.    No.  I did talk to Laurel Fish on like December

6 12th or 11th about the merger and if she had questions, and

7 she was supportive.  And then I think the day after the

8 merger she called -- or Joe -- or Aaron and I and was upset

9 that Eric was staying on staff. Maybe it was that, but I'm

10 -- forcing collective bargaining, so that's the CCK.

11    **Q.    Okay.**

12    A.    Labor grievances.

13    **Q.    Yeah.  And we'll ask you about her notes.**

14    A.    Yeah.

15    **Q.    Because she made some notes of that conversation.**

16 **Okay.**

17    A.    I spoke with --

18    **Q.    The last interrogatory is Number 6, and we just**

19 **wanted you to identify all your speaking engagements, media**

20 **appearances, public speaking events between January 2019 and**

21 **the present.  And you augmented some of this with her**

22 **preliminary conversations --**

23    A.    Yeah.

24    **Q.    -- that we talked about.  Other than that, are you**

25 **still making media appearances?**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1      A.   To my great chagrin, yes, I am.

2          Q.   Okay.  And are there any after May 10th, 2023,

3   that you've been engaged in?

4      A.   May 10th, 2023.  So there was the Macy's. There is

5   the Providence strike, and I -- I did a press conference for

6   that.  I -- I don't know if I did anything formal with --

7   with the Macy's strike, but it's possible.

8          Q.   These are all about labor issues?

9      A.   Yes.

10         Q.   This whole -- this entire list?

11     A.   Do you want me to go one by one?

12         Q.   No, you don't need to do that, just -- first of

13  all, I just want to make sure that these are all accurate

14  and that they are about labor issues in general.

15     A.   I don't know why David -- Dave Schmitz's memorial

16  is on there.  I was -- I was -- that was not a public event,

17  but.

18         Q.   Okay.

19     A.   The safety summit was not a public event.  I don't

20  know if that -- I don't know if that matters, but it wasn't.

21  I'm sorry, what was your question again?

22         Q.   Are those accurate?

23     A.   Yes.

24         Q.   And are they generally about labor issues?

25     A.   Yes.

1    Q.   Okay.  Do you speak publicly about other issues

2    besides labor issues?

3    A.   I don't believe so.

4         MR. DILORENZO:  Okay.  All right.  Let's go off

5    the record for just a second.

6         THE REPORTER:  Please stand by.

7         MR. DILORENZO:  Are you all hungry?

8         THE REPORTER:  We are off the record at 12:58.

9         (WHEREUPON, a recess was taken.)

10         THE REPORTER:  We are back on the record.  The

11   time is 1:37 p.m.

12         MR. DILORENZO:  Welcome back after our brief lunch

13   break.  Let's talk about Exhibit Number 4.  I am going to

14   hand this to the court reporter, and I brought you all your

15   copies.

16   BY MR. DILORENZO:

17    Q.   Ms. Guenther, I am not going to ask you to read

18   the whole thing, but just -- this is your motion to dismiss

19   under Rule 41(a)(2).  Maybe you could glance at the table of

20   contents.  Are you generally familiar with this?

21    A.   Yes, I'm generally --

22    Q.   Okay.

23    A.   -- familiar with this.

24    Q.   If I could call your attention to page two of that

25   document.  Up at line one, your lawyers say, "Plaintiff --

1    litigation have been substantially accomplished." Are those

2    two statements that were made by your lawyers on April 4 of

3    this year correct or incorrect?

4         A.   My personal goal was to find out who did this, and

5    I do not know the answer to that.  Substantially, now that I

6    have the jurisdiction of the Oregon stores, I -- and because

7    of the cost and because of the cease and desists and because

8    Dan Clay was all -- you know, everybody was told that he was

9    dishonest, I will agree with the word substantially.

10        Q.   Okay.  So your answer is these statements are

11   true; is that correct?

12        A.   They're substantially true.

13        Q.   All right.  That's substantially a satisfactory

14   answer.

15        A.   I still -- yeah.  We can go back --

16             MR. MCGUINNESS:  That isn't a question.

17             MR. DILORENZO:  It's not a question.

18   BY MR. DILORENZO:

19        Q.   Let's take a look at Exhibit 5.

20        A.   Are you done with this?

21        Q.   I am, yeah.  There you go.  Exhibit 5 is an e-

22   mail from Eric Renner to Aaron Streepy, September 13, 2021.

23   Have you seen this document before?

24        A.   I have not seen this cover letter, but I believe

25   during Laurel -- that the depositions that I was at that I

1    saw this -- this letter that was attached.

2        Q.    Okay.  And by this letter, you mean the August 23,

3    2021, letter?

4        A.    Yes.

5        Q.    Okay.  Did you read the whole document?

6        A.    Yes.

7        Q.    Okay.  Had you seen this -- had you seen the

8    August 23 document prior to the deposition of Ms. Fish and

9    -- and the others?

10        A.    I don't believe so.

11        Q.    Okay.  What did you think when you read this

12    letter?

13        A.    I could understand why Laurel was frustrated.

14        Q.    Do you want some time to --

15        A.    No.  I mean, I'll read it if you're going to ask

16    me a question about --

17        Q.    No, I'm not going to --

18        A.    -- this specific --

19        Q.    I'm not going to -- I mean, I presume you're

20    generally familiar with it.

21        A.    Yes.

22        Q.    So you sat in on Ms. Fish's deposition and Mr.

23    Garcia's deposition.

24        A.    Yes.

25        Q.    Do you believe them?

NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

Faye Guenther    May 13, 2024    NDT Assgn #74689                    Page 140

1      A.   I have empathy for them.  And I understand why --

2    I have empathy for them, but I am not sure that I completely

3    believe everything that they said.

4      **Q.   Well, do you believe any of what they said?**

5      A.   I do.

6      **Q.   What things that they said about Mr. Renner do you**

7    **believe?**

8      A.   I believe that Armando and Adam and Eric were

9    sending inappropriate text messages.

10     **Q.   Okay.  Anything else?**

11     A.   Let me read this and --

12     **Q.   Sure.**

13     A.   -- I can tell you which things --

14     **Q.   Sure.**

15     A.   -- I believe.

16     **Q.   Sure.**

17     A.   I believe that they believed that they were

18   committed to the work.  I -- I think Adam did help organize

19   those workers, and I believe that Laurel Fish contributed to

20   that.

21          I don't know anything about Katie.  I don't know

22   anything about funding.  I don't know if these statements

23   are true or not true.  I don't know if, "Like as long as I

24   have something to say about it, no one will be president," I

25   don't -- I don't know if he said that. I don't know what he

1    told Adam to do.

2            Yeah, it seems like people are frustrated, but I

3    don't know which of these things are true and which of these

4    things are not true, so.

5        Q.   Okay.  So you don't know which of these statements

6    are true and which of these statements are untrue, by and

7    large, right?

8        A.   No.

9        Q.   You do know that these complainants who are listed

10    here made the statements, right?  These are their

11    statements.  Do you have any reason to believe that they're

12    lying?

13        A.   I don't know beyond -- I don't know many of them,

14    and the two that I know I've only talked to once or twice in

15    my life.  I -- I can't speculate as to what -- whether they

16    are telling the truth or not.

17        Q.   Okay.  Well, you listened in on the deposition of

18    Fish and Jackson about these various matters, and Garcia, I

19    think.  Was there anything that -- in their statements that

20    led you to believe that they were lying?

21        A.   The truth is elusive sometimes in the eye of the

22    beholder.  I have empathy for these folks.  I think they

23    believe these things.  And I saw the text messages between

24    Eric, Adam, and Armando, and I think that those were bad.  I

25    think those --

```
1    A.    Yes.

2    Q.    Right.  And if you could take a look at paragraph

3    three on the union merger agreement, it says that the

4    officers of the newly-merged union will include Todd Crosby

5    and Denise Jagielo.

6    A.    Yes.

7    Q.    So this is an instance in which the president of

8    the union merging in remains an officer of the newly- merged

9    union; is that right?

10   A.    That's correct.

11   Q.    Okay.  Now, I think I heard you say, and please

12   correct me if I'm wrong, when I was asking you why Mr.

13   Renner was not going to be an officer of the newly-merged

14   union, you said, well, it's rare that the officers of the

15   union that is being acquired stay on as officers.

16   A.    It is rare.

17   Q.    Why was Denise Jagielo going to join your board

18   and become an officer?

19   A.    I'd have to go back in time.  Many of the

20   conversations between Denise and Todd I was not privy to.

21   Q.    Ah.  Okay.  So Exhibit 7, that's an e-mail from

22   you to Eric Renner forwarding something that Jim McGuinness

23   has sent you.  And was Jim McGuinness your lawyer at the

24   time?

25   A.    No.
```

1    Q.   Who was Jim McGuinness representing when he sent
2    this to you on October 21, 2021?
3        A.   Jim McGuinness is in-house counsel for 367, I
4    believe.
5            MR. MCGUINNESS:   Are you talking about now or are
6    you talking about back then?
7            MR. DILORENZO:   Then.  Then.  Yeah.
8            THE DEPONENT:   What date?  I -- I don't know when
9    Jim became in-house counsel for 367.
10   BY MR. DILORENZO:
11       Q.   Well, it -- it looked like he was associated with
12   -- it was called McGuinness Streepy.
13       A.   Yes.
14       Q.   Right.  So did you ask him to send you a sample?
15       A.   Yes.
16       Q.   And then he sent you a sample.  So he's
17   representing you; is that right?
18       A.   No.  Jim McGuinness is not representing me.
19           MR. MCGUINNESS:   When you say "you," are you - -
20   you're really talking about the local?
21   BY MR. DILORENZO:
22       Q.   Was he representing Local 21?  That's what I
23   meant.
24       A.   Jim McGuinness worked for Local 21, and then - - I
25   don't know if he was retired, but -- and then went - - my

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

```
 1   This is number ten.  And unfortunately, there are no page

 2   numbers on these.  So we'll count out pages as we get to

 3   them.  These are double sided, right?

 4                 (WHEREUPON, Exhibit 10 was marked for

 5   identification.)

 6   BY MR. DILORENZO:

 7        Q.    Can you tell me basically what this document is?

 8        A.    This appears to be text messages between Eric and

 9   I.

10        Q.    Okay.  And you're in blue, is that right?  Your

11   comments?

12        A.    I believe so.  Will you be asking me questions

13   about these?

14        Q.    Yeah, I'm going to ask you about some particular

15   ones.  But generally yours is in blue?

16        A.    I believe so.  Yes.

17        Q.    And his is --

18        A.    I'm going to need a minute to read these.

19        Q.    Sure.  And you don't need to read them all because

20   I'm going to ask you about some of them.  But if you want to

21   read others around them for context, you're certainly

22   welcome to.  Just ask me to stop for a minute.

23              The very first one, December 29th.  Mr. Renner

24   says, "Faye, while it is on my mind, we need to sign the

25   merger document.  Maria has my electronic signature.  I am
```

1  resigned any position from 1439?

2      A.   Why -- why would he do that?

3      Q.   **Well, his contract says he has to.**

4      A.   That's not what this says.

5      Q.   **It says Renner shall resign his position with UFCW**

6  **1439 effective April 1.**

7      A.   His position as president.

8      Q.   **It says "his position."  So --**

9      A.   Okay.  I don't know what to tell you.

10     Q.   **So my question for you is:  Do you have -- do you**

11 **know whether Mr. Renner ever resigned from any position at**

12 **1439?**

13     A.   He's not the president of 1439, so he is -- must

14 have -- he resigned that position.

15     Q.   **Okay.  We have yet to receive anything from our**

16 **request for production looking like a resignation letter or**

17 **anything to that effect.**

18     A.   Why would he resign?  Why would there be a

19 resignation letter?

20     Q.   **All right.  I'll take that as your answer.**

21     A.   I don't know what -- how else to -- do you want to

22 rephrase the question, and I'll try to answer it, but --

23                .

24     Q.   **Well, I'm wondering whether there has been any**

25 **failure of consideration with respect to this agreement.**

```
 1              MR. MCGUINNESS:  Objection as to the form; calls

 2   for legal conclusion.

 3              MR. DILORENZO:  It wasn't really a question

 4   anyway.

 5              MR. MCGUINNESS:  A comment?

 6              MR. DILORENZO:  A comment, you know.

 7         All right.  Let's go back to where we were.

 8              THE DEPONENT:  Are you going to keep asking me

 9   questions about this?

10              MR. DILORENZO:  Yeah, in a little bit.

11              MR. MCGUINNESS:  Hold on to it.

12   BY MR. DILORENZO:

13       Q.    All right.  So on April 21, Mr. Renner is now

14   working for 3000.  Is that right?

15       A.    Yes.

16       Q.    Okay.  What's his capacity now?

17       A.    What do you mean?

18       Q.    In what capacity is he working for 3000?

19       A.    He's predominantly bargaining contracts.

20       Q.    Okay.  Does he have a title?

21       A.    I think you read the title to me.

22       Q.    Okay.  But, as of this date, he's vice president?

23       A.    Yes.

24       Q.    Okay.  Two more pages.  There's an -- there's an

25   exchange dated April 22, 2022.  And down below in the blue
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

 1   say, "Also Dan Clay has filed a complaint against me and has

 2   asked for my removal from office.  So game time.  I can read

 3   you letter."

 4            And then a little further down, Renner says, "I

 5   will call Al over the weekend to see if we can speed up

 6   getting the evidence."  What -- what further evidence did

 7   you need at this point?  Hadn't you already identified Mr.

 8   Emmons?

 9       A.   Yes, but I think we were -- we believed Emmons,

10   Selvaggio and Dan Clay, and others, were involved in this.

11       Q.   Okay.  So what was your plan?

12       A.   To try to figure out who all was involved in it.

13   And Dan Clay was still denying his involvement.

14       Q.   And why was all this necessary?

15       A.   You'd have to ask them why it was necessary.

16       Q.   No, no, no.  Why was it so necessary for you to

17   know all this?

18       A.   Because they were attacking me and defaming me.

19   And I didn't know to what end they were going to go to.

20       Q.   Well, you know that Dan Clay filed a complaint

21   against you.  What -- what -- what was Emmons and Selvaggio

22   doing at this point?  As far as you know.

23       A.   Who knows?

24       Q.   You don't know?

25       A.   No.

Faye Guenther   May 13, 2024   NDT Assgn #74689                    Page 204

```
 1        Q.    Okay.  So then on April 23, in response to Mr.
 2   Renner saying, "To hell with him, we are going to prove who
 3   did this," you say, "Absolutely.  And in some ways this
 4   brings it right to the surface.  On Monday, we will get
 5   together with Aaron and Jim and decide what to do.  This may
 6   be when you and I get an attorney and sue Dan and 555
 7   personally if we can link to Dan.  I also think because he
 8   is threatening my job, he has a new set of problems."
 9        A.    I don't know where you're at.
10        Q.    The big bubble.
11        A.    Got it.
12        Q.    Why didn't you sue Mr. Clay and 555 then?
13        A.    I did not have -- I had Dan denying it.  I had
14   Selvaggio denying it.  I'm sure there's a letter in there
15   that talks about this.  And the constitution requires that
16   you have to go through an internal process when it's member
17   to member.
18        Q.    When what's member to member?
19        A.    When there's conflict that's member to member
20   before litigation.  So, at this point, I didn't have enough.
21   I wasn't sure.  And I -- I'm still not sure.
22        Q.    So you can sue a member's employee without going
23   through that process, but not a member?
24        A.    You can't do -- I can't -- no UFCW member can do
25   anything to any other UFCW member without first completing
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1                          CERTIFICATE

 2

 3        I, the undersigned Valerie Barna, am a videographer

 4   on behalf of NAEGELI Deposition & Trial. I do hereby

 5   certify that I have accurately made the video recording

 6   of the deposition of Faye Guenther, in the above

 7   captioned matter on the 13th day of May, 2024 taken

 8   at the location of Davis Wright Tremaine LLP, 920 5th

 9   Avenue, Suite 3300, Seattle, Washington, 98107.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20                        Valerie Barna

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3        I, Kacey Hall, do hereby certify that I

 4   reported all proceedings adduced in the foregoing matter

 5   and that the foregoing transcript pages constitutes a

 6   full, true and accurate record of said proceedings to the

 7   best of my ability.

 8

 9        I further certify that I am neither related to

10   counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   17th day of May, 2024.

15

16

17

18   _____

19        Kacey Hall

20

21

22

23

24

25
```

# EXHIBIT 33

4:57



**Sarah Cherin**    now
**To you, Joe Mizrahi & Bobby Whelan**
Where did she get it filled

Agreed I just saw it and sent email asking if this was pre mature

Also Dan Clay has filed a complaint against me and asked for my removal from office. So game time

I can read you letter....

Thank you, wow.... He is not very smart.

My cell died

So I will text Dan and ask him to hold until building committee meets

Thanks!

I will call Al over the weekend to see if we can speed up getting the evidence.

Ok and I need to read letter to you. I will send. Dan trying to go on offense before we get final evidence.

Got it. Time to go to battle! You have already proved to be a better negotiator!

I just texted letter on my other phone

It was sent to all VP board members I believe

+



4:57

ER

Eric

I just texted letter on my other phone

It was sent to all VP board members I believe

Read it, well with the new technology we may very well get the license plate number from the escape. All depends on how things go with POI Emmons. Appears he is getting desperate. Looks like Dan's paranoia of what's to come is getting the better of him. Keep kicking ass Faye, to hell with him. We are going to prove who did this!

Apr 23, 2022 at 8:14 AM

Absolutely. And in some ways this brings it right to the surface. On Monday we will get together with Aaron and Jim and decide what to do. This may be when you and I get an attorney and sue Dan and 555 personally if we can link to Dan. I also think because he is threatening my job he has a new set of problems.

Apr 23, 2022 at 9:47 AM

For sure! Like you said, we will run circles around him and outwork him. He picked the wrong fight!

Yes he did

I just got off phone with Jim and Aaron

# EXHIBIT 34

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

FAYE IRENE GUENTHER, an
individual,

       Plaintiff,

vs.                                    NO. 2:22-cv-00272-TOR

JOSEPH H. EMMONS,
individually, AND OSPREY
FIELD CONSULTING, LLC, a
limited liability company

       Defendants.
_____





**(800) 528 - 3335**
**NAEGELIUSA.COM**

*Nationwide*

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**REMOTE DEPOSITIONS**

**TRIAL PRESENTATION**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**



**VOLUME**

**VIDEOTAPED DEPOSITION OF**

**FAYE GUENTHER**

**TAKEN ON**
**THURSDAY, JUNE 6, 2024**
**10:08 A.M.**

**920 FIFTH AVENUE**
**SEATTLE, WASHINGTON 98104**

1    talked about that.

2         A.    I don't have 18.

3         Q.    Right.  18 is something we talked about last time.

4    I'm going to show you what's already in the record as 18,

5    and I'm just going to ask you one question about it.

6            MS. FAIRCHILD:  I have a copy here, if you want

7    another copy.

8         Q.    Here's 18 in the record, and I think I asked you

9    whether you were aware of the terms of the Confidential

10   General Release and Complaint Settlement Agreement that Mr.

11   Renner was a party to.

12            (Reporter requests clarification.)

13            MR. DILORENZO:  I don't think I said either.  I

14   probably didn't pronounce my words very well.  Complaint.

15   Confidential General Release and Complaint Settlement

16   Agreement.

17        Q.    Now, my recollection, and you correct me if I'm

18   wrong, is that you were aware of this agreement, but not the

19   particular terms; is that correct?

20        A.    That is correct.

21        Q.    Okay.  And were you aware of the existence of this

22   agreement prior to the merger of 1439 and 21?

23        A.    On December 2-ish, so around the beginning --

24   whenever we got formal approval from Marc Perrone.

25        Q.    That was in December, I believe?



1    A.    December 2, I believe.  You have it in here so we

2  can double-check.  But it's around that very beginning part.

3         I think I was verbally told that there were

4  nondisclosure confidential agreements, a global settlement

5  that everybody had signed off on, that the union had signed

6  off on, that resolved a dispute.

7         But I did not -- I do not believe I ever saw any

8  of these until February-ish of 2020 -- no, not -- April-ish

9  of 2022.

10   Q.    Okay.  And why did you see them in April of 2022?

11   A.    Well, I already talked to you about that.

12         Do you want me to repeat it?

13   Q.    Well, just to bring us up to speed, because I'm

14  going to have -- I'm not going to -- I don't want to cover

15  all of the --

16   A.    Yeah, it's in the deposition.  I can restate it,

17  or you can just --

18   Q.    Well, if you can just summarize it for us?

19   A.    I think the main thing, and I don't want to --

20  I'll try to say it word for word, but I don't have a

21  photographic memory.

22         But when we talked last time in my deposition,

23  Armando, there had been people -- I don't know if it's

24  complaining or -- Armando was saying some off-color things

25  that made me wonder what kind of person he was.  So I asked

 1    to see the -- what the dispute was about.

 2         Q.   I see.  Okay.

 3              And you are aware, at least now, that this

 4    agreement was executed by all the parties around October of

 5    2021?  Are those the dates?

 6         A.   Yes.  I mean, I can see it right there.

 7         Q.   Okay.  That will help us keep this in perspective

 8    as we take a look at Number 19.  And please don't be -- I'll

 9    put this back.

10              Whoops!  I'm sorry.

11              (Pause in the proceedings for a liquid spill

12    cleanup.)

13         Q.   Don't be put off by the size of this, because I'm

14    not going to ask you about the whole thing.  I'm just going

15    to ask you about a few pages.

16              This is Exhibit 19.  And Exhibit 19 was also

17    provided by the local, and it appears to be your

18    conversations with Mr. Renner on his phone that ends with

19    9637.

20              Does that appear to be what this is?  I don't need

21    you to read the whole thing, certainly, but I just want to

22    know basically what this is.

23         A.   (Witness peruses document.)

24         Q.   Do the "Sends" appear to be yours and the

25    "Receiveds" appear to be Mr. Renner?

1  spelled M-i-c-h-e-a-u.

2          It says, "Hi, Faye and Maria.  See attached 1439

3  merger side commitments."

4          And then the next page references those as Eric

5  Renner Employment Agreement with UFCW Local 21 and

6  successors.

7      A.   Yes.

8      Q.   Why was this a side commitment?

9      A.   I already discussed this in our first

10  conversation, that the international didn't want -- they

11  just wanted to use their boilerplate language for the merger

12  agreement.

13      Q.   Right.  And so the side commitment --

14      A.   And this is not the final -- I don't -- I keep

15  seeing this.  It is not -- This is a rough draft.

16      Q.   Okay.  But was the purpose to provide employment

17  to Mr. Renner?

18      A.   I don't understand your question.

19      Q.   Well, the front page calls this a merger side

20  commitment.  And what's attached is Eric Renner Employment

21  Agreement, UFCW Local 21 and successors.

22          So was it your understanding that this is a draft

23  of what was supposed to be in the merger agreement, that

24  then got relegated to a side agreement?

25      A.   Yes.

```
 1        Q.    Does she still run -- I think it was a consortium
 2   of --
 3        A.    I have no idea.
 4        Q.    -- labor organizations?
 5        A.    I don't know.
 6        Q.    So you haven't kept track of her?
 7        A.    No.
 8              MR. DILORENZO:  All right.  Let's take a look at
 9   Number 24.  I'm going to change course for a second.
10              Well you know what?  Before we do that, we're
11   going to -- let's take a very quick break now.  Let's go
12   ahead and print that, because then we're going to move on to
13   Mr. Gonzalez and to two others.
14              THE VIDEOGRAPHER:  Please stand by.  We are off
15   the record at 11:14 a.m.
16              (Break in the proceedings.)
17              (Exhibit 65 marked for identification.)
18              THE VIDEOGRAPHER:  We are back on the record.  The
19   time is 11:30 a.m.
20              MR. DILORENZO:  Okay.  Thank you.  We're back on
21   the record.  I've just found what we believe is an
22   employment agreement, which we have marked as Exhibit 65.
23        Q.    And, Ms. Guenther, I think you noted that there is
24   no signed employment agreement with Mr. Renner and Local
25   3000, but you believe that you, by email, agreed to the
```

1    terms of something.  And I'm asking you to take a look at

2    this and see whether this is what, in fact, you agreed to.

3         A.    (Witness peruses document.)

4              I believe so.

5         Q.    Okay.  And when was this agreed to?

6         A.    I probably responded post-merger to this.

7         Q.    Okay.  This was originally set up for Eric Renner

8    to sign on behalf of Local 1439, for you to sign on behalf

9    of Local 21?

10        A.    That looks accurate.

11        Q.    Right.  Is there any reason why you postponed

12   signing this until after the merger?

13        A.    I was focused on the merger agreement and the

14   forward votes.  And then when Emmons, Selvaggio, Dan Clay,

15   Isai, and others decided to distribute flyers throughout the

16   jurisdiction, I was dealing with that.

17              And so this, to me, was -- the content of this was

18   -- I was waiting until I could focus on it.  I wasn't going

19   to sign something I didn't have time to focus on.

20        Q.    Okay.  How long after the merger did it take for

21   you to agree to the terms of this agreement?

22        A.    I don't know when I responded.  I don't know.

23   August of 2022, probably.  I don't know.  Sometime after

24   March 1, 2022.

25        Q.    All right.  So if you can take a look at this

```
 1                          CERTIFICATE

 2

 3        I, the undersigned Valerie Barna, am a videographer

 4   on behalf of NAEGELI Deposition & Trial. I do hereby

 5   certify that I have accurately made the video recording

 6   of the deposition of Faye I. Guenther, in the above

 7   captioned matter on the 6th day of June, 2024 taken

 8   at the location of 920 5th Avenue, Suite 3300, Seattle,

 9   WA 98104.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20             Valerie Barna

21

22

23

24

25
```

1                          C E R T I F I C A T E

2       STATE OF WASHINGTON )
                            ) ss.
3       COUNTY OF KING      )

4

5           I, the undersigned Washington Certified Court
        Reporter, hereby certify that the foregoing deposition
6       upon oral examination of the witness named herein was
        taken stenographically before me and transcribed under
7       my direction;

8           That pursuant to RCW 5.28.10, the witness, before
        examination, was first duly sworn by me to testify
9       truthfully; that the transcript of the deposition is a
        full, true, and correct transcript, to the best of my
10      ability;
        That I am neither attorney for nor a relative or employee
11      of any of the parties to the action or any attorney or
        counsel by the parties hereto nor financially interested
12      in its outcome.

13          IN WITNESS WHEREOF, I have hereunto set my hand
        this 20th day of June 2024.
14

15

16

17                  _Patricia A. Blevins_ (signature)

18      _____
                  Patricia A. Blevins
19      Certified Court Reporter No. 2484

20

21

22

23

24

25

# EXHIBIT 35

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

FAYE IRENE GUENTHER, an
individual,

       Plaintiff,

vs.                         NO. 2:22-cv-00272-TOR

JOSEPH H. EMMONS,
individually, AND OSPREY
FIELD CONSULTING, LLC, a
limited liability company

       Defendants.
_____



**NAEGELI**
DEPOSITION & TRIAL

**(800) 528 - 3335**
**NAEGELIUSA.COM**

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



*Powerful*
LITIGATION SUPPORT

**VIDEOTAPED DEPOSITION OF**

**AARON M. STREEPY**


**TAKEN ON**
**THURSDAY, JUNE 6, 2024**
**2:20 P.M.**


**920 FIFTH AVENUE**
**SEATTLE, WASHINGTON 98104**

```
 1        A.    No.

 2        Q.    Faye Guenther?

 3        A.    Yes.

 4        Q.    Now, when you say yes to Faye Guenther, is this

 5  case the first time you have represented Faye Guenther

 6  personally, or have you represented her personally before?

 7              And I should say I'm distinguishing between her

 8  role as an officer of a client versus being a client.

 9        A.    Outside of her role as an officer, I believe this

10  is the only time I've represented her.

11        Q.    Personally?

12        A.    Personally.

13        Q.    Okay.  Eric Renner?

14        A.    Outside of his role as an officer, I've never

15  represented him.

16        Q.    Okay.  This is very helpful for me.  Thank you.

17              Marc Perrone?

18        A.    I've never represented Marc Perrone.

19        Q.    Lisa Pedersen?

20        A.    No.

21        Q.    Laurel Fish?

22        A.    No.

23        Q.    Katie Dugger?

24        A.    No.

25        Q.    Adam Jackson?
```

```
 1              MR. IGLITZIN:  The document speaks for itself.
 2    It's a letter that purports to be written by some people, to
 3    some other people.
 4         Q.   All right.  Do you regard this as a complaint?
 5              MR. IGLITZIN:  I'm going to object on work
 6    product, his personal impressions.  If he's serving in the
 7    capacity as attorney for UFCW 1439, which is my
 8    understanding, everything he thought about this letter, all
 9    the advice he gave 1439 about this letter, is not
10    appropriate for this deposition.
11              MR. DILORENZO:  All right.
12         Q.   Let me come at this another way.
13              When did you first become aware of this letter?
14         A.   I don't know exactly, but -- So this is where I
15    have a general idea based on my representation of Ms.
16    Guenther in this litigation, but I don't have a personal
17    recollection of exactly when I first became aware of this.
18         Q.   Okay.  Well, let me show you another exhibit.
19    Maybe that will help you.
20              This one is dated August 23, 2021, and it is a
21    letter to UFCW 1439 executive board members and UFCW
22    International Union leadership from a variety of people.
23    There's Exhibit 8.
24              This purports to be a letter dated September 16,
25    2021, from Marc Perrone, International President, regarding
```



1    the September 13, 2021, letter -- or I'm sorry -- regarding

2    the August 23, 2021, letter.

3                Have you -- Were you furnished a copy of this

4    sometime around the date -- the time it's dated?

5                MR. IGLITZIN:  Hang on before you answer.  I just

6    want to think about that.

7                I guess if you remember now, sitting here, if you

8    were furnished a copy of this letter on or about September

9    16, 2021, you can answer that question.

10       A.   I believe I was furnished a copy of the letter

11   close in time to the date of Exhibit 8.

12       Q.   Okay.  And Mr. Perrone informs, in the second

13   paragraph -- informs the complainant that, "It is my

14   understanding that Local 1439 agrees and is retaining

15   outside legal counsel to conduct an independent

16   investigation into the allegations raised."

17                Do you see that?

18       A.   I see it.

19       Q.   Yep.  Were you retained as independent legal

20   counsel to conduct the independent investigation referenced

21   in this letter?

22       A.   Yes.

23       Q.   Okay.

24       A.   I assume.  I don't know for sure what Marc Perrone

25   is referencing, but I believe so.

1    Q.    Okay.  Who was your client?

2    A.    UFCW Local 1439.

3    Q.    Okay.  And to whom were you to report?

4    A.    Secretary-treasurer Jeff Hofstader and inhouse

5    counsel Scott Habenicht.

6    Q.    Okay.  And the investigation was focused on which

7    individual?

8          MR. IGLITZIN:  I'm going to object to that on work

9    product.  You can ask him who he talked to and who talked to

10   him and what was communicated, not his conception of the

11   investigation, what its purpose was, anything like that,

12   which I assume is all attorney-client privilege.

13   Q.    Okay.  Was Mr. Renner the president of Local 1439

14   at the time?

15   A.    Yes.

16   Q.    And why were you to report to the secretary-

17   treasurer as opposed to the president?

18         MR. IGLITZIN:  I would direct you not to answer

19   that.  That's all attorney-client privileged communication.

20   Q.    Was Mr. Renner the subject of any complaints?

21         MR. IGLITZIN:  Same objection.  The document

22   speaks for itself.  What we're here to do is talk about your

23   investigation.

24   Q.    All right.  When were you retained to conduct the

25   investigation?



1      A.    Shortly -- Sometime around mid-September.  I don't

2  know if it was the date on this letter September 13, 2021,

3  from my memory, but sometime around there.

4      Q.    Okay.  **Were you to respond to what was alleged in**

5  **the letter?**

6           MR. IGLITZIN:  I'm going to object. That's

7  attorney-client privileged communication.

8           MR. DILORENZO:  Well, I'm just trying to determine

9  what the role of the investigation was to be.

10          MR. IGLITZIN:  I understand that's what you're

11 trying to determine, but you're not going to get it from

12 this witness talking about his communications with his

13 client.  And specifically, the role is what the client asked

14 him to do, and what the client asked him to do is attorney-

15 client privileged.

16          MR. DILORENZO:  All right.  Fair enough.

17     Q.    **During the course of your investigation, you spoke**

18 **with a number of persons; is that correct?**

19     A.    Yes.

20     Q.    **And if I can turn your attention to page 5 of**

21 **Exhibit 7.  The Exhibit 7.  There you go.**

22     A.    Thank you.

23     Q.    **Did you speak with Mr. Jackson as a part of your**

24 **investigation?**

25     A.    Yes.

```
 1        A.    I don't believe I said that.  I mean, let's take a
 2   look at the email.  I'd remember saying something like that.
 3        Q.    Did you advise him that you were not his counsel?
 4        A.    I did advise him of that.
 5        Q.    Okay.  Did he retain counsel?
 6        A.    He did.
 7        Q.    Who was his counsel?
 8        A.    SoNni Lemonidis.
 9        Q.    Okay.  And that's a woman?
10        A.    It is.
11        Q.    Okay.  Was Ms. Lemonidis present during your
12   discussions with Mr. Renner?
13        A.    She was.
14        Q.    And how long were those discussions?
15        A.    The primary discussion was, I'd guess, about a
16   half a day, maybe a little shorter, but maybe a little
17   longer.  Yeah, it's been a while.  It was a while.
18        Q.    Was Mr. Renner aware of the August 23, 2021,
19   letter?
20        A.    So, I mean, I believe so.
21        Q.    Why do you believe so?
22        A.    Because he was copied on the email on September
23   13, when it was sent out to people, I believe.
24        Q.    Did the August 23, 2021, letter come up in your
25   discussion with Mr. Renner and his counsel?
```



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1    A.    I don't know if the letter itself did.  And I

2    think my email would -- whatever email I sent to him about

3    what we were going to talk to him about I think would give

4    an indication of the topics.

5         I don't know if, like, I'm going to talk to you

6    about the letter.  I don't know if I said that or not.  I

7    can't remember.

8    Q.    Okay.  Did he address some of the allegations that

9    are made in this letter?

10   A.    Yes.

11   Q.    And do you recall generally what his response was?

12   A.    Generally, yes.

13   Q.    Okay.  And generally, what was his response?

14   A.    I think it depended on the allegation.

15   Q.    Okay.  Did he acknowledge some of the allegations?

16   A.    Depends on what you mean by "acknowledge."  I

17   think some of the -- what you told me was that some of the

18   allegations had a negative truth that was being twisted

19   into, you know, a way that it was not originally intended.

20   Q.    Okay.  How about the allegations of road rage and

21   him waving a gun at someone; did you discuss that allegation

22   with him?

23   A.    I can't -- At this point, I can't remember for

24   sure whether I did or not.

25   Q.    All right.  Let's go look at your notes.  Maybe

NAEGELI
DEPOSITION & TRIAL

(800)528-3345
NAEGELIUSA.COM

```
 1                            CERTIFICATE

 2

 3          I, the undersigned Valerie Barna, am a videographer

 4     on behalf of NAEGELI Deposition & Trial. I do hereby

 5     certify that I have accurately made the video recording

 6     of the deposition of Aaron M. Streepy, in the above

 7     captioned matter on the 6th day of June, 2024 taken

 8     at the location of 920 5th Avenue, Suite 3300, Seattle,

 9     WA 98104.

10

11          No alterations, additions, or deletions were made

12     thereto.

13

14          I further certify that I am not related to any of

15     these parties in the matter and I have no financial

16     interest in the outcome of this matter.

17

18

19     _____

20                Valerie Barna

21

22

23

24

25
```

1                          C E R T I F I C A T E

2
        STATE OF WASHINGTON )
3                           ) ss.
        COUNTY OF KING      )

4

5           I, the undersigned Washington Certified Court
        Reporter, hereby certify that the foregoing deposition
6       upon oral examination of the witness named herein was
        taken stenographically before me and transcribed under
7       my direction;

8           That pursuant to RCW 5.28.10, the witness, before
        examination, was first duly sworn by me to testify
9       truthfully; that the transcript of the deposition is a
        full, true, and correct transcript, to the best of my
10      ability;
        That I am neither attorney for nor a relative or employee
11      of any of the parties to the action or any attorney or
        counsel by the parties hereto nor financially interested
12      in its outcome.

13          IN WITNESS WHEREOF, I have hereunto set my hand
14      this 20th day of June 2024.

15

16

17

18      _____
               Patricia A. Blevins
19      Certified Court Reporter No. 2484

20

21

22

23

24

25

# EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

FAY IRENE GUENTHER, an individual,

      Plaintiff,

vs.               Civil Action No. 2:22-cv-00272-TOR

JOSEPH H. EMMONS, individually, and OSPREY
FIELD CONSULTING LLC, a limited liability co.,

      Defendants.

_____



(800) 528 - 3335
NAEGELIUSA.COM



COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

**VIDEOTAPED DEPOSITION OF**

**ADAM JACKSON**

**TAKEN ON**
**MONDAY, MARCH 11, 2024**
**9:12 A.M.**

**25 SOUTH ALTAMONT STREET**
**SPOKANE, WASHINGTON 99202**

1    A.    No, I don't know anything about him.

2        Q.    Okay.  How did the members who talked to you about

3    the flyer respond to it?

4        A.    Just confused more than anything.  I mean, I don't

5    think they knew what it was and -- but because there was a

6    vote coming up, you know, if there's a -- I can't remember

7    if they're already -- they already announced the merger was

8    coming.  I'm not sure as to the date of this, but they were

9    -- they were just confused on it, and so they were asking me

10   about it, and I said, look, I -- I don't know anything about

11   it. It's nothing, you know, we did or our Local put out and

12   so I just reported it to Scott.

13       Q.    Okay.  And is it your recollection that this was

14   shortly after you had signed your agreements?

15       A.    It must have been.  I'm going to say yes.  I don't

16   -- I just don't remember.  I'm sorry.  I think it was,

17   though.

18       Q.    Okay.  Let's look at this --

19       A.    Yeah.  Because I was helping out on the Fred Meyer

20   campaign towards the end of the year, so yeah, it had to

21   have been in October, November, I'm assuming.

22       Q.    Okay.  Let's look at the statement about Mr.

23   Renner.  Is that a picture of Mr. Renner?

24       A.    Yes.

25       Q.    Okay.  Now, this is talking about Faye Guenther.

CERTIFICATE

I, the undersigned Greg Salina, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Adam Jackson in the above captioned matter on the 11th day of March, 2024, taken at the location of 25 S Altamont St, Spokane, WA 99202.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

_____
                    Greg Salina

```
 1                        CERTIFICATE

 2

 3        I, Stephanie Moore, do hereby certify that I

 4   reported all proceedings adduced in the foregoing matter

 5   and that the foregoing transcript pages constitutes a

 6   full, true and accurate record of said proceedings to the

 7   best of my ability.

 8

 9        I further certify that I am neither related to

10   counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   26th day of March, 2024.

15

16

17

18   _____

19                   Stephanie Moore

20

21

22

23

24

25
```